IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JARYL ELLIS, MICHAEL HUNTER, TIFFANY JOHNSON, PAUL ZEIGER, and AARON DELANEY, | ) ) ) | 8:10CV3222 |
| | ) | |
| Plaintiffs, | ) | MEMORANDUM |
| | ) | AND ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT P. HOUSTON, Director of Nebraska Department of Correctional Services, DENNIS BAKEWELL, Warden of Nebraska State Penitentiary, CATHY SHEAIR, Associate Warden of Nebraska State Penitentiary, JOSEPH STALEY, Associate Warden of Nebraska State Penitentiary, BARRY LOOCK, KEVIN STONER, CHAD MILES, CHAD HANEY, SEAN RUNGE, and TIMOTHY FURBY, all in their individual capacities and official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This is a discrimination case brought pursuant to 42 U.S.C. § 1983 by five African American employees of the Nebraska Department of Correctional Services ("DCS"), all of whom were assigned to work the first shift at the Nebraska State Penitentiary ("NSP"). (Amended complaint (filing 37), ¶ 1) Three plaintiffs (Jaryl Ellis, Tiffany Johnson, and Aaron Delaney) are correction officers; one plaintiff (Paul Zeiger) holds the rank of corporal; and one plaintiff (Michael Hunter) is a caseworker. (Id., ¶¶ 3-7) All claim to have experienced a hostile work environment and to have received disparate treatment because of their race, in violation of 42 U.S.C. § 1981

and their right to equal protection under the Fourteenth Amendment to the United States Constitution.[1] (*Id.*, ¶¶ 2, 21, 26, 59-60, 62) They also claim to have been retaliated against for reporting workplace harassment and filing suit, in violation of § 1981 and the equal protection clause. (*Id.*, ¶ 55) Named as defendants, in their official and individual capacities, are the DSC director (Robert Houston), the NPS warden (Dennis Bakewell), two associate wardens (Carthy Sheair and Joseph Staley), one major (Barry Loock), four lieutenants (Kevin Stoner, Chad Miles, Chad Haney, and Sean Runge), and one sergeant (Timothy Furby). (*Id.*, ¶¶ 9-19)

The defendants have filed motions for summary judgment. (Filings 98, 109)[2] The plaintiffs, in responding to the motions, have "stipulate[d] to the dismissal of Defendants Sheair and Staley." (Filing 123 at 1) Because I find there is not sufficient evidence to support any of the plaintiffs' claims against any of the defendants, the motions for summary judgment will be granted and the plaintiffs' action will be dismissed with prejudice.

## I. BACKGROUND

### A. Plaintiffs' Allegations

This action was commenced on November 17, 2010, but the operative pleading is an amended complaint filed on May 4, 2011, wherein Delaney joined the action as

---

[1] Claims based on the Equal Protection Clause and brought under § 1983 are, for all practical purposes, identical to claims based on § 1981. *See Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (citing *General Building Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389-91 (1982) (the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause)).

[2] Filing 98 was filed by Defendants Houston, Bakewell, Sheair, Staley, Loock, Stoner, Haney, Runge, and Furby, all of whom are represented by the Nebraska Attorney General. Filing 109 was filed by Defendant Miles, who is represented by private counsel.

a plaintiff and Loock, Stoner, Miles, Runge, and Furby were named as additional defendants.[3]  In the amended complaint the plaintiffs allege that:

24. . . . Over the last year,[4] it became common practice for a significant number of the non-African American [NSP] staff to make comments in the presence of the first shift Plaintiffs to the effect of: "Looks like the back of the bus is here;" "Smells like fried chicken;" "The gang has arrived;" "The 'hood has arrived;" "If the lights went out, all you would see were white teeth;" and other racially charged comments . . . . At various times Defendants Miles, Runge, Stoner, Furby, and Haney have been present for and/or joined in the comments.

25. Once the NSP employees pass through the turnkey entrance, a sergeant is regularly stationed nearby handling a drug-sniffing canine. As non-African American employees would walk by, the canine-handler would usually stand back and let them pass without incident.  When certain of the Plaintiffs walked through, however, the canine-handler would usually move forward or position himself as to have the canine drug-sniff the Plaintiffs.[5]

26. . . . [T]he Plaintiffs were told that they should not fraternize with the African-American inmates or spend too much time together with each other on duty because "it looks bad." . . .  In addition, the Plaintiffs are routinely singled out for additional duties at NSP that non-African American employees are not called upon to perform as often. When Plaintiffs have raised concerns about the disparate treatment

---

[3] The amended complaint also added another plaintiff, Michael Jackson, but he withdrew from the action in September 2011.  In addition, the plaintiffs dismissed DCS Deputy Director Frank Hopkins as a defendant when they filed the amended complaint.

[4] The phrase "[o]ver the last year" also appeared in the original complaint.  The evidence in this case, as reflected in the parties' statements of material facts, generally fails to indicate when specific incidents of alleged racial discrimination occurred.

[5] The evidence does not show that any of the defendants were involved in or had knowledge of any incidents with the canine handler.

they have endured they have been labeled by co-workers and supervisors as 'lazy' or 'sandbaggers.'"

27. . . . NSP staff have used the word "nigger" and "niggers" in referencing inmates, as well as the term "black mother fuckers." When observing African American inmate behavior, the Plaintiffs have been asked by non-African American staff: "Why do you blacks act that way?"[6]

28. In the summer of 2010, an NSP corporal stated to one of the Plaintiffs that he "hates how blacks act" and that if all blacks could be lined up he "would shoot them all." The corporal professed to be a member of a white supremacist group. When these comments were reported by one of the Plaintiffs to Defendant Furby, the Plaintiff was told to "Stay away from him; he's a racist."

29. When Plaintiffs advised their co-workers and supervisors, including the Defendants, that such terms and comments were inappropriate, they were told that they were "throwing out the black card" or were being "old school militant."[7]

30. In August 2010, the Plaintiffs, following the chain of command, verbally reported their concerns to Defendants Furby and Stoner. . . . No investigation was undertaken by NSP management, including the Defendants, even though they knew or should have known of the racially hostile work environment that existed at NSP and were supposed to follow written policies requiring the reporting and investigation of workplace harassment.

31. In early September 2010, the Plaintiffs put their their [sic] complaints into an Incident Report and submitted them to Defendant Loock. Again, weeks passed and the Plaintiffs received no response from Defendant Loock.

---

[6] The plaintiff have not presented evidence to support these allegations.

[7] The plaintiffs have not presented evidence to support this allegation.

. . .

41. . . . [I]n October, 2010, Defendant Associate Warden Cathy Sheair undertook an inquiry into the complaints of the Plaintiffs. Despite the [NSP anti-harassment] policy's assurance of confidentiality, word immediately began circulating among NSP staff, as well as the inmate population, that the Plaintiffs had complained of a racially hostile environment.

42[-44]. After Plaintiffs' complaints became generally known, two of the Plaintiffs' vehicles were vandalized while parked in the NSP parking lot[,] . . . one of the Plaintiffs was told by a non-African American NSP officer that "the problem around here" is that "hotheads stir up trouble" and "they" (meaning the plaintiffs) had better "watch their backs[,]" . . . [and] one of the Plaintiffs was told by a non-African American officer that when he (the Plaintiff) went out into the yard, he had "better pair up because you never know what might happen in the yard."

. . .

47. When Plaintiffs reported these comments in late October 2010 to Defendant Sheair and Defendant Bakewell, the Defendants responded that they would have an outside law enforcement agency investigate the matter. . . . [The outside investigator] advised the Plaintiffs that the comments did not rise to the level of an illegal threat.

48. In late October 2010 Plaintiffs Ellis, Hunter, Johnson, and Zeiger were summoned to meet with Defendants Bakewell, Sheair, and Staley. . . . Plaintiffs were informed at the outset of the meeting by Defendant Bakewell that this was the first he had heard of any racial problems at NSP. . . . Defendant Bakewell was dismissive of the Plaintiffs' racial concerns and he advised the Plaintiffs that he was going to split them up and transfer them out of NSP to different NDCS facilities. . . .

. . .

51. On November 10, 2010 Plaintiffs Ellis, Hunter, Johnson, and Zeiger were summoned to central office for a meeting with Defendants Houston, Bakewell, and Sheair about their complaints of a racially hostile working environment. Plaintiffs were shocked and degraded when they were made to wait in a room that had a picture featuring an African-American man stooped over picking crops. . . .

52. During the November 10, 2010 meeting with Defendants Houston, Bakewell, and Sheair, Plaintiffs advised the Defendants of their good faith concern that they were receiving extra scrutiny. Defendant Houston said he agreed and "that's going to happen' when one complains about co-workers." . . . [8]

53. During the November 10, 2010 meeting, Plaintiffs advised Defendants Houston, Bakewell, and Sheair that they were concerned about the lack of confidentiality of the investigation (in violation of A.R. [Administrative Regulation] 112). Defendants advised the Plaintiffs that they (the Defendants) were powerless to prevent breaches of confidence in the investigation process.

. . .

55. Since the filing of the lawsuit, the . . . plaintiffs have been under continuing scrutiny by white co-workers and white supervisors. Plaintiffs have received numerous written warnings that adversely affect their employment at NSP and put them in jeopardy of being disciplined for petty infractions that white employees routinely commit.   For example:

    a. On January 5, 2011 Plaintiff Johnson was written up by Defendant Stoner for notifying NSP at 6:02 a.m. that she would not be to work at 7:20 a.m. when regulations require a 2 hour advance call-in notice;[9]

---

[8] The plaintiffs have not presented evidence to support this allegation.

[9] Plaintiff Johnson has not presented evidence to support this allegation.

b. On March 24, 2011, Plaintiff Ellis was written up by a white supervisor for letting an African-American inmate get a haircut in the barbershop when the inmate's name did not appear on the pass list;[10]

c. On March 25, 2011 Plaintiff Hunter was accused by a white co-worker of "shadow boxing" with an unidentified "black" inmate. Despite Hunter's denials that such an incident occurred, he was written up by his white supervisor[;]

d. On March 26, 2011 Plaintiff Michael Hunter was written up by Defendant Runge for leaving the institution without "pre-approval" from his supervisor;

e. On March 31, 2011 Plaintiff Jaryl Ellis was written up by Defendant Stoner for being two minutes late to his post at metal detector when returning from lunch.[11]

(Filing 37 at 6-14)

### B. Defendant's Evidence; Uncontoverted Facts

In accordance with the requirements of our local rules, the defendants' briefs filed in support of their motions for summary judgment each contain a statement of material facts, with appropriate references to the pleadings, affidavits, and other filed evidentiary materials. *See* NECivR 56.1(a). Throughout the statements, however, the defendants comment upon the lack of certain evidence. For example, they state that "[t]here is no evidence that any Plaintiff other than Ellis made a report of workplace harassment to any DCS official at any time prior to September 4, 2010." (Filing 99 at 10, ¶ 40; filing 110 at 7, ¶ 40) These assessments by the defendants regarding a lack of evidence do not constitute "properly referenced material facts" which "will be

---

[10] Plaintiff Ellis has not presented evidence to support this allegation.

[11] Plaintiff Ellis has not presented evidence to support this allegation.

-7-

deemed admitted unless controverted by the opposing party's response." NECivR 56.1(b)(1). In all other respects, the defendants' statements are uncontroverted and will be deemed admitted by the plaintiffs.[12] Thus, there is no genuine dispute that:

1. DCS fulfills those functions of the government of the State of Nebraska relating to the custody, study, care, discipline, training, and treatment of persons in correctional and detention institutions. Neb. Rev. Stat. § 83-922 (Reissue 2008).

2. DCS has over 2,000 employees. (Ex. 12 [Affidavit of Defendant Houston (filing 100-12)], ¶ 7)

3. DCS currently operates ten correctional institutions. (Ex. 12, ¶ 8) These are located in Omaha, Lincoln, Tecumseh, York and McCook. (Ex. 12, ¶ 8) Over 4,000 inmates are confined in these institutions. (Ex. 12, ¶ 8)

4. These institutions operate 24-hours a day, seven days a week. (Ex. 12, ¶ 8) There are three shifts. (Ex. 12, ¶ 8) In most institutions, first shift is from 6:00 a.m. to 2:00 p.m., second shift is from 2:00 p.m. to 10:00 p.m., and third shift is from 10:00 p.m. to 6:00 a.m. (Ex. 12, ¶ 8) DCS also has employees assigned to a day shift. (Ex. 12, ¶ 8)

5. NSP is one of the ten DCS correctional facilities. (Ex. 12, ¶ 9) NSP is located in Lincoln, Nebraska. (Ex. 12, ¶ 9) NSP's population averages over 1,000 inmates every year. (Ex. 12, ¶ 9) NSP averages over 450 staff members every year. (Ex. 12, ¶ 9) NSP houses exclusively male inmates. (Ex. 12, ¶ 9) The inmate population at the NSP consists primarily of inmates ranging in age from 21 and above who are serving sentences of varying length. (Ex. 12, ¶ 9) There are three security levels for inmates housed at NSP: maximum, medium and minimum custody. (Ex. 12, ¶ 9)

---

[12] For the most part, Defendant Miles' statement of facts merely replicates the previously filed statement of the other defendants. Defendant Miles' statement omits several paragraphs, however, and includes some additional facts regarding his own actions.

6. DCS operates a Staff Training Academy located in Lincoln, Nebraska. (Ex. 12, ¶ 10) The DCS Staff Training Academy is responsible for training all new DCS employees. (Ex. 12, ¶ 10) Newly hired DCS employees must complete training at the DCS Staff Training Academy prior to their assignment to one of the DCS correctional facilities. (Ex. 12, ¶ 10) These classes are called pre-service training. (Ex. 12, ¶ 10) During pre-service training, new DCS employees are required to take classes that are designed to prepare them to work in a correctional environment by giving them the basic knowledge, skills, and attitudes necessary to assume their responsibilities. (Ex. 12, ¶ 10)

7. At all times relevant, the pre-service training program required newly hired DCS employees to take courses designed to educate them regarding DCS rules and regulations on discrimination and workplace harassment. (Ex. 12, ¶ 11) These courses examine some of the historical aspects of discrimination and harassment in the United States, give legal as well as ethical reasons for prohibiting discrimination and harassment, and outline the DCS policies and practices for handling discrimination and harassment issues. (Ex. 12, ¶ 11) These courses are designed to encourage and promote a positive and productive work environment by sensitizing all DCS employees to the effects of discrimination and harassment practices. (Ex. 12, ¶ 11)

8. During pre-service training, the newly hired DCS employees receive training on discipline and employee grievance procedures. (Ex. 12, ¶ 12)

9. DCS has a Central Office in Lincoln, Nebraska that provides administrative services for the various facilities operated by DCS and the functions assigned to DCS by statute. (Ex. 12, ¶ 6) DCS Central Office promulgates DCS policies and procedures—called Administrative Regulations (hereinafter "AR"). (Ex. 12, ¶¶ 6, 13, 32-34) Among other things, newly hired DCS employees are provided copies of the ARs regarding workplace harassment and code of ethics. (Ex. 12, ¶ 13)

10. At all times relevant, the DCS Staff Training Academy provided annual training for all DCS employees. (Ex. 12, ¶ 14) This training is called in-service training. (Ex. 12, ¶ 14) Every DCS employee

is required to meet annual training requirements. (Ex. 12, ¶ 14) There are mandatory classes that all employees must take to meet the annual in-service training requirements. (Ex. 12, ¶ 14) The in-service training is updated at the beginning of each year based on an annual needs survey, student evaluations and current correctional trends. (Ex. 12, ¶ 14) Classes on discrimination and workplace harassment have been included in the in-service training. (Ex. 12, ¶ 14)

11. Correction officers, correction corporals, correction sergeants and correction lieutenants are included in the DCS custody division. (Ex. 12, ¶ 15) At NSP, correction officer is the entry level position in the custody division. (Ex. 12, ¶ 15) Correction corporal is the next highest rank after correction officer at NSP. (Ex. 12, ¶ 15)

12. The Department's unit staff division includes unit caseworkers assigned to housing units. (Ex. 12, ¶ 16) In the department's institutions, unit caseworker is the entry level position in the unit staff division. (Ex. 12, ¶ 16)

13. At all times relevant, there was a labor contract between the State of Nebraska and the Nebraska Association of Public Employees / American Federation of State, County and Municipal Employees (hereinafter "NAPE/AFSCME"). (Ex. 12, ¶¶ 17, 35, 36) The State of Nebraska and NAPE/AFSCME labor contract (hereinafter "labor contract") covers correction officers, correction corporals, correction sergeants and unit caseworkers employed by DCS. (Ex. 12, ¶ 17)

14. The labor contract requires corporal boards be held at least two times each year. (Ex. 12, ¶ 18) Corporal boards can be held more frequently than two times a year if needed to fill vacancies. (Ex. 12, ¶ 18) If a correction officer wants to promote to a correction corporal position, the correction officer must apply to the promotions board. (Ex. 12, ¶ 18) In smaller institutions where entry level security staff's responsibilities are more diverse, the rank of corporal is the entry level security staff position. (Ex. 12, ¶ 18)

15. Correction officers and correction corporals are usually assigned to one of the three shifts with two consecutive days off. (Ex. 12,

¶ 19) A few correction officers and correction corporals are assigned to day shift. (Ex. 12, ¶ 19)

16. Correction officers have several essential job duties and responsibilities. (Ex. 12, ¶ 20)

17. Most unit caseworkers are assigned to first or second shift and have two consecutive days off each week. (Ex. 12, ¶ 21) A few unit caseworkers are assigned to the day shift. (Ex. 12, ¶ 21)

18. Unit caseworkers have several essential job duties and responsibilities. (Ex. 12, ¶ 22)

19. Discipline of correction officers, correction corporals, correction sergeant and unit caseworkers is governed by the labor contract. (Ex. 12, ¶¶ 23, 35, 36) The labor contract establishes the reasons an employee can be disciplined, the disciplines that can be imposed, and the minimal procedures that must be followed. (Ex. 12, ¶¶ 23, 35, 36, Houston affidavit, Ex. "D" [(filing 100-12 at 53)] and "E" [(filing 100-12 at 57)]) The labor contract requires that after a correction officer, correction corporal, correction sergeant or unit caseworker completes original probation and becomes a permanent employee, there must be just cause for discipline and the discipline must be progressive. (Ex. 12, ¶¶ 23, 35, 36, Houston affidavit, Ex. "D" and "E")

20. DCS has promulgated AR 112.06 - Employee Discipline to supplement the labor contract. (Ex. 12, ¶¶ 23, 32-34, Houston affidavit, Ex. "A" [(filing 100-12 at 12)], "B" [(filing 100-12 at 22)] and "C" [(filing 100-12 at 43)])

21. [Plaintiffs] Ellis, Johnson, Zeiger, and Delaney became permanent employees when they completed their original probation. (Ex. 12, ¶ 24)

22. [Plaintiff] Hunter has been and continues to be a permanent employee of DCS since his employment was reinstated on or about August 8, 2006. (Ex. 12, ¶ 25)

23. As permanent employees, Plaintiffs are guaranteed due process under the labor contract and the applicable law prior to being disciplined. (Ex. 12, ¶ 26)

24. Discipline for a permanent DCS employee whose employment is subject to the provisions of the labor contract includes a written warning, disciplinary probation, suspension without pay, demotion, reduction in salary within salary grade or termination of employment. (Ex. 12, ¶¶ 27, 32-34, Houston affidavit, Ex. "A", "B" and "C")

25. Disciplinary action for permanent employees of DCS is imposed solely by [Defendant] Houston as DCS Director, with the exception that a Warden or Program Administrator may impose a written warning or disciplinary probation of six (6) months or less, as well as extensions of disciplinary probation in certain circumstances. (Ex. 12, ¶¶ 28, 32-34, Houston affidavit, Ex. "A", "B" and "C")

26. Supervisor's Counseling Logs are not discipline under the labor contract. (Ex. 12, ¶ 29) As part of their job duties, supervisors counsel DCS employees to make them aware of needed improvement. (Ex. 12, ¶ 29) A Supervisor's Counseling Log is merely documentation of such counseling. (Ex. 12, ¶ 29) Supervisor's Counseling Logs are not intended to be documented disciplinary action and do not become part of an employee's personnel file. (Ex. 12, ¶ 29)

27. Incident Reports are not discipline under the labor contract. (Ex. 12, ¶ 30) The purpose of Incident Reports is to document institutional matters, including, but not limited to, inmate behavior, staff compliance with standards and procedures, and inform staff of department activities and incidents. (Ex. 12, ¶ 30) Incident Reports are routine narrative reports that can be used for many reasons throughout the institutional workday to include incidents of harassment and discrimination. (Ex. 12, ¶ 30)

28. The issuance of a Statement of Charges is not discipline. (Ex. 12, ¶ 31) The Statement of Charges is issued to an employee to notify the employee of the allegations against the employee that might result in

discipline. (Ex. 12, ¶ 31) The issuance of a Statement of Charges does not mean an employee will be disciplined. (Ex. 12, ¶ 31)

<u>August 2010 Verbal Report of Workplace Harassment</u>[13]

29. On August 7, 2010, [Plaintiff] Ellis was in the NSP lieutenant's office being issued a Supervisor's Counseling Log – possibly for being late to work. (Ex. 6 [Deposition of Defendant Furby (filing <u>100-6</u>)], 43:11-21)

30. While being issued the Supervisor's Counseling Log, [Plaintiff] Ellis made a verbal allegation of workplace harassment based on race to [Defendants] Furby and Runge, to wit: "I just let them know there was a lot of racial tension going on [at NSP]" and "things being said at roll call." (Ex. 1 [Deposition of Defendant Ellis (filing <u>100-1</u>)], 143:9-14)

31. [Plaintiff] Ellis reported the names of at least six different NSP employees whom he believed had engaged in workplace harassment to [Defendants] Furby and Runge. (Ex. 1, 144:24-145:4)[14]

32. [Plaintiff] Ellis did not report any Defendant herein for workplace harassment on August 7, 2010. (Filing No. 37, ¶¶ 9-14, 16-18; Ex. 1, 143:22-144:1, 145:1-11; Ex. 6, 42:11-45:14; deposition of Furby, Ex. 2 [(filing <u>100-6</u> at 14)], p. 1, Ex. 3 [(filing <u>100-6</u> at 18)], p. 6; Ex. 7 [Deposition of Defendant Runge (filing <u>100-7</u>)], 33:15-24, 48:14-49:5; deposition of Runge, Ex. 2 [(filing <u>100-7</u> at 17), pp. 1-3)

33. [Plaintiff] Ellis did not report any of the specific comments which were later alleged in the Amended Complaint on August 7, 2010.

---

[13] See paragraph 30 of the amended complaint.

[14] According to a November 18, 2010 report prepared by Defendant Sheair regarding her investigation into the plaintiffs' complaints of workplace harassment, Ellis stated that he heard racial comments 12-18 months earlier while working on second shift, and he only provided the names of two individuals, Sgt. Gerdes and Cpl. Thavenet. (Affidavit of Defendant Sheair, Ex. "A" (filing <u>100-13</u> at 5-6))

(Filing No. 37, ¶ 24; Ex. 1, 143:22- 144:1, 145:1-11; Ex. 6, 42:11-45:14; deposition of Furby, Ex. 2, p. 1, Ex. 3, p. 6; Ex. 7, 33:15-24, 48:14-49:5, deposition of Runge, Ex. 2, pp. 1-3)

34. [Defendants] Furby and Runge repeatedly requested [Plaintiff] Ellis complete the appropriate documentation to file a report of workplace harassment pursuant to DCS AR 112.07. (Ex. 6, 44:8-10; deposition of Furby, Ex. 2, Ex. 3, pp. 15-20; Ex. 7, 36:2-5; deposition of Runge, Ex. 2, pp. 1-2)

35. [Plaintiff] Ellis did not want to put his verbal complaint of workplace harassment in writing. (Ex. 1, 144:8-12; deposition of Furby, Ex. 2; Ex. 7, 35:23-36:1; deposition of Runge, Ex. 2, pp. 1-2)

36. [Plaintiff] Ellis requested that [Defendants] Furby and Runge refrain from reporting or documenting his workplace harassment complaint. (Ex. 6, 44:18-21, Ex. 6, Ex. 2, Ex. 7, 35:17-36:5, Ex. 7, Ex. 2, pp. 1-2)

37. As requested, [Defendants] Furby and Runge did not document or report [Plaintiff] Ellis' verbal complaint of workplace harassment as required under AR 112.07. (Ex. 6, 44:8-21; deposition of Furby exhibits Ex. 2; Ex. 7, 35:17-36:5, 41:13-21; deposition of Runge, Ex. 2, pp. 1-2)

38. On January 11, 2011, [Defendant] Furby received six months disciplinary probation for failing to report [Plaintiff] Ellis' verbal report of workplace harassment as required under AR 112.07. (Ex. 6, 56:1-25; deposition of Furby, Ex. 3, p. 1-2)

39. On January 11, 2011, [Defendant] Runge received six months disciplinary probation for failing to report [Plaintiff] Ellis' verbal report of workplace harassment as required under AR 112.07. (Ex. 7, 167:18-169:7; deposition of Runge, Ex. 3 [(filing 100-7 at 14)], p. 2)

. . .

-14-

September 2010 Written Report of Workplace Harassment[15]

41. On September 3, 2010, [Plaintiff] Ellis wrote a four page Incident Report (hereinafter "September 2010 Incident Report") with the input of [Plaintiffs] Hunter, Johnson, and Zeiger. (Ex. 1, 145:21-146:10, 147:2-3) The purpose of the September 2010 Incident Report was to inform the reader of [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger's perception of racial tension at NSP. (Ex. 1, 145:21-146:10, 147:2-3; deposition of Johnson, Ex. 1 [(filing 100-3 at 92)])

42. The September 2010 Incident Report was addressed "To Whom It May Concern" and stated it was submitted by the "African American staff at NSP." (Deposition of Johnson, Ex. 1) [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger did not sign nor mention themselves anywhere in the September 2010 Incident Report. *Id.* The September 2010 Incident Report contains no specific accusation of workplace harassment as to any Defendant herein, provides no specifics as to time, date, or place of any alleged workplace harassment, and provides no specifics as to the comments allegedly made in the Amended Complaint. (Filing No. 37, ¶¶ 9-14, 16-18, 24; *Id.*)

43. [Plaintiff] Ellis states that he and [Plaintiff] Hunter submitted the September 2010 Incident Report on September 4, 2010. (Ex. 1, 146:6-7)

44. On September 7, 2010, [Defendant] Bakewell received a telephone call from Jerall Moreland (hereinafter "Moreland") of the State of Nebraska Ombudsman's Office. (Ex. 8 [Deposition of Defendant Bakewell (filing 100-8)], 36:19, 90:8-19) Moreland asked Bakewell if he was aware of any issues of racial discrimination at NSP. (Ex. 8, 36:16-17) Bakewell asked several members of NSP executive staff if they were aware of any such issues. (Ex. 8, 90:17-21) The executive staff told Bakewell they were not aware of any such issues. (Ex. 8, 90:21) Bakewell told Moreland that neither he nor any member of the NSP executive staff he spoke to at the time were aware of such issues. (Ex. 8, 90:24-91:3)

---

[15] See paragraph 31 of the amended complaint.

45. [Defendant] Bakewell and Moreland made arrangements to meet on September 9, 2010, to discuss the report Moreland received of racial discrimination at NSP. (Ex. 8, 91:7-10)

46. On September 9, 2010, Moreland met with [Defendants] Bakewell and Staley. (Ex. 8, 91:10-14; Ex. 13 [Affidavit of Defendant Sheair (filing 100-13)], Ex. "A", Attach. No. 19 [(filing 100-13 at 46)]) Moreland brought the September 2010 Incident Report to this meeting. (Ex. 8, 175:20-24) Bakewell asked Moreland for a copy of the September 2010 Incident Report. (Ex. 8, 176:6-8) Staley made a copy of Moreland's September 2010 Incident Report. (Ex. 8, 176:6-8) This was the first time any Defendant herein had ever seen the September 2010 Incident Report. (Ex. 8, 93:1-4)

47. Moreland told [Defendant] Bakewell that he had been told that the September 2010 Incident Report had previously been submitted to [Defendant] Loock. (Ex. 8, 91:23-24) [Defendants] Bakewell and Staley called [Defendant] Loock to the September 9 meeting. (Ex. 8, 91:24-92:5; Ex. 9 [Deposition of Defendant Loock (filing 100-9)], 36:17-19) Loock told Bakewell, Staley, and Moreland that he had not received the September 2010 Incident Report. (Ex. 8, 92:3-5) The first time Loock ever saw the September 2010 Incident Report was when Moreland handed it to him at this meeting. (Ex. 9, 36:23-24)

48. On September 2 to September 7, 2010, [Defendant] Loock was on vacation. (Ex. 9, 35:14-19) On September 8, 2010, Loock returned to work at NSP. (Ex. 9, 35:17-19)

49. On September 10, 2010, Captain Rich Brittenham (hereinafter "Brittenham") arrived at work at approximately 5:30 a.m. (Ex. 9, 39:13-14; Ex. 10 [Deposition of Richard Brittenham (filing 100-10)], 11:14-23, deposition of Brittenham, Ex. 1 [(filing 100-10 at 6)]) After receiving the Major's paperwork from the master control staff, Brittenham unlocked the locked incident report box on turnkey floor to retrieve the paperwork and in that paperwork there was a sealed envelope that read "open immediately". (Ex. 9, 39:15-22; Ex. 10, 11:14-23; *Id.*) Brittenham then took the paperwork to [Defendant] Loock's office and

opened the envelope, which contained the September 2010 Incident Report. (Ex. 9, 39:23-25; Ex. 10, 11:14-23, *Id.*)

50. Brittenham came into work before [Defendant] Loock that day. (Ex. 9, 40:1-8) In this timeframe, either Loock or Brittenham, whomever arrived first, picked up the materials from the Major's box, took the materials to the Major's office, and began work on the paperwork. (Ex. 9, 40:9-11)

51. Once [Defendant] Loock became aware that the September 2010 Incident Report was received by Brittenham on September 10, Loock immediately notified [Defendant] Bakewell. (Ex. 9, 43:1-4) By this time, Loock knew that Bakewell had received the September 2010 Incident Report the previous day and that Bakewell had ordered an investigation into its contents. (Ex. 9, 43:5-7)

## Investigation of Written Report of Workplace Harassment[16]

52. On September 23, 2010, [Defendant] Sheair was assigned to conduct the investigation into the allegations contained in the September 2010 Incident Report. (Ex. 13, Ex. "A", Attach. No. 52 [(filing 100-13 at 99)])

53. [Defendant] Sheair kept her investigation strictly confidential. (Ex. 13, ¶ 7) During the course of her investigation, Sheair advised all individuals whom she interviewed not to discuss her investigation with other NSP staff. (Ex. 13, ¶ 7)

54. On October 4, 2010, [Defendant] Sheair met with [Plaintiff] Ellis as part of her investigation. (Ex. 13, ¶ 8) Ellis reported to Sheair that [Defendant] Miles said "it smells like fried chicken in here" on one occasion at roll call and would also say things like "here comes the soul train" and "the bus was late." (Ex. 13, ¶ 8)

[54a. (Miles' statement ¶ 56)]. Although [Defendant] Miles does not recall saying "it smells like fried chicken in here," roll call does take

---

[16] See paragraph 41 of the amended complaint.

place in the staff dining room. (Ex. 3 [Deposition of Defendant Plaintiff Johnson (filing 100-3)], 19:2-3)(Ex. 14 [Affidavit of Defendant Miles (filing 111-1)], ¶¶ 6,9)

[54b.  (Miles' statement ¶ 58)]. [Defendant] Miles does not recall ever saying "here comes the soul train" or "the bus was late" at any time or in any context during roll call. (Ex. 14, ¶ 9)

55. On October 6, 2010, [Defendant] Sheair met with [Plaintiff] Zeiger as part of her investigation. (Ex. 13, ¶ 9) Zeiger reported to Sheair that [Defendant] Miles said "it smells like fried chicken" when he, [Plaintiff] Ellis, [Plaintiff] Hunter and [Plaintiff] Johnson would walk in for roll call. (Ex. 13, ¶ 9) Zeiger also reported that [Defendant] Runge said "the bus has arrived." (Ex. 13, ¶ 9)

56. On October 7, 2010, [Defendant] Sheair met with [Plaintiff] Hunter as part of her investigation. (Ex. 13, ¶ 10) Hunter reported to Sheair that he heard comments like "there's the hood" and "there's the homeboys" and a comment about the way [Plaintiff] Johnson wears her hair. (Ex. 13, ¶ 10) Hunter did not report who specifically made these comments. (Ex. 13, ¶ 10) Hunter did report that [Defendant] Miles said "the bus was late." (Ex. 13, ¶ 10)

57. On October 7, 2010, [Defendant] Sheair met with [Plaintiff] Johnson as part of her investigation. (Ex. 13, ¶ 11) Johnson reported to Sheair that she heard staff say "here comes the hood," "smells like fried chicken," and "there goes the posse." (Ex. 13, ¶ 11) Johnson did not report who specifically made these comments with the exception that Johnson reported that [Defendant] Miles made the comments "smells like fried chicken" and "here comes the hood." (Ex. 13, ¶ 11) Johnson reported that Miles had also made comments about the way she wore her hair like "this ain't no hair show" or "this isn't the hood." (Ex. 13, ¶ 11)

[57a. (Miles' statement ¶ 68)]. [Defendant] Miles does not recall making any of the statements alleged by [Plaintiff] Johnson, but admits that they had discussed her various hairstyles on numerous occasions. (Ex. 14, ¶ 10)

58. On October 20, 2010, [Defendant] Sheair met with [Defendant] Runge as part of her investigation. (Ex. 13, ¶ 12) Runge reported to Sheair that he heard the comment "the bus must have showed" on one occasion when [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger arrived at roll call. (Ex. 13, ¶ 12) Runge reported to Sheair that he did not know who made the comment. (Ex. 13, ¶ 12)

### October 2010 Meeting[17]

59. On October 20, 2010, [Defendant] Sheair received three separate telephone calls from [Plaintiffs] Ellis, Hunter, and Zeiger. (Ex. 13, Ex. "A", Attach. No. 28 [(filing 100-13 at 71)], p. 1)

60. On that date, at about 3:30 p.m., [Plaintiff] Ellis called [Defendant] Sheair and told her he had been threatened by another NSP employee and feared for his life while at work. *Id.* Ellis refused to tell Sheair who threatened him. *Id.* Ellis told Sheair he wanted to meet with her concerning the death threat. *Id.* Sheair asked Ellis if he was going to be at work the following morning. *Id.* Ellis told Sheair he was scheduled to work but did not know if he would come to work due to the threat. *Id.*

61. That same day, at approximately 3:50 p.m., [Defendant] Sheair received a phone call from [Plaintiff] Hunter. *Id.* Hunter told Sheair that he had been threatened and was in fear for his life. *Id.* Sheair asked Hunter who threatened him. *Id.* Hunter told Sheair he was unaware of who actually made the threat, but that he had heard about the threat through the grapevine. *Id.* Sheair asked Hunter if he was going to be at work the following morning. *Id.* Hunter told Sheair he was scheduled to work but did not know if he was going to come in since he had been threatened. *Id.*

62. That same day, at approximately 4:20 p.m., [Defendant] Sheair received a phone call from [Plaintiff] Zeiger. *Id.* Zeiger told Sheair he had been threatened and feared for his life. *Id.* Sheair asked Zeiger who threatened him. *Id.* Zeiger told Sheair he was not going to say because it was too unsafe to tell anyone. *Id.* Sheair asked Zeiger if he was going

---

[17] See paragraph 48 of the amended complaint.

to be at work the following morning. *Id.* Zeiger told Sheair he was scheduled to work but did not know if he would come to work due to the threat. *Id.*

63. [Defendant] Sheair reported these telephone conversations to [Defendant] Bakewell. *Id.* Bakewell directed Sheair to contact [Plaintiffs] Ellis, Hunter, and Zeiger and let them know there would be a meeting in his office at 8:00 a.m. on Thursday, October 21, 2010. *Id.* Bakewell instructed Sheair to tell Ellis, Hunter, and Zeiger to report to work at 6:00 a.m. and that they could wait in the Training Room on the Second Floor in the NSP Administration Building until the meeting started. *Id.* Sheair informed Bakewell that she would report to work at 6:00 a.m. so she could open up the area for Ellis, Hunter, and Zeiger. *Id.*

64. [Defendant] Bakewell asked for this meeting because he was under the impression [Plaintiffs] Ellis, Hunter, and Zeiger refused to report to work the next day. (Ex. 8, 109:19-21)

65. [Defendant] Sheair called [Plaintiff] Hunter and left him a voicemail message to call her back. *Id.* Shortly thereafter, Sheair received a call from [Plaintiff] Ellis. *Id.* Sheair informed Ellis of the meeting the next morning. *Id.* Ellis told Sheair he would do a three-way call with himself, [Plaintiff] Hunter, and [Plaintiff] Zeiger. *Id.* Ellis stated he had been in contact with [Plaintiff] Johnson. *Id.* Ellis stated he would let Hunter, Zeiger, and Johnson know about the meeting the next morning. *Id.* Sheair told Ellis they were to report to work at 6:00 a.m. as usual and go to the Second Floor of the NSP Administration Building and that Sheair would let them into the Training Room so they could wait until the meeting with Bakewell. *Id.*

66. Later that same day, [Plaintiff] Zeiger called [Defendant] Sheair and wanted to know if he and [Plaintiffs] Ellis, Hunter, and Johnson could come at 7:45 a.m. for the meeting. (Ex. 13, Ex. "A", Attach. No. 28, p. 2) Sheair told Zeiger that they were to report to work at 6:00 a.m. as usual. *Id.* Zeiger then asked Sheair if he and Ellis, Hunter, and Johnson could come in at 5:50 a.m. to receive roll call pay. *Id.* Sheair told Zeiger that was fine. *Id.* Zeiger then asked Sheair if he and

Ellis, Hunter, and Johnson could wear street clothes. *Id.* Sheair told Zeiger that they needed to report to work in their work attire. *Id.*

67. [Plaintiff] Zeiger then requested that he be allowed to attend roll call and report to his normal work post as usual. *Id.* [Defendant] Sheair told Zeiger she did not think this request would be approved since he, [Plaintiff] Ellis, and [Plaintiff] Hunter had just reported that they feared for their lives working at NSP. *Id.* Sheair called [Defendant] Bakewell regarding the request that Zeiger be allowed to attend roll call and the request was denied. *Id.* Sheair called Zeiger and reported this information. *Id.*

68. While [Defendant] Bakewell was communicating with [Defendant] Sheair, Bakewell contacted DCS Deputy Director Frank Hopkins (hereinafter "Hopkins"), who in turn was keeping [Defendant] Houston appraised of the situation. (Ex. 8, 110:21-23)

69. [Defendant] Houston instructed [Defendant] Bakewell to assign [Plaintiffs] Ellis, Hunter, Johnson and Zeiger to other institutions within DCS in Lincoln, Nebraska for the reason that Ellis, Hunter, and Zeiger reported to [Defendant] Sheair that they had received death threats and feared for their lives working at NSP. (Ex. 8, 111:15-21) Houston further instructed Bakewell to contact the Nebraska State Patrol to investigate the death threat allegations. (Ex. 8, 111:12-13)

70. The morning of October 21, 2010, [Plaintiffs] Ellis, Hunter, Johnson and Zeiger arrived at NSP at approximately 5:50 a.m, reported to the Second Floor of the NSP Administration Building, and were directed to the Training Room. (Ex. 13, Ex. "A", Attach. No. 28, p. 2; Ex. 8, 111:23-112:1)

71. [Defendant] Bakewell arrived at approximately 7:15 a.m. on October 21, 2010, and spent 45 minutes on the phone with the Wardens at the Lincoln Correctional Center and Diagnostic and Evaluation Center explaining that he had four staff to be reassigned under the direction of [Defendant] Houston. (Ex. 8, 112:2-18)

72. [Plaintiffs] Ellis, Hunter, Johnson and Zeiger were to be assigned to other DCS facilities in Lincoln, Nebraska during the pendency of the Nebraska State Patrol investigation into the death threat allegations. (Ex. 8, 112:2-18; Ex. 13, Ex. "A", Attach. Nos. 29 [(filing 100-13 at 73)] and 30 [(filing 100-13 at 74)]) Ellis, Hunter, Johnson and Zeiger were to have the same shift and the same days off at the new facilities, and would remain on the NSP payroll. (Ex. 8, 112:2-8)

73. The meeting between [Defendant] Bakewell and [Plaintiffs] Ellis, Hunter, Johnson and Zeiger began around 8:00 a.m. in Bakewell's office on October 21, 2010. (Ex. 8, 112:17-24) [Defendants] Staley and Sheair were also in attendance. (Ex. 8, 112:23-24; Ex. 13, Ex. "A", Attach. No. 29 and 30)

74. At the meeting, [Defendant] Bakewell discussed the purported death threats with [Plaintiffs] Ellis, Hunter, Johnson and Zeiger. (Ex. 8, 116:12-17; *Id.*) Bakewell informed Ellis, Hunter, Johnson and Zeiger that the death threat allegations would be turned over to the Nebraska State Patrol. (Ex. 8, 115:21-24; *Id.*) Bakewell informed Ellis, Hunter, Johnson and Zeiger that he did not want the names of the individuals allegedly making the death threats at that time because he did not want to do anything that would taint a criminal investigation. (Ex. 8, 116:25-117:5; *Id.*)

75. At the meeting, [Defendant] Bakewell informed [Plaintiffs] Ellis, Hunter, Johnson and Zeiger that he had made arrangements for Ellis, Hunter, Johnson and Zeiger to be transferred to other DCS facilities in Lincoln, Nebraska pending the Nebraska State Patrol investigation. (Ex. 8, 117:6-9; *Id.*)

76. [Plaintiffs] Ellis, Hunter, Johnson and Zeiger told [Defendant] Bakewell they did not want to be transferred to other DCS facilities and wanted to remain working at NSP because they were not familiar with the other facilities, received overtime at NSP, liked their assigned posts at NSP, and were generally comfortable working at NSP. (Ex. 8, 117:10-18; *Id.*) Bakewell told Ellis, Hunter, Johnson and Zeiger that he understood their concerns, but DCS was trying to address their claim that their physical safety was in jeopardy at NSP. (Ex. 8, 117:15-18)

Bakewell told Ellis, Hunter, Johnson and Zeiger the transfers were not his decision but he would request the decision be changed. (Ex. 8, 117:19-24)

77. At some point during the meeting, [Plaintiffs] Ellis, Hunter, Johnson and Zeiger told [Defendant] Bakewell the posts they felt they could work at and feel safe at NSP. (Ex. 8, 118:8-15; Ex. 13, Ex. "A", Attach. Nos. 29 and 30)

78. Later that same day, [Defendant] Bakewell discussed with Hopkins the request of [Plaintiffs] Ellis, Hunter, Johnson and Zeiger to change the decision to transfer them to other facilities. (Ex. 8, 117:25-118:7) After Hopkins obtained approval from [Defendant] Houston to change this decision, Ellis, Hunter, Johnson and Zeiger were notified that they would continue to work at NSP at the posts discussed at the meeting and would not be transferred to other facilities as contemplated. (Ex. 8, 117:25-118:7; Ex. 13, Ex. "A", Attach. No. 30)

79. On October 22 - 28, 2010, [Plaintiffs] Ellis, Hunter, Johnson and Zeiger each made written statements to the effect that they felt safe continuing to work at NSP. (Ex. 13, Ex. "A", Attach. No. 42-48 [(filing 100-13 at 89-95)])

80. [Plaintiffs] Ellis, Hunter, Johnson and Zeiger were assigned to NSP when this lawsuit was originally filed on November 17, 2010, and when the Amended Complaint was filed on May 4, 2011. (Filing No. 1, ¶¶ 2-5; Filing No. 37, ¶¶ 1, 3-6)

November 2010 Meeting[18]

81. Seven days prior to filing suit, [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger met with [Defendant] Houston, [Defendant] Bakewell, [Defendant] Sheair, and Moreland in the emergency command and training conference room located at the DCS Central Office in Lincoln, Nebraska. (Ex. 11 [Deposition of Defendant Houston (filing 100-11)], 97:16-20, 133:20-23, 150:4-10; Filing No. 1, p. 1)

---

[18] See paragraphs 51 to 53 of the amended complaint.

82. [Defendant] Houston called the November 10 meeting because he was seeking an informal resolution to [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger's concerns with the assistance of the Nebraska State Ombudsman's Office and because he wanted to meet with Ellis, Hunter, Johnson, and Zeiger before [Defendant] Sheair's investigation had reached its conclusion. (Ex. 11, 98:3-11, 99:1-8, 149:11-21, 150:4-7) Houston was aware Sheair was completing her investigation, and he wanted to make sure her investigation was comprehensive. (Ex. 11, 149:16-21)

83. There were eight framed photographs hanging in this conference room when [Defendant] Houston, [Defendant] Bakewell, [Defendant] Sheair, and Moreland met with [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger on November 10, 2010. (Ex. 11, 134:11-15, 150:12-151:1; Filing No. 37, ¶ 51)

84. The framed photograph pictured in the Amended Complaint is a photograph of two inmates working in the Work Ethic Camp (hereinafter "WEC") garden. (Filing No. 37, ¶ 51; Ex. 11, 153:24-154:1; deposition of Houston, Ex. 21 [(filing 100-11 at 17)]) The WEC garden is outside the security perimeter fence of the WEC facility. (Ex. 11, 154:11-12) Inmates volunteer to work in the WEC garden. (Ex. 11, 155:5-9) Inmates consider it a privilege to work in the WEC garden. (Ex. 11, 154:13-15, 155:5-9) The WEC garden provides inmates with fresh garden food. (Ex. 11, 154:17-20) The WEC garden is a matter of civic pride for DCS. (Ex. 11, 154:24-155:1)

85. [Defendant] Houston did not take the photograph of the inmates working in the WEC garden. (Ex. 11, 153:8-11) Houston did not frame the photograph. (Ex. 11, 153:12-13) Houston did not give specific instructions to hang the photograph in the conference room. (Ex. 11, 153:16-18)

86. The purpose of the framed photographs hanging in the conference room is to showcase the character and history of DCS, as well as the various DCS facilities and programs, to members of the general public and DCS staff. (Ex. 11, 151:2-153:4)

-24-

### First Shift Roll Call

87. NSP staff assigned to work first shift are required to attend first shift roll call in the staff dining room prior to the commencement of their shift. (Ex. 3, 18:17-19:3, 19:14-18) In order to attend first shift roll call, NSP first shift staff make their way through the master control and turnkey areas of the facility and gather together in the staff dining room. (Ex. 3, 18:17-19:7; Ex. 1, 25:6-27:7)

88. NSP first shift staff are not required to enter the turnkey area with other staff. (Ex. 3, 19:4-7; Ex. 1, 25:9-13) Sometimes a large group of NSP staff walk through the master control and turnkey areas on their way to the staff dining room for roll call at the same time; and other times NSP staff walk through these areas on their way to the staff dining room for roll call individually. (Ex. 3, 19:4-7; Ex. 1, 26:1-4).

89. Correctional officers, corporals, caseworkers, unit mangers, lieutenants, and sergeants assigned to first shift make up the NSP employees that are generally in attendance at first shift roll call. (Ex. 1, 36:19-24) At times, other NSP staff such as kitchen personnel is also in attendance at first shift roll call. (Ex. 1, 36:24-25)

90. In approximately April of 2010, when [Plaintiff] Johnson transferred from third shift to first shift at NSP, [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger became friends and chose to walk through the turnkey area together on their way to first shift roll call. (Ex. 3, 7:9-13, 21:1-5; Ex. 1, 25:6-12)

91. First shift roll call starts at 5:50 a.m. (Ex. 3, 19:14-17; Ex. 1, 28:2) There are generally about 40 to 50 NSP staff assigned to first shift that are in attendance at roll call. (Ex. 3, 20:9-16) There are a number of tables in the room. (Ex. 3, 28:20-29:2) NSP staff has the option of either sitting at the tables or standing in various areas of the room for roll call. (Ex. 3, 29:3-8, Ex. 1, 35:16-17, 48:13-18)

92. During the relevant timeframe, [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger regularly chose to stand by two pop machines in the dining room. (Ex. 3, 36:22–23; Ex. 1, 32:17-20, 35:18-19; deposition of

-25-

Ellis, Ex. 5 [(filing 100-1 at 57)], 21:3-5) The pop machines are located in the southeast corner of the room approximately six feet behind the "lieutenant's table" in a small alcove next to the men's restroom. (Ex. 3, 36:24-25; Ex. 1, 32:17-20, 45:18-46:20, deposition of Ellis, Ex. 5; Ex. 5, 20:25-21:4)

93. The lieutenant in charge of supervising first shift roll call sits at the "lieutenant's table" and announces roll call. (Ex. 3, 36:24-25; Ex. 1, 32:17-20, 45:18-46:20, deposition of Ellis, Ex. 5) The "lieutenant's table" is approximately two feet from the main entrance of the staff dining room. (Ex. 3, 36:24-25; Ex. 1, 32:17-20, 45:18-46:20, deposition of Ellis, Ex. 5) The "lieutenant's table" is the first table you would see upon entering the dining room through the main entrance. (Ex. 5, 20:21-25)

94. In the relevant timeframe, [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger chose to stand by the pop machines because by the time they arrived at roll call, it was usually about 5:47 or 5:48 a.m. (Ex. 1, 50:14-51:2)

95. [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger generally arrived at roll call a couple of minutes after the lieutenants. (Ex. 5, 45:20-25) Once the lieutenants arrived in the room, it is usually about three minutes before roll call begins. (Ex. 5, 46:6-11)

96. Roll call begins when the lieutenant assigned as the first shift supervisor enters the room, sits in a chair at the "lieutenant's table", announces "roll call," waits for staff to stop talking, and begins to announce the names of staff and the posts they will be assigned to that day. (Ex. 3, 28:5-13, Ex. 1, 34:3-8, 35:21-22) There is a lot of talking and conversations going on amongst staff prior to the first shift supervisor lieutenant announcing "roll call." (Ex. 4 [Deposition of Plaintiff Zeiger (filing 100-4)], 64:24-65:4) Sometimes the first shift supervisor lieutenant will have to say "listen up" after announcing "roll call" before everyone quiets down for roll call. (Ex. 4, 65:6-9)

97. Roll call usually takes about three or four minutes. (Ex. 1, 35:6-10)

98. There are generally about three or four sergeants at roll call sitting at the "lieutenant's table" or standing behind the table at this time. (Ex. 3, 28:14-19, Ex. 1, 36:4-6) Sometimes, sergeants and lieutenants other than the acting first shift supervisor lieutenant are not seated at or standing behind the "lieutenant's table" but are in other areas of the room during roll call. (Ex. 2 [Deposition of Plaintiff Hunter (filing 100-2)], 51:14-52:9)

<u>Alleged Racially Charged Comments During Roll Call</u>[19]

99. In the following paragraphs [100-124], Defendants address each of the alleged racially charged comments in the order asserted in the Amended Complaint. (Filing No. 37, ¶ 24)

<u>"Looks like the back of the bus is here"</u>

100. [Plaintiff] Ellis heard this comment once. (Ex. 1, 38:8-39:1) Ellis does not know who specifically made the comment. (Ex. 1, 38:8-10) Ellis remembers that [Defendants] Stoner and Runge were present when this comment was made. (Ex. 1, 39:25-40:11) . . .

[100a. (Miles' statement ¶ 83)]. . . . [Plaintiff] Ellis remembers that [Defendant] Miles was present when this comment was made. (Ex. 1, 39:25-40:11)

101. [Plaintiff] Hunter heard this comment twice in roll call and at least once walking into roll call. (Ex. 2, 48:4-12) Hunter does not know who specifically made any of these comments. (Ex. 2, 47:20-53:6) Hunter remembers one occasion when this comment was made when [Defendants] Stoner and Runge were present. (Ex. 2, 47:5-9) Hunter does not know if anyone else at roll call heard these comments. (Ex. 2, 52:10-53:2) . . .

102. [Plaintiff] Johnson heard this comment once. (Ex. 3, 32:16-33:6) Johnson does not know who specifically made the comment. (Ex. 3, 32:16-34:7) Johnson does not know who specifically was present

---

[19] See paragraph 24 of the amended complaint.

when the comment was made other than [Plaintiff] Ellis, [Plaintiff] Zeiger and Officer Fleming. (Ex. 3, 33:21-25) . . .

103. [Plaintiff] Zeiger heard [Defendant] Runge make the comment either "looks like the back of the bus is here" or "the bus has arrived" on two occasions. (Ex. 4, 54:8-55:17, 56:24-57:17) On both occasions, Zeiger heard Runge make the comment "looks like the back of the bus is here" or "the bus arrived" when he was walking in the hallway toward staff dining either in front of or behind Runge. (Ex. 4, 54:8-22, 56:24-58:6) Zeiger states that he saw Runge make these two comments and the comments were directed at Zeiger. (Ex. 4, 55:7-9, 57:5-23) [Plaintiff] Zeiger does not recall any Defendant herein besides Runge ever making this comment. (Ex. 4, 58:7-9) . . .

104. [Plaintiff] Delaney heard this comment twice. (Ex. 5 [Deposition of Plaintiff Delaney (filing 100-5)], 34:8-22) Delaney states that on the two occasions he heard this comment, [Defendants] Stoner and Furby were present. (Ex. 5, 36:23-37:2, 37:12-21) Delaney does not remember observing any reaction from Stoner or Furby on either occasion this comment was made. (Ex. 5, 37:3-21) . . .

[104a. (Miles' statement ¶87)]. [Plaintiff] Delaney heard [Defendant] Miles make this comment twice in two and a half months. (Ex. 5, 34:8-22)

<u>"Smells like Fried Chicken"</u>

105. [Plaintiff] Ellis heard this comment once. (Ex. 1, 41:14-42:24) Ellis does not know who made the comment. (Ex. 1, 41:14-16) . . .

106. [Plaintiff] Hunter heard the comment twice. (Ex. 2, 53:7-13) Hunter does not know who made the comment[ ]. (Ex. 2, 53:7-8) Other than himself and the other Plaintiffs, Hunter does not specifically remember anyone that heard this comment other than those individuals who would generally be at roll call during this time. (Ex. 2, 53:4-54:5) . . .

-28-

107. [Plaintiff] Johnson heard this comment once. (Ex. 3, 35:12-36:3) Johnson remembers that the Lieutenants had not come down to staff dining for roll call when this comment was made. (Ex. 3, 36:10-13) Johnson remembers that the first shift Lieutenant was not there when this comment was made. (Ex. 3, 38:3-8) Johnson remembers an unknown number of sergeants who did not make the comment were handing out paperwork around the room at the time this comment was made. (Ex. 3, 38:13-39:4) . . .

[107a. (Miles' statement ¶ 90)]. . . . [Plaintiff] Johnson states that the comment was not directed at her or anyone else. (Ex. 3, 35:25-36:6) Johnson states that she does to know if the comment was meant to be offensive or degrading. (Ex. 3, 39:15-17)

108. [Plaintiff] Zeiger heard this comment once. (Ex. 4, 58:10-60:8) Zeiger remembers [Defendant] Stoner was at a table getting ready to read from a piece of paper in order to start roll call when this comment was made. (Ex. 4, 59:15-21) Zeiger assumes Stoner could hear the comment. (Ex. 4, 59:11-14) . . .

[108a. (Miles' statement ¶ 91)]. [Plaintiff] Zeiger heard [Defendant] Miles make this comment this comment once. (Ex. 4, 58:10-60:8)

109. [Plaintiff] Delaney heard this comment once. (Ex. 5, 38:6-10) Delaney does not remember any reaction in the room on the occasion that this comment was made. (Ex. 5, 40:1-3) . . .

[109a. (Miles' statement ¶ 92)]. [Plaintiff] Delaney heard [Defendant] Miles make this comment once. (Ex. 5, 38:6-13)

<u>"The gang has arrived"</u>

110. [Plaintiff] Ellis heard this comment one time walking into roll call and another time at turnkey. (Ex. 1, 51:12-52:6; 65:22-69:17) Ellis does not know who specifically made these comments either time. (Ex. 1, 51:12-14) Ellis believes, but does not specifically recall, that [Defendant] Haney was present the time he heard this comment at roll

call. (Ex. 1, 52:10-18, 67:10-16) The one time Ellis heard this comment at roll call, Ellis recalls he saw [Defendants] Stoner and Runge were present and laughed at this comment. (Ex. 1, 52:10-18; 67:10-68:3) . . .

111. [Plaintiff] Hunter heard this comment or "the gang is here" at roll call seven or eight times and over twenty times throughout the institution since he has been assigned to NSP. (Ex. 2, 45:8-46:5, 54:6-15) Hunter does not know who specifically said these comments. (Ex. 2, 54:6-8) Hunter does not recall specifically hearing any Defendant herein make these comments. (Ex. 2, 45:8-46:12, 54:6-56:17) . . .

112. [Plaintiff] Johnson heard this comment once. (Ex. 3, 40:13-41:6) Johnson does not know who made the comment. (Ex. 3, 43:4-5) . . .

113. [Plaintiff] Zeiger heard this comment once. (Ex. 4, 60:9-61:8) . . .

[113a. (Miles' statement ¶ 96)]. [Plaintiff] Zeiger heard [Defendant] Miles make this comment once at roll call and once in the hallway. (Ex. 4, 60:9-61 :25)

114. [Plaintiff] Delaney heard this comment at least once. (Ex. 5, 40:4-41:7) . . .

<u>"The hood has arrived"</u>

115. [Plaintiff] Ellis heard this comment once at roll call. (Ex. 1, 53:12-53:19) Ellis heard this comment two or three times outside of roll call. (Ex. 1, 58:8-13) Ellis believes, but does not specifically recall, that [Defendants] Runge, Stoner, and Haney may have been present when the comment was made. (Ex. 1, 54:17-21) . . .

[115a. (Miles' statement ¶ 98)]. . . . [Plaintiff] Ellis does not recall [Defendant] Miles being present when this comment was made [at roll call]. (Ex. 1,54:17 - 21) . . . Ellis believes his co-Plaintiffs heard Miles make this comment once outside of roll call.  (Ex. 1, 54:17-21) . . .

-30-

116. [Plaintiff] Hunter heard this comment three times. (Ex. 2, 56:18-57:1) Hunter does not know who said [this] comment[ ]. (Ex. 2, 56:21-22) . . .

117. [Plaintiff] Johnson heard this comment once. (Ex. 3, 44:6-7) Johnson does not know who said the comment. (Ex. 3, 44:18-22) . . .

118. [Plaintiff] Zeiger heard this comment twice. (Ex. 4, 62:6-15) Zeiger heard [Defendant] Runge make this comment at least twice walking into first shift roll call. (Ex. 4, 62:6-63:3) . . .

[118a. (Miles' statement ¶ 101)]. . . . [Plaintiff] Zeiger heard [Defendant] Miles make this comment at some unknown time. (Ex. 4, 62:6-10)

119. [Plaintiff] Delaney heard this comment at least once. (Ex. 5, 41:9-15) Delaney does not recall any of Defendants herein [other than Defendant Miles] making the comment. (Ex. 5, 41:9-21) . . .

[119a (Mile's statement ¶ 102)]. . . . [Plaintiff] Delaney heard [Defendant] Miles make this comment. (Ex. 5, 41 :9-21)

"If the lights went out, all you would see is white teeth"

120. [Plaintiff] Ellis has never heard this comment. (Ex. 1, 56:1-4)

121. [Plaintiff] Hunter has never heard this comment. (Ex. 2, 57: 14-17)

122. [Plaintiff] Johnson has never heard this comment. (Ex. 3, 45:1-5)

123. [Plaintiff] Zeiger heard this comment at least once at roll call, and at least twice overall throughout the institution. (Ex. 4, 63:6-64:3) Zeiger assumes that the lieutenant sitting at the table might have heard this comment the time he heard it at roll call, but there is a lot of talking from staff walking into roll call, sitting at tables, and standing in the back of the room so the lieutenant may not have heard it. (Ex. 4, 64:18-23) . . .

[123a. (Miles' statement ¶ 106)]. . . . [Plaintiff] Zeiger heard [Defendant] Miles make this comment at some unknown time. (Ex. 4, 63:6-9)

124. [Plaintiff] Delaney heard this comment at least four times. (Ex. 5, 41:22-42:13) . . .

[124a. (Miles' statement ¶ 107)]. . . . [Plaintiff] Delaney states the four times he heard this comment, it was not from [Defendant] Miles. (Ex. 5, 41:22 - 42:13)

<u>Defendants' Participation or Presence</u>

125. [Plaintiff] Ellis believes that [Defendants] Stoner and Runge overheard some of the comments because he saw Stoner and Runge smirk at some of the comments. (Ex. 1, 55:14-19) Other than one comment detailed above, Ellis does not know the particular comments that caused Stoner and Runge to smirk. (Ex. 1, 55:20-25)

126. [Plaintiff] Ellis does not remember the specific lieutenant that was in charge of first shift on any occasion in which he heard racially charged comments. (Ex. 1, 54:22-55:2)

127. [Plaintiff] Zeiger states that it was comments made in the staff dining room at roll call, as opposed to the comments made in the hallway on the way to roll call, for which he presumes some sergeants and [Defendant] Stoner would have been present. (Ex. 4, 56:3-11)

128. [Plaintiff] Delaney did not walk into roll call with [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger during this timeframe. (Ex. 5, 44:15-18) Delaney usually arrived at roll call five minutes before Ellis, Hunter, Johnson, and Zeiger. (Ex. 5, 44:15-18)

129. Between June and September of 2010, [Plaintiff] Delaney overheard comments that he perceived to be racially insensitive directed towards [Plaintiffs] Ellis, Hunter, Johnson, and Zeiger at least 15 times. (Ex. 5, 42:17-43:1, 124:23-125:12) These comments were not directed

at Delaney and were not made by any Defendant herein. (Ex. 5, 43:7-44:11)

130. [Plaintiff] Delaney observed [Defendants] Stoner, Runge and Furby being present for these comments. (Ex. 5, 103:17-24) Delaney observed Stoner, Runge and Furby chuckle at some of these comments at least a couple of times. (Ex. 5, 30:4-7,125:24-127:22) Delaney did not observe Stoner, Runge, and Furby chuckle after every comment he heard. (Ex. 5, 126:13-127:22)

131. Between June and September of 2010, [Defendant] Haney was at roll call only a couple times a month, and usually only when either [Defendant] Stoner or [Defendant] Runge were not present. (Ex. 5, 23:23-24:12, 27:15-21)

. . .

## Other Alleged Offensive Comments[20]

133. [Plaintiff] Ellis does not specifically remember any other racially charged comments being made other than those detailed above. (Ex. 1, 56:12-22; 57:13-58:4) Ellis alleges other non-specific comments were made, but does not remember that any of the nonspecific comments were made by any Defendant herein. (Ex. 1, 56:12-22; 57:13-58:4; 72:12-74:23)

134. [Plaintiff] Hunter remembers an incident when he received a racially insensitive phone call while serving inmates watermelon as part of lunch service in the Housing Unit in summer of 2010. (Ex. 2, 62:9-19) Hunter does not know who made the phone call. (Ex. 2, 62:9-19)

135. [Plaintiff] Hunter is aware of at least one racially insensitive comment made by [Defendant] Furby. (Ex. 2, 63:20-25) The comment was not directed at one of the Plaintiffs. (Ex. 2, 63:20-25)

---

[20] See paragraphs 26 and 27 of the amended complaint.

136. [Plaintiff] Hunter remembers one incident when he was walking in the hallway when [Defendants] Stoner and Runge were coming the other way when the comment "Looks like the back of the bus is here" or "the gang has arrived" was made by someone else. (Ex. 2, 55:3-13)

137. [Plaintiff] Hunter is aware of other nonspecific joking-type comments. (Ex. 2, 64:1-19) . . .

138. [Plaintiff] Johnson has not heard any other racially charged comments at first shift roll call other than those listed above. (Ex. 3, 46:16-19)

139. [Plaintiff] Zeiger does not remember any other racially charged comments made at roll call other than those specifically detailed above. (Ex. 4, 65:13-16)

140. [Plaintiff] Delaney recalls hearing [Defendant] Stoner refer to [Plaintiff] Zeiger as Corporal Zigger on one occasion. (Delaney deposition, 30:10-31:3)

141. [Plaintiff] Delaney never heard [Defendant] Runge make a racially insensitive comment. (Ex. 5, 29:7-30:8)

142. [Plaintiff] Delaney never heard [Defendant] Furby make a racially insensitive comment at roll call. (Ex. 5, 31:24-32:1) Delaney overheard a conversation on one occasion where Furby told a story using the "N" word in the lunch room. (Ex. 5, 31:24-34:3)

143. [Plaintiff] Delaney has never heard [Defendant] Haney make a racially insensitive comment. (Ex. 5, 34:4-7)

144. [Plaintiff] Ellis was told not to fraternize with African American inmates on one occasion. (Ex. 1, 88:22-90:12) . . .

145. [Plaintiff] Hunter remembers being told not to fraternize with African American inmates by at least two different NSP employees at least one time. (Ex. 2, 83:24-84:10, 88:24-89:6) . . .

146. [Plaintiff] Zeiger remembers that he was told not to fraternize with African American inmates on one occasion. (Ex. 4, 65:22-67:1). . .

147. [Plaintiff] Johnson was told not to fraternize with African American inmates on at least three occasions. (Ex. 3, 105:7-111:6) . . .

148. [Plaintiff] Delaney was told not to fraternize with African American inmates by three different NSP employees at least one time each. (Ex. 5, 77:20-78:6) On one occasion, Delaney recalls [Defendant] Furby telling him that he should not be talking to black inmates because it looks bad. (Ex. 5, 78:20-80:8)

. . .

### No Adverse Employment Action

150. Plaintiffs have not suffered a demotion, reduction of hours, reduction of salary or rate of pay, reduction of benefits, or termination of employment as a result of making their complaint of workplace harassment or filing suit. (Ex. 1, 253:4-9; 254:7-256:19; 262:24-263:6; 265:4-7; Ex. 2, 191:15-25, 194:7-15, 197:10-13; Ex. 3, 234:11-20, 236:3-7, 238:9-21; Ex. 4, 175:1-16, 178:23-179:5; Ex. 5, 116:19-23, 118:15-19, 120:16-21)

151. [Plaintiff] Hunter's DCS employment was terminated and later reinstated for unrelated reasons several years prior to the events giving rise to this lawsuit – and several years prior to the time he was assigned to NSP. (Ex. 2, 11:12-24)

(Filing 99 at 2-32; filing 110 at 2-15)

### C. Plaintiffs' Statement of Facts

The plaintiffs' brief in opposition to the defendants' motions for summary judgment contains a lengthy (461-paragraph) summary of deposition testimony provided by (1) Rena Blankenship, a caseworker employed at NSP from December 2004 to October 2011 (filing 112-1); (2) Michael Fleming, a correction officer who

worked first shift at NSP (filing 112-2); (3) Keri Pedrick, another correction officer who worked first shift at NSP (filing 113-1); (4) Brian Hansen, a first shift corporal at NSP from 2006 to April 2011 (filing 113-2); (5) Plaintiff Ellis (filing 114-1); (6) Plaintiff Hunter (filing 114-2); (7) Plaintiff Zeiger (filing 115-1); (8) Plaintiff Delaney (filing 115-2); Plaintiff Johnson (filing 116-1); (9) Cleveland Furby, a correction officer who worked first shift at NSP from 1993 to 2002 (filing 116-2); (10) Glora Hayek, a correction officer who worked first shift at NSP from 2002 to June 2010 (filing 117-1); (11) Ann Marie Kenny, a consultant hired by DCS in January 2011 (filing 117-2); (12) Defendant Stoner (filings 118-1); (13)Valerie Stubblefield, a secretary who worked outside Defendant Loock's office (filing 119-1); (14) Defendant Runge (filing 119-2); (15) Defendant Loock (filing 119-3); (16) Defendant Bakewell (filing 120-1); (17) Defendant Haney (filing 120-2); (18) Defendant Houston (filing 121-1); (19) Levi Bennett, a sergeant at NSP (filing 121-2); and (20) Thomas Goullette, also a sergeant at NSP (filing 121-3).

The defendants, excluding Miles, have moved to strike the depositions of Cleveland Furby, Glora Hayek, Ann Marie Kenny, and Valerie Stubblefield as irrelevant, and also to strike Kenny's deposition on the grounds that her testimony concerns subsequent remedial measures and is inadmissible under Federal Rule of Evidence 407.[21] (Filing 128) The motion to strike will be denied.

---

[21] Rule 407 provides:

When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
- negligence;
- culpable conduct;
- a defect in a product or its design; or
- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures.

-36-

The plaintiffs' statement of facts will be treated as controverted by the defendants, but the statement must be considered to the extent it is supported by admissible evidence and does not contain legal conclusions.  *See Jenkins v. Winter, 540 F.3d 742, 747 (8th Cir. 2008)*.  The statement reads as follows:

<u>Testimony of Rena Blankenship</u>

1. Rena Blankenship was a caseworker employed at the Nebraska State Penitentiary from December, 2004 until October, 2011. (Deposition of Rena Blankenship, Ex. 101, 4:22-5:23) She was present during first shift roll call when Defendant Runge made comments such as "the bus is here" or "the bus was late" when the Plaintiffs would walk in together. (Ex. 101, 7:6-12)

2. She was normally seated directly in front of the lieutenant's table so she was clearly able to hear comments and able to observe the reaction of the lieutenants and sergents when comments were made (Ex.

---

Fed.R.Evid. 407.  The rule has been applied in discrimination cases.  *See, e.g., Estate of Hamilton v. City of New York, 627 F.3d 50, 53-54 (2d Cir. 2010)* (excluding statement that, following challenged promotions, managerial staff decided to involve more individuals in promotion process); *McLaughlin v. Diamond State Port Corp., 2004 WL 3059543, *3 (D.Del. 2004)* ("It would be perverse indeed if attempts to reverse discrimination could be used to condemn a defendant."); *Stahl v. Board of Com'rs of Unified Government of Wyandotte County/Kansas City, Kansas, 244 F.Supp.2d 1181, 1188 (D.Kan. 2003)* (excluding evidence of defendant's suspension of physical fitness test as qualification for employment after plaintiff filed lawsuit); *Vander Missen v. Kellogg-Citizens Nat. Bank of Green Bay, 481 F.Supp. 742, 746 (D.C.Wis. 1979)* (any steps taken by defendant to prevent future acts of sex discrimination are inadmissible to show any reckless disregard by defendant of the requirements of the law).  *But see Kennedy v. City of Zanesville, 2008 WL 2036713, *4 n. 1 (S.D.Ohio 2008)* ("An 'injury-causing event' self-evidently refers to an event that results in physical injury or harm, not legal injury.  Defendant has cited no case law, and the Court has found none, which identifies illegal racial discrimination as an injury-causing event under Rule 407.").  Although Kenny's testimony cannot be used by the plaintiffs to prove culpable conduct on the part of any defendant, I decline to strike her deposition in its entirety.

101, 8:18-25) The lieutenants and sergeants seated at the lieutenants' table would laugh in response to the comments. She recalls Defendants Miles and Furby were normally present. (Ex. 101, 7:13-23, 9:2-8)

3. She never heard any supervisory staff say that the comments were not appropriate. (Ex. 101 ,9:9-13)

4. After the Plaintiffs submitted their written grievance, their working conditions got worse and [they] were treated differently. They were retaliated against. (Ex. 101, 9:14-10:5, 18:5-17)[22]

5. She and other employees were directed by lieutenants to write reports regarding incidents concerning the African American staff. After the Plaintiffs raised their racial concerns, there was more tension and "a lot more reports written." (Ex. 101, 10:7-12.)

---

[22] The defendants object to this and several other paragraphs of the plaintiffs' statement on the ground that they "contain legal conclusions." (Filing 126 at 3) At the summary judgment stage, the court should "consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." *Howard v. Columbia Public School Dist.*, 363 F.3d 797, 801 (8th Cir. 2004). Ms. Blankenship's opinion that the plaintiffs "were retaliated against" is an inadmissible legal conclusion. Her statements that the plaintiffs' "working conditions got worse" and that they "were treated differently" are not *legal* conclusions, and with a factual foundation laid could be admissible under Federal Rule of Evidence 701 (permitting lay witness opinion testimony which is "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue"). However, the statements are still conclusory and, by themselves, are not sufficient to create a genuine issue of material fact. *See LaCroix v. Sears, Roebuck, & Co.*, 240 F.3d 688, 691 (8th Cir. 2001) (conclusory or general statements in affidavits and depositions do not defeat properly supported motion for summary judgment). Most of the paragraphs objected to by the defendants (*i.e.*, paragraphs 4, 7, 37, 38, 55, 68, 74, 75, 83, 87, 91, 173, 174, 214, 215, 217, 327, 387 and 461) contain conclusory, but potentially admissible statements such as this. Although I will not sustain the defendants' blanket objection to "legal conclusions" contained in various paragraphs of the plaintiffs' statement of material facts, neither will I consider any conclusory testimony as proof of unlawful discrimination or retaliation.

6. For example, it was a regular occurrence for employees from other housing units or from the custody division to come to Housing Unit 3 where she worked, but she was directed by Defendant Stoner to write a report about Plaintiff Hunter when he came to Housing Unit 3. (Ex. 101, 10:13-23)

7. When she was told to write the report about Hunter being in Housing Unit 3, Hunter was unfairly singled out. Staff would come and go from Housing Unit 3 quite frequently and she had never been told to write a report on any other person. (Ex. 101, 13:7-23)

8. When reports are submitted up the chain of command, it affects your morale. It is "going to make anybody look bad to get reports written on you." After so many reports, the institution can initiate discipline for repeated conduct that has been documented. (Ex. 101,18:18-19:11)

9. She has observed that the lieutenants and sergeants pick and choose who they want reports written about. She would describe it as "good old boys." If you are in with the good old boys, "things might get overlooked if you did something wrong" and "you would get better treatment." (Ex. 101,11:25-12:15)

10. She observed that there was a good old boys connection between Defendants Stoner, Runge, Furby, and Miles. (Ex. 101, 12:16-21; 36:3-12)

11. The "good old boys" or the "preferred group" watch out for one another. They watch each other's back if they get in trouble. If people who were not in the group did the same thing as these people did, they would be fired or reprimanded. (Ex. 101, 37:7-11)

12. She experienced the good old boy phenomenon during her employment. From her own experience, she knows the lieutenants and sergeants who are part of the good old boy network can affect the terms of your employment from promotion, to days off, to the hours that you work at NSP: they have" a big, big impact" on the terms of employment at NSP. (Ex. 101, 16:23-18:4)

13. Plaintiff Jaryl Ellis was one of the people that if he were to "do something" that was perceived by the good old boys to be improper, he would be reprimanded whereas someone in the preferred group would not. (Ex. 101,38:14-18).

14. She believes that the transfer of Plaintiffs Ellis and Hunter was a result of this group. She viewed their transfer as a disciplinary action and "unfair." (Ex. 101, 38:18-25)

<u>Testimony of Michael Fleming</u>

15. Officer Michael Fleming heard racial comments at roll call. Defendant Miles said it smells like "fried chicken and corn bread" when the Plaintiffs entered roll call sometime in September 2010. Fleming also heard other comments such as the "gang is here", the "home boys are here", "looks like the Hood is here", directed at the Plaintiffs when they walked in as a group. (Deposition of Michael Fleming, Ex. 102, 5:21-6:9; 9:16-24)

16. Fleming heard other comments "a lot of different times." He also saw people at roll call glaring at the Plaintiffs when they walked in together. The glares were noticeable and not directed toward anyone else except the African American officers. (Ex. 102, 6:11-16)

17. He also heard comments during roll call directed toward the Plaintiffs such as, "The gang's here" or "Oh, look they are finally here" even though there were other people walking in late around them. (Ex. 102, 8:18-23)

18. He heard "the gang is here" multiple times in early September. He also heard" the home boys are here" on one occasion and "the 'hood is here" multiple times. (Ex. 102, 10:2-11)

19. He also heard a comment like "get to the back of the bus" directed at the Plaintiffs but he does not recall who said it. He believes the comment was directed toward Corporal Zeiger when they were moving back toward the soda machines. (Ex. 102, 135:1-24; 136:18-25)

20. Exhibit 1 to Fleming's deposition is a two page incident report that he wrote on 9/28/2010 regarding what he witnessed during roll.[23] (See Defendants' Ex. 13, Sheair Affidavit at Ex. A, Attachment 9 [(filing 100-13 at 32)]; Ex. 102, 5:11-16)

21. He stated in the incident report that the comments appeared to be jokes at first, but the progression and commonality of the jokes "showed disdain for the people walking in." Jokes were not made about other people walking in together, only when the Plaintiffs walked in. The comments were not made to them, they were made about them. (Ex. 102, 13:8-22)

22. He recalls Ellis saying at roll call "Damn the jokes." He believes that would have been around the same time that Sgt. Miles made the comment about fried chicken and corn bread. He believes Ellis would have spoken up prior to the time Fleming wrote his 9/28/2010 incident report. Once Ellis spoke up, the comments became more of a derogatory nature. (Ex. 102,14:10-14; 15:3-5)

23. In the year prior to November, 2010, the racially charged comments became "a lot more common." He would not say he heard them everyday, but he heard them every week at least: at least [sic]once per week during that timeframe. (Ex. 102, 106:1- 9)

24. He believes "the big triggering moment" regarding the comments at roll call was the "fried chicken and corn bread" comment. (Ex. 102,106:22-107:14.)

25. Fleming believes that the lieutenants heard Sgt. Miles' comments because Sgt. Miles sat at the lieutenants' table or right next to it. (Ex. 102, 16:13-16) He believes that Miles said it "smells like fried chicken and corn bread" while Miles was seated at the lieutenants' table. (Ex. 102, 16:19-23)

26. The lieutenants would have heard "the gang's all here," the "home boys" and the "'hood" comments because they were said loudly

---

[23] Exhibit 1 to Fleming's deposition is not in evidence.

enough that even when he was sitting in the front of the room, he could hear them. (Ex. 102, 17:1-6)

27. There was a "a noticeable difference" in the way Defendant Stoner began to interact with Ellis and Hunter after the Plaintiffs complained of the racial issues. (Ex. 102, 17:15-23)

28. Officer Fleming began to notice tension between Ellis and Stoner right around the time of the September incident report. He then noticed the tension get "progressively worse". (Ex. 102, 18:10-15) He noticed the same tension between Stoner and Zeiger, Johnson, and Delaney. (Ex. 102,19:7-20:2)

29. He noticed that Defendant Stoner would look at Plaintiff Hunter in a "cross" manner when Hunter, and any of the Plaintiffs walked in close to being late for roll call. There could be other people walking in behind them that would not get "the glare" but if those individuals walked in, there was a noticeable tense glare from Defendant Stoner for them walking in that other co-workers did not receive. (Ex. 102, 18:20-19:6)

30. Officer Ellis got the glares from Defendant Stoner because he was the one who "spoke up" and about racially unfair treatment. There was no tension between Stoner and Ellis before Ellis spoke up. (Ex. 102, 20:6-17)

31. The Plaintiffs received extra scrutiny as a result of making their work place harassment complaints and they were written up more since filing their complaint. (Ex. 102, 122:17-123:8; 124:2-13)

32. There is a consensus about what the good duties are on the yard. (Ex. 102, 46:6-13)[24] Officer Fleming observed Defendant Stoner treat Officer Ellis and the other Plaintiffs unfairly on many occasions. There were many times that if they were on the yard, Stoner would go

---

[24] Officer Fleming testified that "most people prefer just walking the yards" but that "a lot of people prefer not to be seen, . . . [so] they would rather hang out in the housing unit."  (Filing at 112-2 at 12, depo. p. 46:8-18)

out of his way to make sure that the African American employees were separated from one another. He would also hear Stoner make sure they were being "called out for unfavorable details." The unfair treatment was "noticeable." (Ex. 102,21:1-11)

33. Officer Fleming observed Defendant Furby get summoned to Lt. Stoner's office and Furby then assigned Ellis to a last minute travel order. One time specifically, Ellis was already gone on a travel order. When he came back from the travel order, he was told by Master Control that he needed to call upstairs where he spoke to Sgt. Furby. Ellis was then reassigned to another detail right after the travel order. This was not in keeping with the general practice that when an officer returns from a travel order they are given an opportunity to eat lunch before being dispatched again. When Defendant Furby did this to Ellis, there were other people on the yard available to do the work. (Ex. 102, 49:8-50:6)

34. Officer Fleming observed Plaintiffs Ellis, Johnson, and Delaney being called out more often than anyone else when they are working on the yard. He would "noticeably" hear their names called out more often on the radio. He would continuously hear, "Ellis we need you to get a tug," "Ellis we need you to escort contractors," "Ellis we need you to go upstairs," "Ellis we need you to take somebody to the hospital," while there were plenty of other staff available to perform these tasks and no one else was being called out on the radio. (Ex. 102, 50:17-51:14)

35. He has seen Officer Johnson being treated unfairly. She would be told to disperse when talking to a fellow officer, while other officers would be allowed to congregate together on the yard. (Ex. 102, 61:10-24, 62:17-21) He has noticed Johnson being called out for unfavorable duties such as tugs, especially in the warmer climate, and being called out for different details. (Ex. 102, 63:3-14)

36. He has also observed Officer Delaney being assigned on the yard to a lot of "off-shift" posts such as the shop area, tech shops, travel orders. He believes that Delaney was "definitely" called out on the yard more often than others. (Ex. 102, 63:15- 64:14)

37. The tension that exists between Defendant Stoner and Ellis was because of institutional racism or the unfair "good ol' boy" system. When Ellis rocked the boat by speaking out, the African American employees were deemed a threat to the system. From there "you could progressively watch" as they were singled out and treated unfairly. (Ex. 102, 21:25-22:13)

38. The racism was directed toward all of the Plaintiffs but Officer Ellis was the individual who initially spoke out and was the most verbal about mistreatment which led to him being "scorned." (Ex. 102, 24:17-23)

39. Defendant Furby said that he thought Ellis was lazy and when Furby was running the yard, Furby singled out officer Ellis many times to do details. Fleming also witnessed NSP employees sitting in the yard for hours while Defendant Furby treated Plaintiffs Ellis, Johnson, and Zeiger unfairly. (Ex. 102, 29:9-30:4)

40. Correctional officers are hesitant to step forward and complain because of the fear of suffering backlash. Other officers have told Officer Fleming that they heard the comments and noticed that Ellis was being called out a lot, but they were afraid to speak out. (Ex. 102, 28:1-21)

41. The "good old boys" or "in group" is generally a group of lieutenants, sergeants, and officers who hang out in the lieutenant's office during the day for sometimes 2-3 hours while the other yard staff are working. It is very clique-like. If you were not of that group, you would be cleared out of the office by the lieutenant. (Ex. 102, 30:5-19; 31:17-32;2)

42. There is a privileged group of officers that are favored by lieutenants, sergeants and corporals. Other people do not get the same privileged treatment that the "in group" gets (Ex. 102, 31:13-16; 33:1-6)

43. There are no African Americans in the "in-group." It is generally made up of Caucasian employees. (Ex. 102, 30:6-19)

44. After Officer Fleming wrote the September 28, 2010 incident report, he observed a noticeable "freezing out" where some individuals that always talked to him before became stand-offish, including Defendants Miles, Stoner, and Furby. They quit talking to him so he began to walk in to roll call with Ellis, Johnson and the other African American officers, as well as Officer Pedrick. He noticed that Officer Pedrick was noticeably "frozen out" as well. (Ex. 102,34:1-14)

## Testimony of Keri Pedrick

45. Officer Keri Pedrick wrote an incident report on September 21, 2010 stating that she had heard racial comments directed toward the Plaintiffs. One example was one morning while officers Johnson, Delaney, Zeiger, Ellis and Hunter walked into roll call, Sgt. Miles looked at them and said, "It smells like fried chicken and corn bread." (Deposition of Keri Pedrick, Ex. 103,5:18-6:3)

46. Defendant Miles was standing right next to the Plaintiffs and made the comment directly to them. (Ex. 103,37:12-16)

47. There were more comments, but this is the one she remembers in particular. From November, 2009 to November, 2010, there were multiple comments during roll call. (Ex. 103, 6:9-14; 9:1-16; 29:1-4; 64:5-10) She heard the comment "the gang has arrived". (Ex. 103,20:5-24)

48. Plaintiff Ellis told Defendant Miles to stop with the comments after they had gone on for several weeks. But the comments just kept going. (Ex. 103, 9:1-16).

49. She remembers the "fried chicken and corn bread" comment word for word, so that is why she wrote it down. She didn't want to write anything down that she did not remember word for word. (Ex. 103, 9:9-16; 33:21-34:3)

50. She found the comment that it smells like fried chicken and corn bread to be offensive. (Ex. 103, 35:15)

51. The Plaintiffs were standing only two steps away from the lieutenant's table at roll call. She estimates it was just three feet away. (Ex. 103, 58:24-59:7)

52. If racial comments could be heard by her during roll call, she believes they also could have been heard by someone sitting just a couple of steps away. When Defendant Miles made the comment he was literally sitting "right next to the lieutenants." (Ex. 103, 59:17-20)

53. She does not know which lieutenant was on duty the day Miles said it "smells like fried chicken." However, she knows the lieutenants were all sitting around the table. (Ex. 103, 68:13-24)

54. It surprised her when racial comments were made that the lieutenant did not say, "This needs to stop," or "Knock it off." (Ex. 103, 60:7-10)

55. There is racial tension at NSP and the supervisors "show favoritism." As an example, white staff members are allowed to congregate together in the yard while African American officers are told to separate. She recalls a time in 2010 when Plaintiffs Delaney, Johnson, Ellis and Zeiger were on the yard together for about 10 minutes and she heard Lt. Stoner calling over the radio telling them to separate and clear out. (Ex. 103, 16:8-25; 17:12-24)

56. The whole institution is aware of the "in group". Defendant Stoner, the lieutenants, and sergeants are in the in group. (Ex. 103, 69:13-70:19; 71:9-12)

57. Defendants Miles, Stoner, and Furby were part of the in group at the time the racial comments were occurring. (Ex. 103, 61:13-15, 23-24) The in group is able to "cover" for each other. (Ex. 103, 61:5-11)

58. The African American employees were not part of the "in group" with the lieutenants and sergeants. (Ex. 103, 62:23-63:2)

<u>Testimony of Brian Hansen</u>

59. Officer Brian Hansen was a first shift corporal from 2006 until he left NSP in April 2011. He has no "axe to grind" and did not have interpersonal conflict with any of the lieutenants or sergeants (Deposition of Brian Hansen, Ex. 104, 11:15-23; 14:15-15:15)

60. During roll call, Corporal Hansen was generally seated in about the third row back from the lieutenants table. (Ex. 104, 20:3-5) From there he heard "smells like fried chicken" and "here comes the 'hood." These comments were directed at the African American officers who were present for first shift roll call. (Ex. 104, 7:8-25)

61. He knows that Defendants Stoner, Runge, and Furby heard the comment because they laughed about it. Furby was sitting near Miles when the comment was made and Furby laughed. (Ex. 104, 18:12-17; 21:13-20)

62. There were 60 to 70 people in roll call at that time. He believes that almost everyone in the room heard the comment and laughed. (Ex. 104, 18:18-21; 19:6-8)

63. Defendant Miles would typically stand next to the lieutenants table where the lieutenants and sergeants were seated for roll call. He was either sitting at the table or standing right behind it when he made racially offensive comments. (Ex. 104, 12:4- 18)

64. When the comments were made, everyone in the room would laugh, especially the lieutenants and sergeants. Defendants Stoner, Runge, Furby, Miles, and Haney were present when comments were made and they laughed. (Ex. 104, 8:1-9:3)

65. The lieutenants and sergeants never told anyone to stop the comments or indicate that such behavior was unacceptable. (Ex. 104, 12:19-13:3)

66. The racial comments went on for a several month period of time in 2010. After a while, "it got old." (Ex. 104, 8:5-6; 10:1-6)

67. The "fried chicken" comment was directed toward the African American officers who were coming into the room. He could tell that the comments bothered the Plaintiffs "a lot." (Ex. 104, 18:4-7; 8:7-9)

68. After the African American employees made known that they did not appreciate the comments, "They were treated differently." They were given the "cold shoulder." Sergeants who ran the yard, like Defendant Furby and Sgt. Goullette, would "keep an eye" on what the African American employees were doing and where they were located. The yard sergeants would give them a lot of details that other people could have done. (Ex. 104,10:18-11:7)

69. The lieutenants and sergeants were part of a "good old boy" network. They would give answers to the sergeant exam to favorite employees. They would overlook certain employees being late for roll call and write up or give "B-forms" to others who were not a part of the good old boys system. (Ex. 104, 9:3-24)

70. The assigning of undesirable tasks to people who were disfavored was also part of the way the good old boy network operated. (Ex. 104, 11:8-14)

71. Defendant Furby was one of the sergeants who ran the yard and called on the African American employees to do extra duties because he thought they were "lazy." The yard sergeants "kept an eye" on the African American employees more than any other staff—and more often. (Ex. 104,31:1-15)

72. Corporal Hansen recalls specific times when he was working with Ellis on the yard and Ellis was called out for additional job duties. (Ex. 104, 35:3-8) He knows that Ellis was given vehicle escorts and then would be called to do an inmate escort even though there were other people available in the yard. The sergeants were "running him around". (Ex. 104, 35:9-16)

73. He observed that Defendants Runge, Stoner, Furby, and Miles gave the African American employees "the cold shoulder" after they raised their racial grievance. (Ex. 104, 40:8-18) Other staff then followed

suit and also gave the African Americans "the cold shoulder" throughout the work day. The Plaintiffs were treated as if they were not welcome. (Ex. 104, 40:8-16; 41:2-15)

### Testimony of Plaintiff Hunter

74. Prior to Ellis, Johnson, Zeiger, and Delaney joining him at NSP, Plaintiff Michael Hunter was the only African American [e]mployee on first shift. The reason there are not more African American employees at NSP is due to the racial environment at NSP. African American employees would "just get fed up" and leave. (Ex. 106, 201:4-15)

. . .[25]

### Testimony of Cleveland Furby

76. Cleveland Furby is an African American who worked as a first shift correctional officer in the custody division of NSP for ten years (1993 to 2002.) After three or four months on second shift, he moved to first where he worked along with three other African American males. (Ex. 110, 5:6-7:7)[26]

---

[25] Paragraph 75 of the plaintiffs' statement merely characterizes the testimony provided by Cleveland Furby and Glora Hayek and is excluded as argumentative and not a proper statement of material facts.

[26] The defendants object that Cleveland Furby's testimony is irrelevant because he did not work at NSP during the period in question.  The Eighth Circuit has held, however, that "deposition testimony of non-parties may, depending on the facts and circumstances, be used to show discriminatory intent in the context of a § 1981 claim."  *Gibson v. American Greetings Corp.*, 670 F.3d 844, ___ (8th Cir. 2012) (citing *Bennett v. Nucor Corp.*, 656 F.3d 802, 809-10 (8th Cir. 2011)).  "A district court must therefore engage in a 'fact-intensive, context-specific inquiry' in order to determine whether such evidence [of prior acts of discrimination against non-parties] is relevant under Federal Rule of Evidence 401, . . .."  *Bennett*, 656 F.3d at 810.  Cleveland Furby's testimony appears marginally relevant.

77. He then moved from the custody division to being a substance abuse counselor at NSP. He transferred to Lincoln Correctional Center from 2005-2008 and then returned to NSP as a counselor in 2008 or 2009. After returning to NSP, he learned that there were racial concerns from the African American officers working in the custody division of NSP. They complained to him about the racial environment on first shift. He could tell that the Plaintiffs were very stressed out working on first shift in the custody division. (Ex. 110, 15:1-16:2)

78. He understood what was happening to them because when he began working on first shift in the 1990's, he felt like all eyes were on him as an African American all the time. It was a stressful environment to the point where he and the two other African American officers on first shift hung together in a group. They felt it was necessary to hang together due to the tension between black and white officers and they felt more comfortable with one another. (Ex. 110, 8:2-22)

79. There was a "good old boy system" where the people who were friends with the lieutenants and supervisory staff would move up the ranks "pretty fast." (Ex. 110, 9:1-10:5) As an African American, he was treated unfairly and threatened by white supervisors like Captain Brittenham. (Ex. 110, 10:15-11:3)

80. First shift lieutenants would talk down to him as an African American man. When he confronted a lieutenant about this, he was written up and received a B form. The lieutenant he challenged was friendly toward the white officers and did not talk down to them. (Ex. 110, 11:8-16)

81. During Cleveland Furby's time on first shift, Loock was the major of the custody division. Defendant Stoner became a first shift lieutenant and Brittenham was a captain on first shift. When Stoner became a first shift lieutenant, he had the same demeanor as the other lieutenants who were part of the good old boy network. (Ex. 110, 11:17-12:25)

82. Throughout Furby's time as a correctional officer his treatment as an African American created a stressful environment for him. He was

ready to quit a number of times because of the racial discrimination he endured. (Ex. 110, 12:17-12:25)

83. He was treated differently from the white officers. If you did not move up the ranks, you were treated differently—and African Americans rarely moved up the ranks. (Ex. 110, 13:1-20)

84. During his time in the custody division from 1993 to 2002, he does not recall any African American being promoted other than Officer Ziboh who moved up one rank to corporal. Ziboh eventually left the custody division and moved over to the Housing Unit division at NSP. (Ex. 110, 13:21-14:6)

85. Cleveland Furby transferred from the custody division to the substance abuse area because as a black officer he was not going to get promoted and because of the racial environment being stressful. (Ex. 110, 14:7-14)

86. It was his experience that if you complain or express concern about any type of discrimination or problem at NSP, you were stereotyped as a troublemaker. If you are stereotyped in that way, promotion became difficult. You just have to shut your mouth and "take whatever." (Ex. 110, 17:6-18:6)

## Testimony of Glora Hayek

87. Glora Hayek worked at NSP from October, 2002 to June, 2010. She worked first shift from 2006 until the time she left in June, 2010. (Ex. 111, 5:1-6:24) She left at NSP because of the hostile work environment on first shift. (Ex. 111, 7:20-22)

88. Things noticeably changed when Runge came to first shift. When Miles was the yard sergeant he would spend all day in the lieutenants' office rather than being out on the yard. (Ex. 111, 15:17-22)

89. She noticed that a female corporal and Runge spent a lot of time together in the lieutenants' office. Cpl. Hayek reported their interactions. After she reported her concerns about Runge, she was

retaliated against by Stoner who refused to recommend her for a position as a crisis negotiator even though her former supervisor, Lt. Burkey, had endorsed her for the position. Lt. Runge had since replaced Burkey. (Ex. 111, 17:3- 25,20:1-10)

90. Stoner refused to recommend her even though nothing had changed in Cpl. Hayek's work performance or qualifications. (Ex. 111, 18:2-6) She was an outstanding employee who worked hard, banked 500 hours of sick leave, and did not call in sick. (Ex. 111, 21:1-5)

91. She observed the lieutenants and sergeants would function as a good old boy network and take care of one another other. They would retaliate against people who reported upon their activities. One of the ways this occurred was the sergeants who manned the yard would retaliate against people by giving them the "crappy" jobs. (Ex. 111, 21:17-23:23)

92. It was well understood that if you got on the wrong side of the sergeants who were running the yard that you would end up doing the less desirable work. (Ex. 111, 24:10-16)

93. One of the undesirable tasks is cold storage. Nobody wants to do it because it is right before shift change so if you were on "the bad list" that day you would probably get assigned to that job. (Ex. 111, 24:19-25:3)

94. Escorting medical passes from the segregation unit is another undesirable task and if you were on the bad list, you might be assigned to that job. If somebody is assigned to that job several days in a row, it was clear that the yard sergeant did not like that person or was mad at them. (Ex. 111, 25:12-17)

95. "Running someone on the yard" is the phenomenon where an employee is given task after task, while other people get to stand around. (Ex. 111, 25:18-26:8)

96. Each time she reported violations of supervisors, she felt more heat or retaliation. She felt very alienated because other people did not

want to get involved. She observed the lieutenants and sergeants pick and choose who they would write up for policy violations or inappropriate conduct. They would overlook behavior by staff who they were friends with, and write up others. (Ex. 111, 30:8-23)

97. She worked directly with the African American officers on first shift. Officer Zeiger was a great guy and very upbeat when he began his employment. Over the course of time she watched the "wind going out of his sails." She really noticed a change in him. (Ex. 111, 37:16-38:24)

98. When she went to work at NSP, she looked forward to serving her community, having health insurance, and a retirement fund. At first she really enjoyed working there. It was a very interesting job. She enjoyed the people she worked with and she had planned to stay there until she retired. (Ex. 111, 34:7-35:10)

99. She left because she could not endure the good old boys environment any longer. The more she reported inappropriate the conduct of supervisors, the worse things got for her—and the braver they got. (Ex. 111, 35:14-25)

## Testimony of Defendant Runge

100. Defendant Runge confirmed that Cpl. Hayek had raised the issue of supervisory staff playing favorites. (Ex. 115, 90:1-25) Cpl. Hayek reported that Runge had shown favoritism to a female corporal who had sent inappropriate pictures to him. (Ex. 115, 193:11-21)

101. Runge is aware that there were concerns that he showed favoritism. It was Cpl. Hayek who had raised these concerns. (Ex. 115, 193:11-194:21)

## Testimony of Defendant Stoner

102. Defendant Stoner admitted that he has heard concerns from staff about a "good ole boys network" It involved a female staff member making allegations. (Ex. 113, 168:9-169:1)

103. If he heard that there was a good old boy club or a good old boy network, Stoner testified that he forwarded the reports to his supervisors, one of whom is Major Loock (Ex. 113, 171:6-10)

### Testimony of Defendant Loock

104. Major Loock testified, however, that he has never seen evidence of a good old boy network within the Custody Division at NSP. (Ex. 116, 33:16-18)

105. Major Loock seeks to enforce the diversity statement of NDCS by treating all staff fairly and equally. One of the ways he does that is by forwarding reports to the warden or deputy warden if he thinks there has been unfair treatment. (Ex. 116, 15:22- 25)

### Testimony of Defendant Bakewell

106. Warden Bakewell has never heard the complaint on first shift at NSP that there is a group of lieutenant and sergeants who are sort of a good old boys network (Ex. 117, 29:9-11) He has heard there are rumors about cliques within the Department but he has not seen any evidence of that. (Ex. 117, 29:13-15)

107. When he became warden in 2006, the highest ranking African American officer was a sergeant. By 2007, there was no African American sergeant, captain, or lieutenant. (Ex. 117, 41:21-42:2; and Ex. 8 to Houston Deposition)[27] There was one male African American corporal (Ex. 117, 42:5 and Ex. 8 to Houston Deposition), a reduction from 2005 when there were three. (Ex. 117, 42:6-9 and Ex. 8 to Houston Deposition) He does know what became of the other two African American corporals. (Ex. 117, 42:12) In 2007, there was one female African American officer and four male African American officers. (Ex. 117, 42:3-43:5 and Ex. 8 to Houston Depo.)

---

[27] Exhibit 8 to Houston's deposition is not in evidence.

-54-

108. By 2010, there were no African Americans above the level of correctional corporal (Plaintiff Paul Zeiger) within the Custody Division at NSP. (Ex. 117, 43:15-25)

109. Defendant Bakewell was warden of NSP from 2006 to August, 2011. (Ex. 117, 5:6-11) According to Warden Bakewell, a correctional institution is an "abnormal" environment with a different type of culture. (Ex. 117, 140:19-141:10)

110. When Bakewell first started working in the NDCS institutions, they operated on what is called the "snitch" system. If you were an inmate and told on someone, you might get a benefit. While they do not operate in that manner with inmates any longer, the "snitch" is still part of the institutional vocabulary and carries over to the staff. Staff members do not want to write something down because it is telling on somebody else and then you get labeled a "snitch." (Ex. 117, 140:13-142:12)

111. NDCS is like a new department every five years because the turnover rate is very, very high: around 21 or 22% per year. So that means that essentially every five years it is a new department. (Ex. 117, 150:5-10)

112. At the time of his deposition on August 2, 2011, there were only five or six African American custody officers out of a total of 90-95 employees on first shift. (Ex. 117, 10:12-21) He tried to increase the diversity of his department through his participation in the Executive Steering Council. (Ex. 117, 12:9-12)

113. After the Plaintiffs' complaints, the curriculum used at the staff training academy and in service training was revised so that it is more "focused" on the policy regarding work place harassment and the elements of the policy. (Ex. 117, 138:10-14)

. . .[28]

---

[28] Paragraphs 114-121 of the plaintiffs' statement contain the text of certain administrative regulations regarding the NDCS policy on workplace harassment.

122. Bakewell had known that pre-service and in-service curriculum needed to be improved for some time. Changes to the curriculum had been discussed for a year or two. (Ex. 117, 147:16-21, 149:15-21)

123. Another change was the culture awareness training for members of the Executive Steering Counsel ("ESC") with a consultant named Ann Marie Kenny. She assessed the ESC in diversity issues and facilitated in helping them learn how to be more appreciative of cultural differences and to make the workplace a more inclusive environment. (Ex. 117, 138:1-139:3) The ESC is the director's executive staff, central office department heads, and the wardens. It is a group of around 40 people. (Ex. 117, 147:7-25)

<u>Testimony of Ann Marie Kenny</u>

124. Ann Marie Kenny is the owner of Whole World Enterprises, a management consulting firm specializing in intercultural services. She was hired by the Nebraska Department of Correctional Services (NDCS) in January 2011. (Deposition of Ann Marie Kenny, Ex. 112, 6:16-24; 12:25-13:3)

125. Her particular specialty is assessing and designing training to develop greater levels of intercultural sensitivity, awareness, and relationships. She utilizes a testing instrument known as the Intercultural Development Inventory ("IDI"). The IDI has been used through the world and it measures what a person's world view is toward cultural differences and commonalities. (Ex. 112, 13:12-16; 15:7-16:19)

126. The IDI has met the psychometric standards for scale construction and is a recognized and accepted assessment of intercultural competence, the capability to accurately understand and adapt behavior to other diverse cultures. (Ex. 112, 23:22-25; 24:6-10)

127. She met with Director Houston on January 4, 2011 where they discussed her performing intercultural work for the NDCS. NDCS Director Houston advised her the need for changes in "how staff treats

each other". (Ex. 112, 31:3-17 and Ex. 5 to Kenny Deposition [(filing 117-2 at 61)], p. 2)

128. At the time she administered the IDI survey in April, 2011, there were a total of 1,088 line staff working for NDCS: 976 were white, 47 were black or African American, and 110 non-white racial ethnic minority. Of the corrections officers, 9.81% were an ethnic racial minority.  Of the 504 corporals, 7.34 % were racial ethnic minorities. (Ex. 112, 72:11-73:14)

129. In Nebraska, the minority population is 17.25%. She believes it is the Department's intention to have a racially balanced work force. (Ex. 112, 61:1-11) However, the NDCS staff is 90% white and only 10% minority. (Ex. 112, 120:5-16) Overall the U.S. prison staff is 64% non-minority and 36% minority. (Ex. 36 to Kenny Deposition [(filing 117-2 at 57)]. )

130. When she conducted her inventory of NDCS, she had an excellent return rate receiving 127 out of 139 surveys. The Nebraska State Penitentiary (NSP) received the largest number of surveys, and had the largest number of completed surveys. She found the assessment of the NSP staff to be a valid assessment. (Ex. 112, 74:4-23; 77:4-8; and Ex. 11 to Kenny Deposition)[29]

131. According to Director Houston, it was important for Ms. Kenny to understand the work environment and the workforce. The surveys gave her a glimpse into the workforce and how "we feel about things." (Houston Depo. 90:3-12)

132. Ms. Kenny was hired to advance NDCS's diversity initiative which the Director Houston had been "thinking about for years." The Plaintiffs' case influenced NDCS's diversity initiative forward. (Houston Depo. 88:1-13)

133. As a part of her work for NDCS, she did a major overhaul of the department's diversity training materials. (Ex. 112, 90:6-23; and

---

[29] Exhibit 11 to Kenny's deposition is not in evidence.

Ex. 3 to Kenny Deposition [(filing 117-2 at 58)], p.1., noting that, "Contractor will design and provide a new, customized InService Diversity Curriculum for the NDCS" and Houston Depo. 90:3-15)

134. As a result of administering the IDI surveys, Ms. Kenny found that NDCS had a *Mono-Cultural Mindset* where staff members will tend to make sense of cultural differences and commonalities based on their own cultural values and practices which was limiting the department's progress toward diversity initiatives and goals. *This collective mindset can lead to poor retention of workforce diversity, since people from non-dominant cultural groups often interpret these claims as hypocritical.* In addition, when extreme emphasis on corporate culture exists [such as exists in corrections and law enforcement] it creates a strong pressure for culture conformity, which generates an atmosphere of assimilation where the corporate culture clashes with non-dominant cultures. (Emphasis supplied.) (See, Ex. 18 to Kenny Deposition [(filing 117-2 at 44)], "Review and Recommendations" pp. 1-2.)

135. The dominant cultural group within the Department of Corrections is white male. (Ex. 112, 126:18-127:9 and Ex. 23 to Kenny Deposition [(filing 117-2 at 49)], p. 2)

136. As a part of her work, Ms. Kenny met with the NDCS Diversity Council on April 12, 2011, where she learned about the "code of silence" which says that you never "rat out" an employee. The problem with the "code of silence" is that the person who reports the problem is then "isolated." (Ex. 112, 160:23-161:25 and Ex. 39 to Kenny Deposition)[30]

137. When she was surveying NDCS line staff and the executive steering committee ("ESC"), she learned of the "good old boys club." (Ex. 112, 124:3-5)

138. Ex. 23 to her deposition contains notes of her meeting with the ESC on May 26, 2011. On page 1, she prepared a qualitative

---

[30] Exhibit 39 to Kenny's deposition is not in evidence.

summary of the information that she learned about NDCS in the process of gathering information and conducting the survey: NDCS has good policies but they are not being carried out; employees feel it is of no use to report racial and gender insults; women need a thick skin; NDCS loses a lot of minority staff; and there is a "good old [white] boys' environment." (See p.l, Ex. 23 to Ex. 112, Kenny Deposition)

139. She learned of the" good old boy society" from line staff and from private conversations with members of the executive steering committee. On page 1 of Ex. 23, it was noted that the staff is not racially and ethnically diverse enough. She was advised, "We lose a lot of minority staff" and it is a "good old (white) boys environment". (Ex. 112, 124:17-125:13 and Ex. 23 to the Kenny Deposition, at p.l)

140. If the non-dominant group is minimizing cultural differences, that can manifest itself in "going along to get along" in fear of retaliation for "rocking the boat." This is a form of assimilation. If you don't file a complaint, you "go along to get along." (Ex. 112,127:10-128:7 and Ex. 23 to Kenny Deposition)

141. In her meeting with the executive steering committee on July 28, 2011, she brought up the "L-Word"—the lawsuit filed by the plaintiffs in this case. An attorney for NDCS advised her at the meeting that the diversity initiatives were "not about the lawsuit." (Ex. 112, 130:19-131:17; and Ex. 24 to Kenny Deposition [(filing 117-2 at 52)]" at p. 2)

142. At the meeting, former NDCS director Harold Clarke, an African American, said: "Name the problem, face it, deal with it, change/train . . . it's not the lawsuit, *it's what led up to the lawsuit*." (Emphasis supplied.) (Ex. 24 to Ex. 112, Kenny Deposition. )

143. When Mr. Clarke said, "It's not the lawsuit, but what led up to the lawsuit", she was quoting him exactly. (Ex. 120, 137:18-138:1) Clarke advised her that the problem is "race." (Ex. 120, 138:2-9) He also said, "Face it, deal with and train to that." His goal was to have Ms. Kenny direct the training program more toward race. (Ex. 112, 138:20-139:3)

144. When he was director, Harold Clarke tried to "change the culture in the department." As a "black man", he had "some very negative experiences while he rose in the ranks from counselor to warden to director." (Ex. 112, Kenny Deposition at Ex. 37, p. l)[31]

145. In Ex. 25, Ms. Kenny catalogued the primary problems she uncovered during her "walk-arounds" at NSP and other NDCS facilities and from meetings with the ESC conducted between April and August, 2011. (Ex. 112, 141:15-142:1; 149:20-150:8 and Ex. 25 to Kenny Deposition [(filing 117-2 at 53)]).

146. There were repeated references to the "good old boys" club or society. The good old boys show "favoritism." (Ex. 112, 142:18-143:20)

147. She learned that the sergeants and lieutenants are in need of training because of the issue of "favoritism" (Ex. 112, 143:21-144:3) and that the lieutenants need more training on "racial, ethnic, and gender issues." (Ex. 112,145:12-20)

148. The "real challenge" was getting the middle group of managers (the lieutenants and sergeants) "on board" with the diversity initiatives because they promote an "us and them mentality" (Ex. 112, 144:9-145:2) and that the security line staff take their cues from the lieutenants and sergeants in the way they treat minorities. (Ex. 112, 144:9-145:11)

149. Ms. Kenny learned of the "code of silence." Employees are hesitant to report harassment due to the fear of retaliation and that work place harassment violations are handled with a "nod and a wink." (Ex. 112, 148:16-150:2)

150. NDCS has "an informal culture" that stifles complaints. (Ex. 112, 153:24- 154:10 and Ex. 26 to Kenny Deposition.) Ex. 26 to her deposition is information that she gathered during the executive

---

[31] Exhibit 37 to Kenny's deposition is not in evidence.

committee training on July 28, 2011.[32] She presented the information contained in Ex. 25 to the ESC at the July 28, 2011 meeting. (Ex. 112, 150:9-19 and Ex's 25 and 26 to Kenny Deposition)

151. This is the type of information that experts in her field reasonably rely upon in trying to assess an organization and make recommendations regarding cultural competence. She recorded this information because it is important for her to get the "boots on the ground" perspective. (Ex. 112, 151:1-21)

### Testimony of Defendant Sheair

152. After the Plaintiffs submitted their racial grievance on Sept. 5, they heard nothing for weeks. The report was placed in the major's drop box on the evening of Sept. 5,2010, but Captain Brittenham claims he did not find it until September 10, 2010. (Sheair Depo. 28:17-29:10)

### Additional Testimony of Defendant Bakewell

153. Warden Bakewell became aware of Plaintiff's grievance when ombudsman Jerral Moreland contacted him on or about September 9 [sic], 2010. At that time, Bakewell learned of the racial comments and became aware of the Plaintiffs' concern of a "buddy-buddy system" among certain lieutenants, sergeants, and corporals. If there were such a system, Bakewell agrees it could create the appearance of unfairness amongst lower level staff. (Ex. 117, 31:20-32:8)

154. Bakewell tasked Ms. Sheair with performing an investigation. (Ex. 117, 32:23-24) His instructions to Ms. Sheair were to go through the entire complaint of the African American employees, interview the people involved, and do an investigation. (Ex. 117, 33:2-6)

155. Though the investigation drug on for more than 6 weeks, he was satisfied with the thoroughness of her investigation. He thought it was a good investigation. (Ex. 117, 33:7-9)

---

[32] Exhibit 26 to Kenny's deposition is not in evidence.

156. Favoritism or unfairness as it related to the assignments of duties at NSP was part of the complaint of the African American employees. (Ex. 117, 33:23-34:1) However, Ms. Sheair did not investigate whether there was some sort of "buddy system" or a network of friendships among the lieutenants, sergeants, or corporals. (Ex. 117, 33:10-14)

157. He believes comments such as "smells like fried chicken" or "the back of the bus is here" or "the gang has arrived" would be offensive racial comments if they were made in the presence of African American staff. (Ex. 117, 63:6-11)

158. When he first heard of the comments, he thought they were inappropriate, disgusting, and should not happen in the work place. All staff members had been trained about working with each other, getting along. From a personal standpoint, he found the comments to be wrong and offensive. (Ex. 117, 63:11-18)

159. At the time of his deposition on August 2,2011, he was not aware that such comments had been made in front of supervisory personnel other than Sergeant Miles. (Ex. 117, 63:24-25) Through the investigation, he became aware that Miles was a supervisor and that Miles made comments. (Ex. 117, 64:1-7)

160. Based on the reports he reviewed, there was no evidence that any sergeant or lieutenant heard Miles make comments. He based that on the fact that there was no evidence to establish that anybody else made comments or heard those comments. (Ex. 117, 64:13-17)

161. During the statement of charges hearing for Miles, he documented there were five or six staff who heard Miles make racial comments. After the hearing, after the evidence was presented, he made a list of the comments. It was quite clear to him that those comments were made. (Ex. 117, 64:13-25)

162. During Bakewell's deposition on August 2,2011, he was asked to review the statement of Defendant Runge to Ms. Sheair (Ex.

117, 66:3 and Ex. 2 to Bakewell Deposition)[33] After reviewing Runge's statement to Sheair, Bakewell admitted that it appeared the Runge heard a racially offensive comment at roll call having to do with "the bus" having shown. (Ex. 117, 66:3-15)

163. Runge never reported to Bakewell, or to anyone else, that the comment had been made prior to the time Sheair took his statement on October 20, 2010. (Ex. 117, 66:16-20) Given the history of African Americans and buses, Bakewell believes that the comment was offensive. (Ex. 117, 66:21-67:1) and should have triggered a workplace harassment report from Runge. (Ex. 117, 67:2-4)

164. Bakewell believes that if a lieutenant heard a comment like "the back of the bus is here" or "the bus must have showed," and then does nothing about it, that the African American employees on first shift could conclude that such comments are condoned. (Ex. 117, 68:10-23)

165. No formal investigation was assigned to look into whether Runge, Stoner, or any other supervisor heard offensive comments at roll call and then failed to take any action. The only person he was aware allegations had been made about was Miles and NSP dealt with Miles through the disciplinary process. (Ex. 117, 69:2-20)

166. When the African American employees claimed that other people at first shift roll call made racial comments, those allegations were not "substantiated." (Ex. 117, 78:1-7)

167. He needs evidence in order to discipline people. In Miles' case, there were 5 or 6 people who were able to verify that he made one or more of the statements despite the fact that Miles denied making them. (Ex. 117, 70:8-22)

---

[33] Exhibit 2 to Bakewell's deposition is not in evidence.  Attachment 15 to Ex. "A" of Sheair's affidavit (filing 100-13 at 40) is an interview with Runge, dated October 20, 2010.

168. He never went to roll call to address the issue of racial comments on first shift when he learned of them in September, 2010. (Ex. 117, 54:17-25)

169. Bakewell did got [sic] to first shift roll call in July, 2011 after Defendant Stoner submitted a report on July 11th to Major Loock that was highly critical of Plaintiffs Ellis and Zeiger for answering "softly" when their names were called at roll call and then, allegedly, laughing. (Ex. 23 to Stoner Depo., Ex. 113).[34]

170. Bakewell then went to first shift roll call and saw that the Plaintiffs were standing behind the lieutenants' table (where they had always stood) and the lieutenants were not able to see them. The [sic] "the old school teacher in me kicked in" and Bakewell issued a memo requiring that the Plaintiffs and other employees no longer stand behind the table. (Ex. 117, 74:9-75:16 and Ex. 4 to Bakewell Depo., Ex. 117)[35]

171. At the time of the Plaintiffs' grievance, A.R. 112.07 required that if a supervisor became aware of workplace harassment, he or she had an affirmative obligation to report it up the chain of command—even if the employee did not put it into writing. (Ex. 117, 136:20-25)

## Testimony of Defendant Stoner

172. Defendant Stoner has been a lieutenant at NSP since approximately the year 2000. (Ex. 113, 6:10-12) He is a supervisor of staff and activities at NSP. (Ex. 113, 18:7-13) One of his duties is to see that the policies of the institution are enforced, which would include a policy against discriminatory behavior. (Ex. 113, 18:14-25)

173. NSP staff receive annual training on race and diversity. He understands from his training that they are not to discriminate based on race, religion, age, etc. (Ex. 113, 11:12-12:8) He understands

---

[34] Exhibit 23 to Stoner's deposition is not in evidence.

[35] Exhibit 4 to Bakewell's deposition is not in evidence.

discrimination to be playing favorites to one class of people or another. (Ex. 113, 12:9-12) Racial comments can be discrimination. (Ex. 113, 13:5)

174. He is familiar with the concept of hostile working environment and believes a hostile work environment could be created by any type of discrimination as outlined in their policies. (Ex. 113, 13:6 -14:1)

175. He would hope that there is not a hostile work environment but he cannot be responsible for other people's actions. (Ex. 113, 56:15-57:1)

176. However, he can take action against individuals who make comments or create a hostile work environment. (Ex. 113, 57:2-6) He can do this by properly documenting and submitting reports to his supervisors and by informing the employees involved that it is against the policy to promote a hostile work environment. (Ex. 113, 57:7-13)

177. He has done things outside of work with Defendant Runge. He would consider that he has friendly working relationship with Defendants Runge, Haney, and Furby. (Ex. 113, 34:7-20) He has no African American friends. (Ex. 113, 100:1-3)

178. He spends most of his time at NSP in the lieutenant's office with the first shift sergeants, including Defendants Furby and Miles (when he was a sergeant.) The sergeants assist in the supervision of the first shift. (Ex. 113,35:2-18; 159:11-16) The lieutenants' office is the central meeting place for the lieutenants and sergeants. (Ex. 113, 159:17-24)

179. Defendant Miles has even spent time in the lieutenant's office since his demotion. However, Stoner has "made sure" Miles has not spent "excessive time" in the office. (Ex. 113, 159:25-160:22) When Miles has been hanging out in the lieutenant's office since the demotion, Stoner has told him to "get to work." (Ex. 113, 161:6-9)

180. Stoner is sure that he talked with Runge, Furby, and Haney about the Plaintiffs' racial concerns after he learned of them. Stoner felt that the Plaintiffs' racial grievances were "unfounded." (Ex. 113, 99:17-100:25; 101:7-8)

181. He believes that the majority of the reports submitted by the African American plaintiffs in this case have been retaliation against their supervisors or fellow staff about "the wrongs" the Plaintiffs have committed. (Ex. 113, 108:21-109:5)

182. Stoner observed a change in Plaintiff Zeiger's work performance. When Zeiger started at NSP, he was "impressive." He did a good job and made few mistakes. He believed Zeiger had the potential to be an outstanding employee. (Ex. 113, 50:12- 51:2) Stoner and Runge nominated Zeiger for employee of the month in May of 2009. At that time, he saw in Zeiger the potential to promote and he believed he did a very good job. (Ex. 113, 49:8-24)

183. He has now seen a difference in Zeiger's attention to detail. He has seen him be in areas where you do not expect him to be and he has seen him talking with coworkers. (Ex. 113, 51:5-8) He saw a pattern of Zeiger going to Housing Unit 4 and interacting with Ellis and Hunter and since that time his "work performance has gone down." (Ex. 113, 51:10-15,55:3-25)

184. There is no policy against employees going to the housing units. There is nothing against policy or procedure for Zeiger to go a housing unit. (Ex. 113, 59:13-19)

185. He recalls a time where Zeiger had been on a travel order and left the institution. Upon his return, he should have reported to the yard sergeant and instead he went to Housing Unit 4. (Ex. 113, 52:4-14) "It is possible" that other staff have gone on travel orders and not reported to the yard sergeant upon their return. (Ex. 113, 52:25-53:6) Stoner does not recall ever writing up an employee simply for going to a housing unit. (Ex. 113, 59:20-24)

186. Since the filing of the Plaintiff's racial grievance, Stoner would rate Ellis' work performance as below average because he has observed him to have a poor work ethic, to be confrontational, argumentative, and disrespectful. There has been a definite change in Ellis since he came to first shift. (Ex. 113, 61:12-24, 62:1-6)

187. There is no other employee who he has written up more than Ellis since September, 2010. There is no other employee whom he has written up as often as Ellis within the last year. He is unsure whether he has ever written anyone up more than he has written up Ellis. (Ex. 113, 260:25-261:8) He has issued more incident reports regarding Ellis because he has had more verbal reports, written reports, and work related problems with Ellis than anyone he can previously recall. (Ex. 113, 266:12-18)

188. Things changed for Ellis after September, 2010 to the present. There have been a significant number of reports that have been submitted by the Plaintiffs in this case concerning numerous allegations. (Ex. 113, 266:19-267:3)

189. Prior to the time Plaintiffs submitted their racial grievance in early September 2010, Stoner does not recall having written Ellis up for any violation of NSP policy or procedure. (Ex. 113, 98:21-99:9) That immediately changed after the racial grievance was submitted by the Plaintiffs on September 4 or 5, 2010.

190. On September 16, 2010 Stoner wrote up Ellis for an incident involving a medical travel order. Ellis stated he felt sick and needed to go home. Stoner claims that Ellis then had a conversation with him about black inmates in the barbershop. Ellis informed Stoner that there were people who were "not happy at work" due to racial slurs. Stoner claims that Ellis referred only to matters that had occurred on second shift. (Ex. 113, 98:21-99:9, Ex. 7 to Stoner Deposition)[36]

---

[36] Exhibit 7 to Stoner's deposition is not in evidence.  Attachment 33 to Ex. "A" of Sheair's affidavit (filing 100-13 at 77) is a September 16, 2010 memorandum from Stoner to Loock regarding Ellis.

191. On September 23, 2010, Stoner wrote up Ellis again. Ex. 8,[37] a cover letter regarding an incident alleging that Ellis was laughing when a black inmate was making statements about assaulting a white corporal. (Ex. 113, 84:16-23,86:10) There were four officers on an escort of inmate Lyncook and one of the officers accused Ellis of laughing when Lyncook made a comment. Ellis denied laughing and the other two officers stated that they did not see Ellis laugh, talk, or joke. (Ex. 113, 84:25-85:24.) Nonetheless, Stoner believed that Ellis had engaged in unprofessional conduct, wrote up the matter, and required Ellis to submit a report. (Ex. 113, 89:9-11)

192. Stoner has written up Ellis for "inappropriate" interactions with black inmates on other occasions. On March 29, 2011 Stoner wrote up Ellis for laughing with a group of "mostly black inmates" by the Housing Unit 2 fire escape. (Ex. 113, 62:7-25 and Ex. 5 to Stoner Deposition).[38]

193. The intent of his report was to document that Ellis exhibited inappropriate interaction with inmates. (Ex. 113, 65:9-14) However, he concedes that one of the duties NSP staff has is to develop good professional relationships with inmates. (Ex. 113, 65:15-18) Warden Bakewell testified in his deposition that it is important for the staff at NSP to interact with inmates. That is part of what they teach at the training academy and talk about with NSP staff. (Ex. 117, 7:22-8:7) Bakewell testified that it is important for staff to interact with the inmates: "I think it is a good thing for individuals of a particular culture or race to see staff of that culture or race and see them in a positive light, as a good role model." (Ex. 117, 8:16-9:1)

194. However, Defendant Stoner testified that it was "unprofessional" for Ellis to interact "socially" with the inmates. (Ex. 113, 66:21-67:2) He believes Ellis's laughing with the "mostly black

---

[37] Exhibit 8 to Stoner's deposition is not in evidence.  Attachment 35 to Ex. "A" of Sheair's affidavit (filing 100-13 at 80) is a September 23, 2010 memorandum from Stoner to Loock regarding Ellis.

[38] Exhibit 5 to Stoner's deposition is not in evidence.

inmates" was not maintaining a professional demeanor in the work environment. (Ex. 113, 67:7-13)

195. Whether something is "unprofessional" partly comes down to a matter of his judgment. (Ex. 113, 93:18-25)

196. He does not know if he has ever written up a white staff member for laughing with white inmates. (Ex. 113, 67:18-20)

197. He wrote up Ellis for leaving the kitchen and appearing to have inappropriate interaction with inmates and "race" had nothing to do with it. When he asked why he put the color of the inmates in the report, he stated, "I was documenting the facts. Their skin color could indicate to our intelligence people if they were related to gangs, possibly identify inmates." (Ex. 113, 68:1-69:2)

198. He did not think to utilize inmate numbers or names when he wrote his report in order to identify the inmates involved. (Ex. 113, 69:3-10) He talked with the yard sergeant about why Ellis left his post and began interacting with the inmates. (Ex. 113, 70:21-71:6) He also reviewed video of that incident. (Ex. 113, 71:13-14) 199. He then wrote a report dated April 14, 2011, marked as Ex. 6,[39] documenting what occurred when Ellis was called to the lieutenant's office to respond to his report of the situation dated March 29, 2011. (Ex. 113, 72:4-14) He felt Ellis needed to write a report because he had acted "inappropriately." Ellis was rude in the lieutenant's office that day and made a comment to Lt. Haney about handling something "one on one." He believed that Ellis was upset about being written up for laughing with the "mostly black" inmates. (Ex. 113, 72:4-73:21)

200. On November 10, 2010, he reported an incident where Ellis did not report to the yard to be available for work. He recommended that Ellis receive a supervisor counseling log. (Ex. 113, 165:19-25) This occurred after Stoner became aware of the African American employees' concerns about the racial atmosphere on 1st shift. (Ex. 113, 166:2-12)

---

[39] Exhibit 6 to Stoner's deposition is not in evidence.

201. In Ex. 10[40] he recommended that Ellis receive two separate supervisor counseling logs: for failing to report and reporting late to work when he was to contract escort at 0700. (Ex. 113, 166:8-23) He claims that every time he knows about a first shift employee reporting late to work that they received a supervisors counseling log. (Ex. 113, 167:19-168:2)

202. Ex. 24[41] is a cover letter that he authored regarding an incident in which Plaintiff Zeiger responded in a low voice at roll call. Stoner had to call his name a second time and he responded more loudly, and then laughed or made some noise with Caseworker Hunter. Stoner thought this was possibly an intentional act to get Stoner to call his name twice so he ordered Zeiger to report to the lieutenants' office after roll call to "verbally counsel" him. (Ex. 113, 178:2-179:4 and Ex. 24 to Stoner Depo.)

203. Stoner believed that whether Zeiger was laughing at a joke or refusing to respond loudly enough so Stoner would have to call his name twice, it was "disrespect towards supervisors." (Ex. 113,184:4-17)

204. Stoner has written reports on previous occasions for "inappropriate behavior" at roll call such as staff being vocal about not liking their work assignment. (Ex. 113,185:11-19)

205. Exhibits 5 through 24 to Stoner's Deposition[42] are reports written up primarily about Ellis:

Ex. 5 - 3/29/11 report by Stoner re Ellis talking to black inmates

Ex. 6 - 4/4/11 report by Stoner re Ellis being unprofessional and submitting reports that "are not true" causing disruption and lower morale on first shift

---

[40] Exhibit 10 to Stoner's deposition is not in evidence.

[41] Exhibit 24 to Stoner's deposition is not in evidence.

[42] Exhbits 5 through 24 to Stoner's deposition are not in evidence.

Ex. 7 - 9/16/10 report by Stoner re Ellis claiming he was sick when given medical travel order

Ex. 8 - 9/23/10 report by Stoner re Ellis allegedly laughing when Inmate Lyncook talked about assault on Cpl Grove

Ex. 9 - 10/10/10 report by Stoner re Ellis submitting leave slips

Ex. 10 - 11/10/10 report by Stoner re Ellis not reporting to Yard

Ex. 11 - 11/29/10 report by Stoner re Zeiger reporting late for insulin detail and unprofessional behavior

Ex. 12 - 12/9/10 report by Stoner re Zeiger, Ellis, and Hunter and HU#3 Emergency Electrical Power Door Control Button being pushed accidently

Ex. 13 - 12/15/10 report by Stoner re Ellis vacation request

Ex. 14 - 12/15/10 report by Stoner re Ellis vacation request

Ex. 15 - 4/11/11 report by Stoner re Ellis complaint not being assigned to yard relief

Ex. 16 - 4/4/11 report by Stoner re Ellis not being assigned to yard relief

Ex. 17 - 4/4/11 report by Stoner re Ellis not answering phone in HU#l

Ex. 18 - 5/26/11 report by Stoner re Ellis request for time off for midget football in 2009

Ex. 19 - 1/6/10 report by Stoner re Zeiger re travel order to DaVita Dialysis

Ex. 22 - 11/30/10 supervisor's counseling log re Zeiger insulin incident

Ex. 23 - 7/15/11 Haney memo re Bakewell memo advising staff not to stand behind lieutenants' desk at roll call after Zeiger and Ellis laughed

Ex. 24 - 7/11/11 Stoner memo re Zeiger and Ellis laughing at roll call.

206. Exhibits 5, 6, 7, 8, 10, 11, 17, 19, and 24 could have led to discipline. (Ex. 113, 252:6-17)

207. The type of documentation written up on Ellis" can have an adverse effect on an NSP employee's ability to do their job." (Ex. 113, 255:12-20)

208. Counseling logs can lead to discipline if the same problem is repeated. The prior documentation can be used to support a future judgment of discipline. (Ex. 113, 254:17-255:4) When he reports things, they go up to the Major. If they are found to be serious enough, then it could be a matter for a statement of charges. (Ex. 113, 95:1-8)

209. A "statement of charges" is a packet notifying a staff member that they have made a mistake or committed a wrong at work, that a hearing will be conducted, a determination of disciplinary action. (Ex. 113, 95:9-16) His cover letters are part of the evidence that his superiors utilize in order to determine whether some one should be disciplined. (Ex. 113, 96:3-22)

210. After Stoner's write-ups documenting Ellis's "inappropriate" behavior, as well as interactions with Hunter in Housing Unit 4, Hunter and Ellis were transferred from the Penitentiary. It was a "central office" decision he learned about from Major Loock. (Ex. 113, 117:8-126:8)

Testimony of Defendant Runge

211. Defendant Runge began working on first shift in 2008 or 2009. As the Area 2 Lieutenant on first shift it is his responsibility to assist Lieutenant Stoner. (Ex. 115, 12:3-12) He supervises the sergeants, corporals, and officers on first shift. (Ex. 115, 13:6-10) It is also a part

of his responsibility to see that the policies and procedures of the Department of Corrections are followed and enforced. (Ex. 115, 13:11-18)

212. He spends the most of his time on a day to day basis in the lieutenants' office or out in the facility. During a 40 hour work week, he estimates that he would spend between 20-30 hours per week in the Lieutenants office. He estimates that Lieutenant Stoner spends ½ to ¾ of his time in the Lieutenants office as well. (Ex. 115, 20:1-23) The sergeants spend 1 to 3 hours per day in the lieutenants' office. (Ex. 115, 21:4-6) When Miles as a sergeant, he would have spent 1 to 3 hours per day in the Lieutenants office as well. (Ex. 115, 21:10-15)

213. His understanding of the workplace harassment policy is that he had the responsibility if he learned of any type of racial workplace harassment to report it to his supervisors immediately. (Ex. 115, 26:19-24)

214. He would define racial discrimination as doing something that would degrade somebody else or requiring them to do something that nobody else wants to do." (Ex. 115, 28:16-22)

215. He understood that racial discrimination was illegal as a matter of law in September 2010. (Ex. 115, 28:6-15) He would agree that if a person is treated differently on the basis of their race that that could also be grounds for discrimination (Ex. 115, 28:23-29:3)

216. He received in-service training through the Department of Corrections regarding issues involving racial discrimination prior to August and September 2010. The Department does not tolerate discrimination of any sort whether its racial, sexual, religion, age and it would be documented and forwarded up the chain of command if it occurred. (Ex. 115, 29:8-19)

217. He received training on hostile work environment which he defines as His [sic] something occurring that created an uncomfortable situation for a staff member to be in. (Ex. 115, 29:20-30:4)

218. Prior to the racial issues being raised by the Plaintiffs, he never had any interpersonal conflict with the African American staff at NSP. (Ex. 115, 17:17-23)

219. The first time he became aware that there was a racial tension amongst staff members at NSP was when Officer Ellis was in the Lieutenant's office speaking with Sergeant Furby about an unrelated issue on August 7, 2010. (Ex. 115, 31:9-11) He recalls Officer Ellis making the comment that, "We have a bunch of racists working here." (Ex. 115, 53:19-22)

220. After the conversation with Ellis, Defendant Runge did nothing more about the racial issues until he submitted a memorandum to Major Loock on September 10, 2010, which the major requested after the Plaintiffs had filed their racial grievance. (Ex. 115, 45:11-19)

221. In addition to the conversation he was present for with Ellis and Furby, Plaintiff Michael Hunter had verbally reported to Runge in May or June 2010 that an NSP officer named Stanek had been affiliated with a white supremacist group and was "talking crazy." (Ex. 115, 75:11-76:3; 78:21-79:1) Runge did not report this conversation with Hunter to anyone. (Ex. 115, 76:4-10) Despite the fact that Stanek was a first shift corporal under Runge's supervision, he did not think there was anything to report about Stanek. (Ex. 115, 76:24-77:1) He did not believe there was any policy violation. (Ex. 115, 77:4-6)

222. Ellis brought up Stanek's name as well in the August 7, 2010 conversation with Furby. Runge did not go to Stanek because he "was never told to". (Ex. 115, 84:6)

223. In November 2009, Officer Tyler Dean was speaking with several staff in the turnkey area where he used the phrase "prairie nigger." Those comments were reported to Lieutenant Stoner. Officer Dean was disciplined but subsequently promoted to Corporal. (Ex. 115, 88:11-15) Runge does not know if he was bothered by Dean promoting after using a term like that. He does not have an opinion on it. (Ex. 115, 88:19-23) He would assume that the African American staff did not like it. (Ex. 115, 88:24-89:4)

-74-

224. There were times when they would be walking from the Lieutenants office to the staff dining room when the African American employees would be walking in about the same time. (Ex. 115, 105:25-106:6) He never heard at anytime on the way from the Lieutenants office to the staff dining room anyone make racially charged comments. (Ex. 115, 106:21-25)

225. At roll call, he heard "the bus must have showed" but he does not know who made the comment. (Ex. 115, 107:22-108:10) He is aware that there was a time when African Americans were required to ride in the back of the bus. He believes that Rosa Parks was an activist. (Ex. 115, 108:17-25) He "guesses" that a comment about the bus arriving could be interpreted as a racial comment by African American employees. He does not believe it was a racially offensive comment. (Ex. 115, 109:7-23)

226. The department does not condone comments that can create a racially hostile work environment. (Ex. 115, 111:2-4)

227. He does not know if "smells like fried chicken" is a racially offensive comment because, "I don't what they mean by it." He does not know if comments about "the gang" or "the hood" are racially offensive. (Ex. 115, 112:2-10)

228. If he would have heard "looks like the 'hood is here" or "the gang is here," he believes he would have been obligated to do something about it such as confront the staff member who said it. (Ex. 115, 113:1-10) He would ask the staff member why they said it and what their intent was. (Ex. 115, 113:12-13)

229. He did not feel "the bus must have showed" was offensive because he did not know what the speaker's intentions were. He does not know if, "It looks like the back of the bus is here" is an offensive comment. (Ex. 115, 115:15-23)

230. A stereotype is a label placed upon somebody for whatever reason. He believes racial stereotypes can be offensive and that saying to a group of African  American employees when they enter a room,

"The bus must have showed" could be construed as a racial stereotype. (Ex. 115, 116:2-15) When he heard the comment, he did not believe it was a racial stereotype. (Ex. 115, 116:16-20)

231. He did not ask around after roll call who made a comment about the bus. (Ex. 115, 118:12-15) When asked why he did not inquire as to who made the comment he testified in his deposition, "Because I didn't." (Ex. 115, 118:18-20) He did not find it to be an offensive comment, so he did not follow up with it. (Ex. 115, 118:24-119:1)

232. He never heard anyone make comments about "the bus" when a group of white employees walked into the room. (Ex. 115, 118:1-8)

233. He does not recall chuckling when he heard the comment about the bus. He does not recall what he did when he heard it. He does not know what his actions were when he heard it. (Ex. 115, 120:1-7) He does not ever recall making comments when African American employees walked in to the room about the bus being here. He testified, "To the best of my recollection, no, I did not." (Ex. 115, 120:8-11)

234. He understands that given the history of African Americans being forced to ride on the back of the bus how any comment regarding the bus could be offensive to the African American staff. (Ex. 115, 120:20-24)

235. If he would have heard a racially offensive comment during roll call he had the authority to stop whatever was occurring at roll call and find out who it was who made the comment. (Ex. 115, 121:22-122:3) If the institution wants to address issues at roll call it has the capacity to do so. For example, if a group of employees had been standing in a particular area of the dining room and the institution decides that they should not stand there any longer, NSP can issue a memo directing people where to stand. (Ex. 115, 126:8-14 and Ex. 23 to Stoner Depo., Ex. 113)[43]

---

[43] Exhibit 23 to Stoner's deposition is not in evidence.

236. Other than Warden Bakewell's memo directing that staff could not longer stand behind the lieutenants' table, he can not recall any other memo addressing how people should act at roll call. (Ex. 115, 127:7-23)

237. No memo ever addressed comments being made at roll call (Ex. 115, 128:7-23)

238. When Cathy Sheair interviewed him, she first asked him about comments such as the hood, the bus, and fried chicken being made in front of the African American employees. She then asked at point number 4 in the statement, "Were you aware that these comments were being made?" He stated in response to question 4 that, in fact, "Ellis had said something to him and Sergeant Furby." (Ex. 115, 129:24-132:10)

239. Question 4 indicates that Officer Ellis had advised him and Sergeant Furby that comments were being made such as are listed in item 1-3 in his statement to Cathy Sheair. (Ex. 115, 132:21-133:2) The statement he gave to Cathy Sheair is how he remembers things occurring that day. It refreshed his recollection of about how the interview with her went. (Ex. 115, 132:8-15) He told Cathy Sheair that the first time he was aware of racial tension between staff was on August 7, 2010. (Ex. 115, 133:19-23)

240. Point number 15 in the statement to Cathy Sheair stated that he could not recall if he discussed work place harassment with Officer Ellis and Sergeant Furby. He did not document it in his cover letter of September 10, 2010. (Ex. 115, 137:7-22)

241. Point number 16 of his interview with Sheair states that Ellis wanted to wait to see if there were any more racial problems before he thought about filing work place harassment. Ellis was going to go back to the other African American staff. He was kind of the "spokesman" for the group. (Ex. 115, 138:10-23) Knowing that Ellis was the spokesman for a group adds weight to an allegation if it is not just one person that feels a certain way, but it is a group of people. (Ex. 115, 140:10-14)

242. At the time he gave his statement to Cathy Sheair, he claims that he had "no idea" who Officer Ellis was being a spokesman for. (Ex. 115, 140:24-141:2) He did not know whether Ellis was being a spokesman for the local rotary club, 29 year-old employees, or left-handed people. (Ex. 115, 141:2-12)

243. He believes Ellis was the one that used the term spokesman for the group. (Ex. 115, 142:2-8) He was under the impression that Ellis was going to talk with the group or whomever he was the spokesman for and then get back to him. (Ex. 115, 145:7) But he did not record that anywhere in Exhibit 2, his cover letter. (Ex. 115, 145:8-10 and Ex. 2 to Runge Deposition [(filing 100-7 at 17)])

244. The Lieutenants have to document "significant" events that occur either from staff or inmates. (Ex. 115, 149:3-7) There are a thousand things that happen everyday at NSP that could get written up and forwarded to Major Loock. (Ex. 115, 150:1-8) To substantiate or refute that things happen, the supervisors obtain reports from other staff. (Ex. 115, 150:22-25)

245. He understands why Officer Ellis may not have been very happy about being asked to write a report about something he did not do (the Lyncook incident.) (Ex. 115, 152:1-4) He does not know whether O'Connell was written up for making a false report. (Ex. 115, 152:10-14)

246. Prior to the filing of allegations of racial tension, his opinion was that Ellis was an average employee who was "not causing any problems." (Ex. 115, 152:15-19) Prior to the filing of the Plaintiff's report, he never had any problems with Caseworker Hunter. (Ex. 115, 152:20-23) Plaintiff Johnson was an average employee who does a good job. (Ex. 115, 153:2) When Corporal Zeiger started he did a "great job." Runge and Stoner had recommended him at one point early in his career for employee of the month. (Ex. 115, 153:4-9) Officer Delaney was an average employee, "not a problem causer." However, since the African American employees on first shift registered their concerns about the racial atmosphere he has seen a change in their work performance. (Ex. 115, 153:12-17)

247. It is up to the yard Sergeant to determine what tasks the Corporals and Officers on the yard will do on a given day. (Ex. 115, 157:9-12) He has heard that there are some jobs that are less desirable then others. (Ex. 115,157:13-19) There is no way to go back over the last 6 months and see who gets assigned to what task on the yard on a day to day basis. (Ex. 115, 158:7-11)

248. He agrees that it could be a problem if someone claimed that racists were working at an institution that is charged with the safety and security of housing a significant number of African American inmates. (Ex. 115, 164:2-14)

249. After he received the claim from Officer Ellis on August 7, 2010, that there were a bunch of racists working at NSP, he did nothing. (Ex. 115, 165:5-10)

250. He was given a statement charges in December 2010 for failing to report the conversation that he had with Officer Ellis. (Ex. 115, 166:9-14) He "took responsibility" for not reporting his conversation with Officer Ellis. (Ex. 115, 167:18- 168:6) He was given 6 months disciplinary probation. (Ex. 115, 169:7)

251. He understands that if a comment like "the bus is here" is made when African American employees walk into the room and no corrective action is taken by supervisory personnel charged with enforcing the non-discrimination policy of the institution, that that failure to take action could foster a environment where more comments are made. (Ex. 115, 166:23-167:8)

252. He agrees that one of the purposes behind discipline is not only to correct the action of the persons receiving the discipline but also to send a broader message to employees that this type of behavior will not be tolerated. (Ex. 115, 167:9-17)

253. On March 28, 2011, Runge wrote a report to Major Loock regarding Ellis and Hunter. Hunter had gone home that day without his knowledge and Officer Ellis seemed disgusted with having to work the post of "TEK 1" and requested to go home sick as well. It was reported

-79-

to him that shortly before Ellis went home, he and Hunter had been conversing. (Ex. 115, 172:19-173:24 and Ex. 5 to Runge Deposition)[44]

254. He recorded that Ellis was then in the dining hall with a green incident report tablet talking with inmates. Three of the four inmates that he was talking with were African American. (Ex. 115, 178:18-20)

255. He believed that Ellis's interaction with the inmates was "unprofessional" as he appeared to be having personal conversations with inmates. He does not know whether the inmates had requested to talk with Ellis or whether Ellis had initiated conversation with them. (Ex. 115, 178:13-179:1)

256. He has had many people request to go home because they got sick during their shift (Ex. 115,179:23-180:2) If he believes that somebody gets sick and wants to go home because they did not want to work a post he would document it. ([Ex. 115,]180:11)

257. He wrote that caseworker Hunter did not have approved leave. Caseworker Hunter received a statement of charges for leaving without Runge's permission. (Ex. 115, 182:24-183:25) In the past, he has advised housing and staff that he was not "their supervisor" and that it was their responsibility to make sure the housing unit was staffed sufficiently or to find relief. (Ex. 115, 185:5-14) On the day caseworker Hunter left, March 26, 2011, the housing staff was housed sufficiently. (Ex. 115,185:5-10) He has never written up a white employee in the housing unit for leaving early. (Ex. 115, 185:24-186:1)

258. He believes that the African American officers have written incident reports that he would consider to be retaliation against the supervisory staff since the filing of the lawsuit. (Ex. 115, 187:17-24) He takes offense at that because it is his belief their allegations are retaliation for anything the supervisors thought they were accountable for. (Ex. 115, 188:3-7)

---

[44] Exhibit 5 to Runge's deposition is not in evidence.

259. When he writes up a cover letter, he has discretion as to whether to recommend discipline to an employee. There have been times where he recommends disciplinary action. (Ex. 115, 217:12-19)

260. When he wrote the report regarding Ellis and Hunter, he understands it could be understood by his superiors that he was having criticisms about two African American employees. (Ex. 115, 220:18-25)

### Testimony of Defendant Haney

261. Immediately after Plaintiffs filed this lawsuit with Jaryl Ellis as the lead plaintiff, Defendant Haney began sending negative reports up the chain of command on Ellis. (Filing No.1) Haney wrote up Officer Ellis on November 21, 2010 because he thought he was faking an illness. Haney ordered Ellis to "produce a doctor's note" when he returned to work. (Ex. 118, 138:13-139:2, Haney Depo. Ex. 5 [(filing 120-2 at 52)]).

262. NSP policy only requires a doctor's note if sick leave is in excess of 72 hours. (Ex. 118,139:11-22). Haney said that he required a doctor's note of Ellis because, "He did not sound sick to me". (Ex. 118, 139:25-140:13).

263. He claimed that Ellis was argumentative. However, Ellis had simply pointed out that the written sick leave policy only requires a note when an employee has been absent for 72 hours or longer. Haney required the note even though he did not know what Officer Ellis had banked in terms of sick leave at that time and whether Officer Ellis was engaging in sick leave abuse. (Ex. 118, 141:9-11).

264. Haney was unable to identify any other employee from whom he had required a note simply because he did not like their tone or what they said to him on the phone when calling in sick. (Ex. 118,142:15-19). Ellis received a supervisor's counselor's log for failing to report on November 21, 2010. (Ex. 118,143:4-19; Ex. 5, p. 2)

265. Ex. 11 is a memo from Haney to Major Loock regarding a March 18, 2011 incident at first shift roll call wherein Haney believed

that Ellis was questioning his assignments at roll call. (Ex. 11 to Haney Depo., Ex. 118 [(filing 120-2 at 57)])

266. Ex. 12 is a memo from Haney to Major Loock regarding an incident which occurred on March 31, 2011 wherein Ellis was in the lieutenant's office with Runge and Stoner when Haney entered the room. Haney perceived that Ellis was disrespectful, had "completely fabricated[ ]" the details of an incident and was causing "unnecessary disruption, jeopardizes the careers of staff members assigned to supervise him and could potentially pose a threat to the safety and security of the facility due to the unpredictable nature of Ellis' behavior and his willingness to lie with regard to any incident." (Haney Depo. Ex. 12 [(filing 120-2 at 59)], p. 2) He believed that Ellis needed to be transferred out of the facility. (Ex. 118, 182:7-14).

267. Haney does not know whether he has written cover letters concerning any other employee and sent them up the chain of command more than he has on Ellis since the time of the filing of the Plaintiff's racial grievance. (Ex. 118, 190:21-191:2) Haney does not know of any employee that he has written up more than he has written up more than [sic] Officer Ellis during that timeframe. (Ex. 118, 191:3-7)

268. His cover letters and the information contained in his cover letters to his superiors can form the basis for discipline of an employee. ([Ex. 118,]186:11-15).

269. On November 28, Haney wrote up Corporal Zeiger regarding an incident wherein Zeiger made a comment about not wanting Haney to know his home address. Haney recommended that Zeiger received a "minimum of a supervisor's counseling log" and "because of the way this incident evolved, as well as other incidents that have taken place recently, I believe that Corporal Zeiger continued assignment with the first shift and his continued assignment to the Penitentiary pose a very real threat to the safety and security of the facility, as well as a danger to any manager responsible for supervising him due to the unpredictability

-82-

that has become increasingly prevalent in directly communicating with Corporal Zeiger." (Ex. 7, p. 2 to Haney Depo., Ex. 118)[45]

270. Haney thought Zeiger should be transferred out of first shift or out of the institution. (Ex. 118, 158:12-16)

271. Ex. 13 is a cover letter prepared regarding a confrontation between Cpl. White and Caseworker Hunter. Sgt. Goullette advised Haney that on May 7, 2011, there was a confrontation between White and Hunter. (Ex. 118, 188:23-189:11, Haney Depo. Ex. 13 [(filing 120-2 at 61)])

272. Ex. 8 to Haney's deposition is a supervisor's counseling log documenting that Ellis was 23 seconds late for roll call. (Ex. 118, 161:1-162:5, Haney Depo., Ex. 8).[46] He does not recall whether he had ever written up any other employee for being 23 seconds late and issued them a supervisor's counseling log. (Ex. 118, 162:6-10) Cpl. Stewart, a Caucasian employee, may have walked in after Ellis arrived at roll call on the same day. He does not recall writing up Cpl. Stewart for being late. (Ex. 118, 163:1-17.)

273. Technical violations of rules at NSP occur on a daily basis and supervisors have discretion over whether or not to document violations. If they deem them to be significant, they can document them. (Ex. 118, 194:10-195:6)

<u>Testimony of Defendant Loock</u>

274. Major Loock has been with the Department of Corrections since 1971. He has been a major since 1983 or 1984 and has been the Major of the Custody Division at NSP from 1991 to the present. (Ex. 116, 4:11-8:17)

---

[45] Exhibit 7 to Haney's deposition is not in evidence.

[46] Exhibit 8 to Haney's deposition is not in evidence.

275. His job is the overall supervision of the security or custody division of NSP. Directly under him are the captains and one secretary. The captains supervise the lieutenants and lieutenants supervise sergeants, sergeants supervise corporals. Captains and lieutenants report to him directly on a daily basis. (Ex. 116, 10:1-13)

276. He is responsible for seeing that the policies of the Department of Corrections are applied to the people underneath of him. (Ex. 116, 12:2-7)

277. He relies upon the lieutenants to be the eyes and ears of the institution. Part of their responsibility is to observe the staff and report to him about staff interactions and staff work performance. (Ex. 116, 16:13-25)

278. Over the 20 years that he has been a major of the Custody Division of NSP, the only two African American officers that he can recall working with are Otha Sorell, who achieved the rank of lieutenant, and Alvin Moore, who achieved the rank of captain. (Ex. 116, 17:19-19:10) It does not surprise him that he cannot recall the names of any other African American employees because of turnover. (Ex. 116, 19:19-20:5)

279. There has been no African American who achieved the rank of sergeant or above since 2005. (Ex. 116, 26:11-14)

280. Until his deposition was taken, he was not aware of the low number of African Americans who have been promoted. (Ex. 116, 29:19-30:4) He thinks the department needs" to take a look" at the reasons why there have been no African Americans at the captain, lieutenant, sergeant level in the Custody Division in recent years. (Ex. 116, 28:25-29:18)

281. Employees are promoted through a promotion board which consists of an oral and a written report and it takes into account their evaluation and discipline. A correction lieutenant chairs the corporal board. (Ex. 116, 30:13-31:2)

282. He does not believe there is a good old boy network within the Custody Division at NSP. (Ex. 116, 33:16-18).

283. He did not assign anyone to investigate the discrepancy between the Plaintiff s claim that they turned in their incident report on September 5, 2010 and the fact that it was not found by Captain Brittenham in the Major's box until September 10, 2010. (Ex. 116, 39:5-41:14)

284. When he receives reports in the Major's box, he processes them and sends them up to the Deputy Warden's office the same day. (Ex. 116, 41:25-42:4) It is important to do that because situations can gradually become worse if they are not handled properly and in an expedient manner. (Ex. 116, 42:5-10)

285. He believes it would have been important to begin addressing the concerns of the African American staff on first shift immediately. (Ex. 116, 42:11-17) If the report were to be deposited into the box on September 5, and then the people who submitted it heard nothing for days, they might conclude that their concerns are not important. (Ex. 116, 43:12-20)

286. He was very surprised when he read the Plaintiff's grievance. He was surprised that there were those types of issues "out there." (Ex. 116, 42:18-25)

287. At the time of his deposition on August 3, 2011, he was not aware of any comments made by Defendant Runge. As a first shift lieutenant, if Runge heard comments such as "the bus must have shown" when the Plaintiffs walked into roll call that would not be acceptable to him as the Major of the Custody Division at NSP because the comments are not appropriate, unprofessional, and would promote a negative environment. (Ex. 116, 47:15-48:16)

288. He would have expected Runge to report such comments immediately up the chain of command and address the person who made them immediately. (Ex. 116, 47:17-24) If Runge did not do that, it was a failure on Runge's part. (Ex. 116, 48:22-49:2)

289. If Stoner, Runge, Miles, Furby and Haney had a working relationship among themselves where they focused on the wrongdoing of certain staff members but overlooked the actions of other staff members that would cause him concern as the Major of the Custody Division at NSP because it promotes a negative attitude, is unprofessional and causes disruption between staff. (Ex. 116, 49:3-18)

290. He believes that Ellis is an "average" employee. His opinion of Ellis has not changed since Defendant Stoner began turning in a lot of memos and reports about Ellis: "Nothing I have seen proved one thing one way or the other." (Ex. 116, 51:13- 52:8)

291. Reports generated by supervisors form part of the evidence that is used in disciplinary proceedings known as "a statement of charges." Therefore, it is important that these reports be fair to the employees and be accurate. (Ex. 116, 63:2-13)

<u>Testimony of Valerie Stubblefield</u>

292. Valerie Stubblefield is an African American who worked as a secretary outside Major Loock's office. At the time her deposition was taken on September 28, 2011, she had been at NSP for 2½ years. (Ex. 114, 4:19-24)

293. Her job was to handle inmate records and record disciplinary hearings of NSP staff. (Ex. 114, 9:17-20)

294. In the days following the filing of the racial grievance by the African American officers, she saw" a lot more paperwork" filed on them. (Ex. 116, 52:14-53:20)

295. For example, when the Caucasian officers grouped and talked together it was "okay" but when the African American grouped together it was not. (Ex. 116, 54:11-15) She has never seen reports saying that a group of white officers were congregating and had to be told to disperse. (Ex. 116, 54:16-19)

296. She has never seen paperwork where a white officer was written up for talking to a group of predominantly white inmates. (Ex. 116, 54:20-23)

297. She has observed the lieutenants enter Loock's office, close the door, and she heard Loock say, ["That is why we are in this 'GD' situation already, because so and so, Ellis or could be Zeiger—I just hear the names."][47] (Ex. 116, 56:16-24) She would hear lieutenants complaining to Major Loock about the African American employees: "He is crying again, he is crying again, I am sick of this." She heard another NSP supervisor say that Ellis or Hunter should be transferred. She also heard that Hunter, Ellis, and Zeiger, "aren't where they are supposed to be." (Ex. 116, 57:2-16)

298. She knows that the African American officers were "having tabs kept on them." (Ex. 116, 57:17-18) She knows that they were being watched. (Ex. 116, 176:3-9)

299. Major Loock was there to protect his staff, which would include the lieutenants: "They are always in his office" and he favors them. (Ex. 116, 174:13-175:1) She has observed the lieutenants file into his office and Sergeant Furby "keeps close with the lieutenants as well." (Ex. 116, 175:25-176:2)

300. Because she had access to seeing paperwork in the Major's office, she believed she was requested to transfer out of that area so that she could not read the paperwork. She felt like they wanted to get her out so she could not read the reports on the African American officers. (Ex. 116, 57:21-58:5)

Testimony of Plaintiff Zeiger

301. Paul Zeiger began his employment at NSP on November 17, 2008. Six months later he was promoted to Corporal. He has worked first

---

[47] In the plaintiffs' statement of facts, this testimony is misquoted. Also, Ms. Stubblefield did not attribute the statement to Defendant Loock.

shift since five weeks after he began his employment. (Ex. 107, 8:20-9:10)

302. Zeiger heard Runge say "the back of the bus is here" or "finally the back of the bus made it" several times as he was going into roll call Runge and Miles would be walking from the lieutenants' office toward roll call and the African American officers would walk in behind or in front of them (Ex. 107, 53:12-18; 54:17-22)

303. Plaintiff Zeiger also heard the comments "the 'hood is here," "smells like fried chicken," "they are serving watermelon today, I am sure you guys are happy," and comments about Plaintiff Johnson's hair. He heard Miles and Runge take turns making these comments. (Ex. 107, 53:22-25; 54:1-3; 57:14-17)

304. One day when watermelon was being served to the inmates, Miles looked over to the African Americans, and said, "Well hope you guys are happy today, they are serving watermelon." (Ex. 107, 55:18-22)

305. Plaintiffs Hunter, Ellis, Johnson, and Delaney were present when comments were being made walking into roll call. (Ex. 107, 55:15-17) The sergeants and Lt. Stoner would have been present at the lieutenant's desk at roll call when the comments were made. (Ex. 107, 56:3-11)

306. Miles said smells like fried chicken in here while looking at Zeiger, Hunter, Ellis, Johnson and Delaney. (Ex. 107, 58:10-59:1) He made this statement in the staff dining room just before roll call began. (Ex. 107, 59:2-7) Zeiger believes Stoner could hear the comment. Stoner was at the table getting ready to read off roll call. (Ex. 107, 59:11-60:1)

307. Miles said "the gang has arrived" at roll call. Miles was about six inches from Zeiger when the comment was made. (Ex. 107, 60:9-25) He remembers Runge saying "looks like the hood has arrived." He heard Miles say that as well. (Ex. 107, 62:6-10)

308. Plaintiff Zeiger heard things every day at roll call. When Miles wasn't there, Runge would make racial comments. (Ex. 107,

62:16-23) It was worse when Miles was there for roll call. (Ex. 107, 62:5)

309. At roll call, Miles said, "If the lights went out all you would see would be white teeth." Miles was looking at the Plaintiffs when he made the comments. (Ex. 107, 63:6-9; 64:10)

310. In addition to the "back of the bus," "fried chicken," "the gang is here," "the 'hood is here" and "white teeth," there were other comments at roll call the months predating the filing of the racial incident report in September, 2010. There were other comments that were racially oriented and were made on a regular basis in his presence. (Ex. 107, 186:2-10)

311. Around the time the African American officers demanded that the comments stop, Sgt. Furby had a conversation with Cpl. Zeiger wherein Furby admitted that NSP was run on the "good old boy" system." (Ex. 107, 80:5-12)

312. Co-worker Glora Hayek warned him that if you bring things up, "they" will get rid of you. (Ex. 107, 86:15-22) He knows it is difficult to raise concerns about discrimination at NSP. He observed what Hayek endured when she raised questions. (Ex. 107, 83:10-84:1)

313. When he works the yard at NSP, he has been assigned to many undesirable jobs more often than non-African Americans, including tugs, cold storage, and other less desirable duties. (Ex. 107, 13:23-14:6) He has observed that his fellow African American officers, Delaney, Ellis and Johnson, have been assigned unfavorable duties more often than non-African American NSP workers. (Ex. 107, 17:1-7)

314. The NSP supervisors pick on Ellis. (Ex. 107, 20:1-2) He has observed the yard sergeants running Ellis and Delaney. This happened before the incident reported of September, 2010. (Ex. 107, 23:3-18 and 25:23-26:3)

315. Haney has singled him out for racially motivated reasons by assigning him to the farthest tower. (Ex. 107, 33:5-21) He has been

singled out for treatment different from his non-African American counterparts by being assigned off shift posts. (Ex. 107, 34:9-35:21)

316. He believed that if he put something in writing, it could jeopardize his ability to promote. He did not want to name names for fear that there would be reprisal and he not be promoted to sergeant. (Ex. 107, 81:10-20)

317. On a scale of 1-10, with 10 being extremely severe, he would say the environment is a"9." It was severe. (Ex. 107, 82:11-18) Since the filing of the lawsuit, the comments are down about 50%. (Ex. 107, 82:2-10)

318. Ellis advised Zeiger that he was going to write an incident report to the major and drop it off in the major's box. Zeiger agreed with that strategy to make the major aware because the major is the highest in command of the custody division. (Ex. 107, 87:21-88:1)

319. Zeiger thought that would be a great idea. He read the report, made sure the facts were straight, and he believed the Major would take action and stop it. Ellis wrote the report with the support of Hunter and Johnson and Delaney and Zeiger. (Ex. 107, 88:2-25)

320. After they submitted the report, they heard nothing. Several weeks [sic] went by. He assumed that by giving it to the Major, the Major would submit it to the Board. Every day the Major has a meeting with the Administrator, the Associate Warden and the Deputy Warden in the Warden's conference area. However, when Zeiger spoke with Warden Bakewell, he acted like he didn't know anything about it. (Ex. 107, 89:21- 90:6)

321. They then contacted the State Ombudsman office.[48] When no one from NSP came and spoke with them about their concerns for several weeks, they felt it was the good ol' boy system and they were going to be ignored. (Ex. 107, 90:20-91:14)

---

[48] The evidence establishes that the Ombudsman's Office had a copy of the incident report by September 7, 2010, four days after it was written.

-90-

322. The Defendants' actions have caused him to be depressed and have anxiety. He goes home feeling upset and depressed. He finds himself sleeping a lot just to distance himself. He has mood swings because with the comments and environment he is stressed and put into a stressful environment. He had to go to the emergency room for anxiety. (Ex. 107, 165:19-166:12)

323. Anxiety attacks are something he has to deal with every day now. He feels numbness, lightheaded, difficulty breathing and hard to swallow. He has had the attacks at work, at home and is related to stress dealing with the working environment. He has been prescribed Ativan to help him relax and he counsels with his pastor. (Ex. 107, 166:20-169:6-7)

324. He has experienced humiliation at work when his supervisors make comments. He was humiliated. He didn't know how to handle it. Felt like he was doing something wrong. If he does something wrong, he was concerned that they would lash out and use racial comments so he tried to do everything right. Seeing his co-workers suffer and seeing the information being leaked out about the case to other members of NSP, seeing the head of the chain of command, the Major walk by him in disgust is really humiliating. (Ex. 107, 169:18-170:8)

325. He has suffered embarrassment from people looking at him to people not talking to him. Having Haney make comments and stare with his arms folded or his hands on his hips watching the African American staff. He has experienced fear of something happening at NSP and whether other people would come to the aid of the African American staff. (Ex. 107, 170:16; 171:1-3)

326. He has suffered damage to his reputation because once he was a correctional officer who wanted to advance. He wanted to be one of the top people at NSP. But now his attitude had changed. His reputation of wanting to learn everything he could about a post has changed. (Ex. 107, 173:4-13)

327. When supervisors make fun of you and make derogatory comments and racial comments, it results in distrust. (Ex. 107, 174:7-12)

He has suffered stress from the hostile work environment at NSP. The depression, anxiety, mood swings, stress, humiliation and embarrassment is due to the racial environment at NSP. He also believes his wife lost her job because of the racial allegations. She was employed by Cpl. Stanek's mother-in-law. (Ex. 107,183:17-184:24)

328. He feels like an inmate at NSP. He feels like he is being watched all the time. (Ex. 107, 186:20-25)

## Testimony of Plaintiff Delaney

329. Plaintiff Aaron Delaney began at NSP in August 2008. He has worked first shift since he began (Ex. 108, 5:16-8:22)

330. The first time he heard "the back of the bus is here," Miles said it as Hunter, Ellis, Johnson and Zeiger were coming to their usual spot in roll call by the soda machines. (Ex. 108, 34:19)

331. The second time Officer Ellis actually turned around and said something like "That's enough with the jokes." People at roll call looked at Miles when he made the comment. Caseworker Blankenship said the comments had gone too far. (Ex. 108, 35:9-36:17)

332. Lt. Stoner was at the table when Miles made the first comment and Sgt. Furby was standing next to Stoner at the lieutenant's table. (Ex. 108, 36:20-37:2)

333. At that point, the comments had been occurring on almost a daily basis. (Ex. 108, 38:21-39:4)

334. He is not sure who said" the gang has arrived." The comment came from the back of the room near the food line. (Ex. 108, 40:4-11) He heard Miles say "the 'hood has arrived." (Ex. 108, 41:9-15) He heard, "If the lights went out all you would see is white teeth," a couple of times from the back area of the room near the serving line. He heard this comment on at least four occasions. (Ex. 108, 41:22-42:13)

335. While he was personally present, he heard at least 15 racially insensitive comments directed toward the Plaintiffs. He believes Miles made the majority of the comments. The rest would he would say emanated from the back near the serving line. (Ex. 108, 41:17-43:14)

336. The comments occurred during the time the sergeants and lieutenants were in the roll call room. The sergeants and lieutenants are usually in the room before the Plaintiffs would arrive. (Ex. 108, 44:19-45:19)

337. About three minutes passes from the time the lieutenants come into the room from the time roll call begins and it is in that three minute time frame that the racial insensitive comments would be made. (Ex. 108, 46:6-24)

338. He has observed the drug sniffing dog brought in much closer to the African American employees than to the white officers. He believes that Sgt. Nieman is profiling the African American employees. (Ex. 108, 47:19-49:14)

339. Plaintiffs Hunter and Ellis are constantly being written up and now he has been written up since he joined the lawsuit. (Ex. 108, 49:20-50:16) One example involved him doing an elongated travel order that took 8-10 hours. In the past, when a travel order has taken a long time, people have been allowed to come in a little bit late the next day. Rather than reporting at 5:50 a.m., he came in at 6:00 a.m. next day and missed roll call by 5 minutes or so. He was called into a lieutenant's office and given a warning. None of his white co-workers have been written up under similar circumstances. (Ex. 108, 50:20-52:15)

340. By written up, he means being issued a "B Form." If you are written up again, you can be disciplined with a statement of charges. (Ex. 108, 53:5-18)

341. He has been singled out for treatment which is different from his white co-workers. (Ex. 108, 49:18) When assigned to the yard, he is singled out for treatment that is different from the Caucasian employees. (Ex. 108, 62:14 -18) For example, Caucasian employees will hang out

on the yard right outside of turnkey. At any given time, there will be 4-7 non-African American employees. Whereas, there have been times when he and officer Ellis were standing together in the yard and they have been told to "break up." At the same time, there were numerous Caucasian employees standing right under Tower 10. (Ex. 108, 62:20-:63:15)

342. After the Plaintiffs put in their report about the racial environment, he and the other African Americans got the less desirable yard details. (Ex. 108, 64:10-65:21) When he challenged the yard sergeant about assigning him to certain tasks, he has been told he is "just lazy." Defendants Miles and Furby were the yard sergeants during this timeframe. Miles gave him crap details more often than white officers. (Ex. 108, 67:5- 11)

343. For example, Miles gave him a tug and he was told to get an inmate out of the housing unit. Miles told him to do this while he Miles [sic] was just chatting with three Caucasian officers who were available to do the tug. (Ex. 108, 67:15-68:5) He believes that Miles was doing this because reports had been written about him regarding the racial comments. (Ex. 108, 68:21-25) He recalls this happening after the African American employees put in their initial complaints. (Ex. 108, 61:1-7)

344. From November, 2009 to November, 2010, he was treated by Sgt. Furby differently than Caucasian employees. He has seen Furby pile duties on the Plaintiffs. (Ex. 108, 69:20-72:7) He believes he was doing this because they were black and because Furby was not doing it to anyone else. (Ex. 108, 72:10-16)

345. He has been told not to spend too much time talking to African American inmates because "it looks bad." Defendant Furby was one of the supervisors who had told him this. (Ex. 108, 77:20-78:6) In about March, 2011, there was an incident where he was standing in the yard and a couple of African American inmates came up and he had "maybe" a two minute conversation with them. Defendant Furby came up and said you really shouldn't be talking to black inmates "it really looks kind of bad." (Ex. 108, 78:15-79:15)

-94-

346. In about his second month at NSP, Delaney heard Furby use the "N-word" while telling a story in the dining hall about a family member of Furby's who had ordered pizza and a black person had delivered it. (Ex. 108, 80:12-20)

347. Delaney was written up by Lt. Stoner because he joined the lawsuit. After joining the lawsuit, he was written up for things that he would not have been written up for in the past like missing roll call on the day after he had an elongated travel order. (Ex. 108, 96:24-97:11)

348. Defendant Furby has given him more of the "crappy details" because he joined the lawsuit. (Ex. 108, 98:2-18) The other defendants do not even look at him now. (Ex. 108, 93:24-25)

349. Defendants Runge, Furby, and Stoner were all present the whole time during the making of racial comments at roll call. Not one of them said anything to Miles even though they were only a few feet away from him. (Ex. 108, 103:15-24) He does not believe there is any way that the lieutenants and sergeants who were present at roll call could not have heard the comments. In fact, he saw Furby, Stoner, and Runge chuckle at the comments. (Ex. 108, 122:25-126:8)

350. When racial comments were made, the lieutenants and sergeants would just let it go. None of them even batted an eye or said, "Cut that out." (Ex. 108, 103:25- 104:5)

351. He has suffered a lot of stress. He has started to break out in hives and have anxiety attacks due to the stress of working at NSP. (Ex. 108, 104:14-108:14)

352. When he first started working, people would say good morning to him and have a quick joke with him. They would stop in the housing unit to talk with him. Now they will not speak with him. They don't want to be seen with him or around him on the yard. (Ex. 108, 113:12-21)

353. There is a drastic change in working conditions at NSP in that he has no more interaction with his co-workers. If he has interaction with

co-workers, Stoner or Runge "start coming down on them." (Ex. 108, 121:18-122:10)

354. He heard the racially insensitive comments over approximately a three month period of time starting in June of 2010. (Ex. 108, 122:11-24)

355. There are conversations happening before roll call, but it is not loud in the room. Once the lieutenants walk in most of the conversations most of the conversations shut down and everybody prepares for roll call. (Ex. 108, 128:6-15)

356. When he heard the racially insensitive comments at roll call, it angered him that people still hurt other people with those derogatory terms and that supervisors would just sit there just a few feet away and do nothing to stop it. (Ex. 108, 124;8-16)

### Testimony of Plaintiff Ellis

357. Plaintiff Jaryl Ellis began his employment with the Nebraska State Penitentiary in January, 2009. He worked second shift from January to August, 2009 and then first shift from August, 2009 to the time he was transferred out of NSP in July, 2011. (Ex. 105, 16:9-17:4)

358. Non-African American staff and NSP supervisors began making comments over the course of the year prior to the filing of the complaint. The African American staff put up with it, but the comments became more blunt. When the African Americans on first shift would walk into the roll call room, comments like it "smells like fried chicken," "look the gang is here," and "the back of the bus is here," were made. (Ex. 105, 28:9-29:3)

359. Racial comments had been made since he began working at NSP but the comments at roll call began during 2010. (Ex. 105, 31:17-20.) The comments came from various places in the roll call room. He would enter the room from the area right behind where the lieutenants are during roll call and sit or stand by the pop machines. (Ex. 105, 32:9-19.)

360. When the lieutenants walk into roll call, the people quiet down. It is just average talking going on prior to that. When you enter roll call, you can hear remarks that are made. One could hear the comments at any time during roll call, whether or not the actual roll call meeting was underway. (Ex. 105, 33:16-21; 34:3-19)

361. Ninety percent of the time, the African American employees on first shift would walk into roll call at the same time as the lieutenants, so he knows Lieutenants Stoner and Runge heard these comments and may have said some of them. (Ex. 105, 33:1-8)

362. He believes "looks like the back of the bus is here" was directed at the African Americans because it occurred when the four African American officers walked into roll call. He immediately heard laughter and giggling. (Ex. [10]5, 39:10-15; 40:15-21)

363. Defendants Runge, Stoner and Haney were present when "the hood has arrived" comments were made. (Ex. 105, 54:17-21)

364. He knows the lieutenant was present when the comment was made because the lieutenants would walk in ahead of the African American officers and already be seated when the comments would be blurted out. He knows the Lieutenants Stoner and Runge heard the comments because they smirked. (Ex. 105, 55:3 -19)

365. He heard "the gang has arrived" at roll call. There was laughter when the comment was made. Defendants Miles, Runge, Stoner, and Haney were present when the gang comments were made. (Ex. 105, 51:12-18; 52:9-53:4)

366. These comments occurred before the African American officers turned in their grievance in September, 2010. He knows that Runge and Stoner heard the comment that day because they laughed about it. (Ex. 105, 67:17-68:1)

367. This comment was made when he and Plaintiffs Hunter, Johnson and Zeiger were walking into roll call. The comment was made more than once by Miles. Runge and Stoner were with Miles and did

nothing about the comment. So that encouraged him to say it more. This prompted Ellis to say, "Damn the jokes." (Ex. 105, 58:14-59:1)

368. At roll call, people would point at the African American officers and whisper on a daily basis. After they turned in the September, 2010 incident report, the finger pointing would occur on a daily basis. Prior to them turning in the September, 2010 incident report, it occurred two or three times per week. He could see the finger pointing and hear the whispering. (Ex. 105, 59:2-19; 60:6-11)

369. Miles, Runge, and Stoner just looked at him and grinned when he said "Damn the jokes." They knew he was serious but they just proceeded to start roll call. (Ex. 105, 29:4-23.)

370. He was so upset about all of the racial comments that he contacted Furby to ask if Furby had a problem with him. Lt. Runge was also present. (Ex. 105, 29:25- 30:2; 142:19-24) The date of that meeting was August 7, 2010. (Furby Depo. 42:11-43:7)

371. At that meeting, Ellis let Runge and Furby know there was a lot of racial tension going around NSP and that things were being said at roll call. (Ex. 105, 143:3- 11,25)

372. He did not want to give names or put anything on paper for fear of being singled out as a trouble maker. Runge and Furby told him they could not help him unless he put names on paper. He reluctantly gave them some names. Furby indicated he would look into it and get back to him. Two weeks went by and he heard nothing from Furby or Runge. (Ex. 105, 131:16-24; 143:19-145:11)

373. When Ellis checked back with him two weeks later, Furby told Ellis that he had spoken with a Corporal Stanek and that Ellis should stay away from him because he was" a racist." However, Furby said he had done nothing more to follow up on the racial issues that Ellis had raised with him. Ellis took this to mean that Furby was not taking the racial issues seriously and did not care about them. (Ex. 105, 132:21-133:5)

-98-

374. Furby has admitted that he did not do anything to follow up on Ellis's concerns other than have a conversation with Corporal Stanek who denied he had any problems with people of other races. (Furby Depo. 45:1-5)

375. After the conversation with Ellis in August of 2010, Sgt. Furby spoke with caseworker Hunter. Sgt. Furby asked Hunter if there was anyone at NSP making racial comments. Furby stated that Ellis was reluctant to give names. Hunter confirmed to Furby that racial comments were being made. Furby asked why he hadn't come to him. Hunter stated that it was because he had no one to trust because there was no one higher up in the administration who is African American. He feels there is no support system at NSP. There is no one they can sit down and tell their complaints to. (Hunter Depo, Ex. 106, 123:21-124:25)

376. Plaintiff Hunter did not observe any change in the working conditions at NSP because "everything" was still happening, i.e., the racial comments and joking continued.   [(Hunter Depo,] 125:12-20 After Ellis approached Runge and Furby, the jokes from roll call were still going on so Ellis approached Runge and Furby about two weeks after the August, 2010 initial meeting. (Hunter Depo, Ex. 106, 125:12-20[,] 126:8-127:8)

377. Ellis has been made to feel like an inmate because he knows he has been watched and his whereabouts checked on every second of the day. He feels belittled and degraded basically making it seem like he doesn't know anything or that he is just stupid because he is black. (Ex. 105, 79:4-15)

378. He has been "singled out" for treatment is different from non African American employees. He has been told he should not talk to African American inmates because "it looks bad." (Ex. 105, 78:5-20)

379. He has been singled out for more details and has been checked on. When he would be the only African American on the yard, there were would 14-15 Caucasians employees working the yard and the sergeant running the yard would come running to him and advise him he needed to a particular task rather than the one of the 14 or 15 Caucasians

on the yard. When he would confront the yard sergeant, the yard sergeant would say oh I didn't see the white employee. Ellis believes this to be a flat out lie. (Ex. l05, 79:2-80:3)

380. There would be times when he would be on a travel order where he would take an inmate to an outside hospital and when he would come back, whichever officer he was with or corporal at the time. The yard sergeant would ask where Ellis was so that he could do an additional detail rather than the Caucasian employee who accompanied Ellis on the escort. They will assign Ellis duties as soon as he gets back from the escort whereas the other person they would not care about his whereabouts. (Ex. 105, 80:4-23)

381. For example, after they filed their racial grievance, there was an incident where after he returned from a travel order, he was immediately put on rover patrol because it was windy and he needed to check the fences. Prior to his returning from the travel order, there was other staff available to do rover patrol, but he was assigned to do just after he completed another detail. (Ex. 105, 81:2-22)

382. Examples of less desirable tasks that he gets assigned to more frequently are medical boxes, cold storage, and "tugs." No one likes to do cold storage but he gets assigned to that task when he is on the yard. He would often be stuck doing less desirable tasks all day. (Ex. 105, 82:3-83:20)

383. There is a constant running of the African American employees when they are on the yard. They are told to do one detail after another. One day when Plaintiffs Zeiger, Johnson, Ellis and Delaney were working in the yard, it was as if they were the only officers on the yard. (Ex. 105, 155:1-156:4)

384. Once when he was on the yard with Officer Johnson, he was told by Lt. Stoner that he spends too much time with the other African American employees while on duty. (Ex. 105, 91:15-92:9)

385. After they turned in the September report, the work environment became more hostile for him. For example, there was an

incident where he was assigned to housing unit 4 and Stoner asked Force to go and check on Ellis. Force asked Ellis if he had been smoking in the bathroom. Stoner called on the phone and no one answered so Stoner instructed Avig to write up Ellis as for having abandoned his post when all he did was go to the bathroom. (Ex. 105, 102:15-103:23)

386. Ex. 15[49] to his deposition was the incident report where he left the bubble to use the bathroom and Stoner told the caseworker he needed to write him up for abandoning his post. Officers leave the control center on a daily basis to go to the bathroom. They do not need to be relieved. There is nothing that states you have to be relieved before you use the bathroom. So for Stoner to tell Avig to write him up shows that he was not being treated equally. (Ex. 105, 230:15-231:23)

387. On a scale of 1-10, he would characterize NSP as a "10" in terms of a racially hostile work environment. It reminds him of being back in the 1940s and being segregated. (Ex. 105, 136:8-24)

388. The discriminatory conduct has clouded his vision and his thoughts. He should be concentrating on the safety of the institution but now he gets worried about his own safety and how things are going to play out with the racism and the stuff that is going on. It has affected his ability to do his job by stressing him out by being angry and not feeling like he can trust anyone. (Ex. 105, 137:2-11)

389. Ex. 1[50] to his deposition is the September, 2010 incident report. All of the plaintiffs worked on the report. They wrote it on September 3 and put it in the Major's box on September 4. (Ex. 105, 145:21-147:4, see Defendants Ex. 13, Sheair Affidavit, at Attachment A [(filing 100-13 at 11)])

390. They did not name names at that time because were not trying to get someone in trouble or get anybody fired, they just wanted

---

[49] Exhibit 15 to Ellis's deposition is not in evidence.

[50] Exhibit 1 to Ellis's deposition is not in evidence.  Attachment 1 to Ex. "A" of Sheair's affidavit (filing 100-13 at 11) is the September 2010 incident report.

to let their superiors know their concern and ask what their superiors planned to do about it. (Ex. 105, 147:13-25)

391. The first time he was contacted by NSP in response to the September, 2010 incident report was when he was told by his lieutenant to go and meet with Cathy Sheair, a deputy warden assigned to investigate the claims of the African American officers. (Ex. 105, 149:1-13) Deputy Warden Sheair's notes indicate that this meeting took place on October 4, 2010. (Defendants' Ex. 13, Attachment 21 to Sheair Report [(filing 100-13 at 50)])

392. After the September, 2010 incident report, he was retaliated against: he received "write-ups" without cause, was assigned more details, was treated worse than before, and watched more closely. (Ex. 105, 180:7-24)

393. On September 16, 2010 he was accused of laughing after inmate Lyncook insulted a coworker. After the Lyncook incident, Stoner immediately called him into the office to question him about laughing. (Ex. 105, 173:12-176:11) Word got around the next day that Ellis was laughing at staff getting assaulted. (Ex. 105, 177:21-178:16)

394. Another incident that occurred shortly after they turned in their racial grievance, was when Lt. Haney wanted to check on Ellis to see if he was truly sick. That same morning Ellis got a call from Stoner. He does not believe they ever called anyone else at home and that Stoner actually wrote a report stating that he had not called Ellis. (Ex. l05, 152:15-154:6)

395. Zeiger observed that Ellis has been treated differently as an African American than a white officer regarding calling in sick. There is an incident where Haney wanted Ellis's address so he could go and check to see if Ellis were at home sick. Zeiger noted that there was a white officer named Hansen who had been called in sick many times and no one had checked on aim. Zeiger advised Haney that it seemed like he was picking on Ellis. Hansen calls in sick all the time. Zeiger checked with Hansen to see if anyone had ever checked up on him when he had called in. Hansen advised him never once had anyone called or checked

on him. He had this conversation with Hansen a couple of days after the conversation with Haney. He asked Hansen whether Haney or Stoner or Runge or any of the first shift lieutenants ever came to his house or asked one of his friends where he lived in order to find out if he was really sick at home. Hansen said no. (Zeiger Depo, Ex. 107, 114:19-118:24)

396. Ellis believes that Haney does not like him and therefore he assigned him to a housing unit rather than the post he was supposed to be assigned to on the yard. (Ex. 105, 93:17-94:25)

397. Due to the racial environment, Ellis gets the jitters. Sometimes he shakes. His temper flares easily. He feels powerless and stressed out. He has felt embarrassment and hurt just like when you are a little kid. He will lay in bed at night and shake sometimes. He has experienced pain in his chest due to the stress. (Ex. 105, 246:20-249:3-21 )

## Additional Testimony of Plaintiff Hunter

398. Plaintiff Michael Hunter was a caseworker on first shift at NSP until his transfer in August 2011. (Ex. 121, Affidavit of Michael Hunter) He heard racially insensitive comments walking into roll call on more than 50 occasions. (Ex. 106, 57:17- 58:1) The supervisors were making comments at roll call and then it trickled down to the other officers. (Ex. 106, 45:3-7)

399. If you are in with the lieutenants, you are considered part of a "buddy-buddy" system. (Ex. 106, 25:23-26:626:6-9)

400. He has heard "the gang is here" many times walking into roll call. He estimates that he has heard it at roll call about 7-8 times and 20 times overall. (Ex. 106, 45:5-21) The "back of the bus" comment came from the area where Miles, Runge and Stoner were situated. (Ex. 106, 47:5-9) He heard the comment "it smells like fried chicken" when entering roll call. (Ex. 106, 47:10-16,53:7-16)

401. He heard "the gang has arrived" over 20 times. (Ex. 106, 54:8-12) He had heard the comment "the gang has arrived" from other staff when Miles was not there. (Ex. 106, 56:11-17)

402. When the African American plaintiffs were walking through the secured vestibule door for master control, Runge, Stoner and Miles were walking in and one of them said, "The back of the bus has arrived." (Ex. 106, 55:13) Either Runge, Stoner, or Miles made the comment the back of the bus is here. (Ex. 106, 128:24-129:2) Stoner and Runge were present when the comment" the back of the bus is here" was made. (Ex. 106, 181:22-182:10)

403. Of the 90 or so people are first shift, he would estimate that 70% - 75% of them laughed or joined in the racially charged comments. That made him like it was the 1950's and he was a black kid walking into an all white school. (Ex. 106, 201:16- 202:3)

404. He felt like there was nothing the Plaintiffs could do, "when the people you report to are the same people who are laughing and joking with them." That is why he was reluctant to come forward with specifics and reluctant to report even though this had gone on for some time. (Ex. 106, 202:15-22)

405. Officer Ellis said, "Damn the jokes" because they were laughing at them. They stopped laughing but still had smirks on their faces as they proceeded to roll call. (Ex. 106, 127:21)

406. Shortly thereafter, the Plaintiffs turned in the incident report which was written on September 3 and turned in on September 5 because they did not want the report sitting on the Major's box throughout the whole weekend and wanted him to be able to see it first thing Monday morning so they placed it in the Major's box on Sunday, September 5 after the 2:00 shift. (Ex. 106, 128:12-23)

407. He was prompted [to] write the report because of the "constant hearing" of racial jokes and comments from staff of higher ranking, the constant rumors, the individual joking, the comments, everything. (Ex. 106, 129:19-20)

-104-

408. They did not put any names into the racial grievance because they wanted the Major to be aware of the atmosphere. (Ex. 106, 130:3-7) He felt like if they named specific individuals then the report would have been taken to that the individual would have been given an opportunity to collaborate on a story. (Ex. 106, 130:12-21)

409. After they submitted the report, nothing happened and they felt like they were not taking the concerns of the African American employees seriously. (Ex. 106, 130:23-131:2) They then decided to contact the Ombudsman's Office and spoke with Mr. Moreland. (Ex. 106, 131:4-12)

410. When Plaintiff Hunter told Cathy Sheair about the racial comments and other incidents, she stated it sounded like "high school stuff". (Ex. 106, 131:19-133:11)

411. After he submitted the grievance regarding racial comments, he was not allowed to work overtime as much as he did before (Ex. 106, 89:23-91:6)

412. Prior to submitting the racial grievance, he would generally be granted overtime whenever he asked. He normally asked every Wednesday before the racial grievance. Before they submitted the racial grievance, he would get overtime 99% of the time he asked for it. After the grievance went in, he estimated that it dropped to 15% of the time. His requests for overtime were affected by the incident report regarding racial comments. (Ex. 106, 91:7-93:15)

413. The discriminatory conduct at NSP happens "every day." On a scale of 1- 10, he estimates the severity of the conduct being a "10." The atmosphere affects his ability to do his job. (Ex. 106, 118:2-120:13)

414. He feels it is an "us against them" mentality which why the African American officers feel like they need to know where each other are at all times. They feel they do not have the support of other staff. (Ex. 106, 121:3-16)

415. He has been diagnosed with Alopecia where when under stress you lose your hair. He has lost his eye lashes, part of his eye brows, facial hair because of the stress level at NSP. (Ex. 106, 185:18-188:10) He has gone through EAP counseling (employee assistance program). (Ex. 106, 189:15-191:4) His working conditions have been difficult to handle as a result of the racial environment because of "having to deal with the racial comments." (Ex. 106, 99:9-21)

416. Since he has been working for the Department of Corrections, he does not recall an African American employee ever receiving an employee of the month. (Ex. 106, 200:13-24)

417. For a long period of time, he was the only African American Employee on first shift. The reason there are not more African American employees at NSP is due to the racial environment at NSP. African American employees "just get fed up" and leave.[ ] (Ex. 106, 201:4-15)

418. If the African American officers were in trouble, he believes they would have to fend for themselves. When Officer Johnson had an occasion where she set off the emergency switch on her radio (the tag alarm button) no one responded. Problems break out in a maximum security prison and sometimes they are life and death. (Ex. 106, 206:11-23)

419. There was an incident recorded in Exhibit 25 where Zeiger accidently hit an emergency switch and everything was locked down. Lt. Stoner instructed caseworker Blankenship to write a report that Hunter was in the area at the time. (Ex. 106, 79:24-81:23) Non-African American employees were in the area, but Lt. Stoner did not request that they be written up. (Ex. 106, 110:13-22)

## Testimony of Plaintiff Johnson

420. Officer Johnson began her work at NSP on January 7, 2008. She has worked first shift from April, 2010 until the present. Over the course of the year 2010, it became common practice for non-African American staff and supervisors to make comments to the African American officers at roll call. (Ex. 109, 15:18-23)

421. On a scale of 1-10, with 10 being extremely frequent that she has experienced discriminatory conduct at NSP, she would rate NSP a 10. She describes it as being a "very racial environment." (Ex. 109, 127:19-128:5)

422. In August, 2010, she heard the comments, "There goes the hood" and "It smells like fried chicken," or "Look at her hair," when she walked into first shift roll call. There were no offensive comments made about any Caucasian group who would come into the roll call room. (Ex. 109, 21:6 -23:22)

423. She heard the comments every day until the Plaintiffs began the lawsuit. She heard the comments and heard people laugh at the comments. (Ex. 109, 24:9-15; 30:13-18) She heard the comment, "Looks like the back of the bus is here" at roll call. She knows it was directed at the African American officers because they were the only ones walking through the door. (Ex. 109, 32:16-20; 33:11-12)

424. She heard the comment, "There goes the back of the bus."(Ex. 109, 34:1-4; 43:18-44:9) It made her feel like she was in 1960 and they were sitting in the back of the bus. She felt unappreciated, disrespected. It was heart-breaking because they are supposed to be a team and not divided. (Ex. 109, 34:17-35:8)

425. She heard Defendant Miles say, "Smells like fried chicken" in August, 2010. People started laughing. All of first shift was present. (Ex. 109, 35:12-37:14-15; 38:3-6) She believes the comment was meant to be offensive to African Americans. (Ex. 109, 39:5-12)

426. The comment "The gang has arrived," came from the back of the room where Miles was. (Ex. 109, 40:13-16) She once had a conversation with Miles about her having formerly been in a gang in Mississippi. The comment was offensive to her. (Ex. 109, 42:9-43:18)

427. Stoner is usually the lieutenant at roll call on Sunday, Monday, Tuesday, Wednesday and Thursday. Runge is the lieutenant on Friday and Saturday. They are the two main ones. If they are gone, then they are relieved by Haney or Bailey. (Ex. 109, 70:12-22)

428. The lieutenants assign what sergeant is going to run the yard. (Ex. 109, 71:13) If Sergeant Furby does not like you, you get assigned to cold storage, laundry truck, or tech tug. (Ex. 109, 82:16-23) Goullette and Furby are unfair sergeants. Miles was too when he was a sergeant. (Ex. 109, 83:5-9)

429. She has been "singled out" for treatment that differs from her non-African American co-workers at NSP because when she is on the yard, her name gets called out more often than others. For example, there was an incident where there were ten coworkers on the yard but instead of them getting called for yard duties, she did. (Ex. 109, 58:19-59:6)

430. She has been told not to talk with African American inmates. However, part of her job is to have conversations with inmates. (Ex. 109, 104:13-105:6) In August, 2010, she and Ellis were in the front yard by Tower 10 talking to inmate Danny Robinson, an African American. She and Ellis were told to go to work and quit talking. A few minutes later, she saw a whole bunch of Caucasian staff by Tower 10 talking to a Caucasian inmate and they were not instructed to stop. (Ex. 109, 93:2-94:25)

431. The white corporal came up to Johnson and Ellis and advised them to "get to work." She then observed that same corporal walk past Caucasian staff members talking to a Caucasian inmate and not say anything to them. (Ex. 109, 97:9-98:1)

432. On another occasion, she was in the barber shop when a sergeant advised her she was letting "too many black inmates" into the barber shop for haircuts. She advised the sergeant that they were all on the pass list. (Ex. 109, 99:4-13) There is no regulation that limits the number of inmates in the barber shop at a given time. (Ex. 109, 99:16-18) The inmate simply needs to have their name on the list to receive a haircut. (Ex. 109, 99:18-23) Sergeant Force said she was letting too many black inmates in the barber shop that were not supposed to be there and that person working Tower 4 was concerned there were too many black inmates in the barber shop. (Ex. 109, 101:18- 102:16)

433. In August, 2010, Sergeant Furby advised her that Ellis had told him "what was going on." Sgt. Furby told her not to worry about it and that he was going to take care of it. (Ex. 109, 135:21-136:20) After he advised her of this, she found no change in the working conditions at NSP. (Ex. 109, 137:19-138:20)

434. After the racial incident report was turned in, comments were still being made at roll call regarding the hood, the gang, fried chicken. (Ex. 109, 243:11-15) She kept hearing these same comments over and over again even after Furby said he would take care of it. (Ex. 109, 243:16-244:3)

435. When they turned in their racial grievance in September, 2010, the African American employees wanted to let NSP know what was going on. They did not name specific names of employees at that time because they were hoping to get the NSP administration to talk to them so they could then tell them the entire story what needed to be fixed. (Ex. 109, 144:20-145:17) They were hoping that Major Loock would fix the problem. (Ex. 109, 145:18-19)

436. In the racial grievance, when they said "constant running of one of us on the yard" they meant constantly calling out the name of the African American employees to do duties. Furby was the one who kept calling her name when many other people were available. (Ex. 109, 152:6-16)

437. She estimates that she did not hear anything from anyone at NSP about the racial grievance for approximately three weeks. (Ex. 109, 146:19-24)

438. She believes their report was not handled confidentially because everyone at NSP was talking about it. An employee named Arndt told Hunter exactly what had been said by the staff in the meeting with the Warden and Scheer. (Ex. 109, 162:18-25)

439. After they turned the racial grievance, her and Ellis's vehicles were vandalized in the parking lot at NSP. It looked liked someone had kicked the side of her door and there was a big shoe print. She checked

her vehicle after Ellis called her and told her that somebody had damaged his vehicle. (Ex. 109, 169:14-170:13)

440. She believes it was related to the allegations in their racial complaint because her car was at NSP from 6:00 a.m. to 2:00 p.m. that day and after she left NSP she went straight home. So it had been sitting in the NSP parking lot for eight hours. This occurred in late September, 2010. (Ex. 109, 171:16-172:4)

441. She advised Ms. Sheair in the interview that the comments were made by Miles and a group of people in the back of the staff dining room. (Ex. 109, 184:2-8)

442. After they turned in their racial grievance, the harassment and being called out on the yard and being made to do different details was constant. (Ex. 109, 184:24-185:4)

443. When the Plaintiffs entered roll call, people would just stare and them and not talk to her anymore. (Ex. 109, 187:3-11)

444. When they had the meeting with Bakewell he was very angry when the meeting started and said, "I am going to just move you all to different institutions." She was very emotional during the meeting with Bakewell. [(Ex. 109, 192:24-193:6)] During the meeting, Bakewell recounted an incident where his son had written up a staff member at NSP and then his son went to his car and had had a flat tire like someone had stuck a knife in it. That is when she and Ellis began wondering about the vandalism to their cars and wondered why he brought that up. (Ex. 109, 188:11-23-195:20)

445. After the October, 2010 [meeting] with Bakewell, Officer Arndt advised Hunter that he knew where each of the Plaintiffs were going to be assigned to work. (Ex. 109, 195:21-196:6) After the interviews with Sheair, she believes that things were not kept confidential because she heard from a lot of staff members that they had put in a report alleging racial comments and racial slurs were occurring at NSP roll call. (Ex. 109, 198:2-199:4)

446. From the time they met with Bakewell in October 2010, to the time they met with Houston in November, the institution did nothing about the racial allegations. They were still getting constantly run around yard. (Ex. 109, 203:11-22)

447. After they filed the racial grievance a lot of co-workers did not talk to her anymore. When she is on the yard, she feels as though her co-workers would not come to her aid if trouble breaks out. People who used to talk with her do not talk with her any longer. (Ex. 109, 216:5-217:9)

448. She feels as though she is constantly being watched by the camera. Officer Howard advised her in late November 2010 that the lieutenants would call down and ask where Johnson is. (Ex. 109, 217:13-218:18)

449. She has received unequal treatment since the meeting with Houston in November, 2010. She continued to get run on the yard. When she was working metal detector, they were constantly calling her and telling her she was not supposed to do something. When she tells her supervisor she is following post orders, Stoner and other lieutenants get angry with her. (Ex. 109, 223:23-224:12)

450. The environment at NSP is still the same. Things happen every day. (Ex. 109, 225:9-12) Before August of 2010, she loved her job. Now it is horrible. (Ex. 109, 227:3-8)

451. She is constantly stressed out because when she goes to work, she has to think about watching her back all the time. Sometimes she doesn't even want to go to work but she has to feed her family. She is stressed out because it is like they are still living back in the 1950s. (Ex. 109, 228:19-229:5) Her blood pressure has gone up since the racial incidents began occurring. She has gained a lot of weight and has suffered stress in her marriage. (Ex. 109, 226:16-23)

452. She would describe the racial atmosphere at NSP as being very tense. She has talked with people at NSP, the more [sic] she

understands that they don't like African American people. (Ex. 109, 248:1-10)

<u>Evidence Regarding Transfers of Plaintiffs Ellis and Hunter</u>

453. On August 16, 2011, personnel investigator, Levi Bennett, recommended that Plaintiffs Hunter and Ellis be transferred to other NDCS facilities. He based his recommendation on the fact that Hunter and Ellis are in a "conflict-filled environment" at NSP. The primary incident relied upon to conclude that Hunter was in a conflict-filled environment was a verbal exchange Hunter had with a Corporal White wherein Hunter received a statement of charges for cursing. (Ex. 120, and Ex. 3 to Bennet Depo. [(filing <u>121-2</u> at 3)])

454. White and Hunter's conflict stemmed from an incident wherein Hunter understood that White was talking about his "shadow boxing" with an inmate. A first shift sergeant named Goullette claimed that he had seen Hunter "shadow boxing" with an unknown inmate on March 25, 2011. (Ex. 121, Goullette Depo. at 38:1-5; Ex. 1).

455. Goullette did not think anything about incident initially. He felt that there was no serious issue that needed to be addressed so he did not document the incident on the day that it occurred. After he spoke with Lt. Runge and/or Lt. Stoner, he decided to document the incident. (Ex. 121, 38:22-39:19; 44:6-18).

456. Goullette reported that caseworker Hunter had interacted inappropriately with "an unidentified black inmate". It appeared they were "shadow boxing". (Goullette Depo. Ex. 1).[51] Lt. Stoner and Goullette reviewed video of the yard in order to try and document the incident with videotape. Lt. Stoner pulled the video up for him to view. (Ex. 121, 81:5-16)

457. According to Caseworker Blankenship, it was common in July, 2011 for housing unit staff getting off of first shift to leave the housing unit together and to walk through the yard and leave the facility

---

[51] Exhibit 1 to Goulette's deposition is not in evidence.

together. She would often walk out with Plaintiff Hunter and other housing unit staff during that time. (Ex. 101, 15:11-21)

458. Caseworker Blankenship does not believe that Sergeant Goullette's report of Hunter shadow boxing with an inmate is credible because there were people leaving and also people coming on to second shift so there was a lot of staff at that time in the yard. (Ex. 101, 13:24-15:10)

459. Levi Bennet recommended the transfer of Ellis primarily because on the conflict Ellis was having with Lt. Stoner (Ex. 3 to Bennet Depo., Ex. 120).

460. On August 18, 2011, Director Houston approved the transfer of Ellis [and Hunter] to other NDC facilities: Ellis to the Diagnostic Center and Hunter to the Correctional Center. (Ex. 3 to Bennet Depo., p. 2). The transfer order stated that Ellis and Hunter were to retain their current shift and days off. (Ex. 3 to Bennett Depo., Ex. 120)

461. Due to their transfers, Plaintiffs Hunter and Ellis have suffered the loss of overtime pay opportunities since neither the D&E Center nor LCC have the same type of understaffing problem as NSP.[52] Therefore, Hunter and Ellis have not been afforded the same opportunity to work as much overtime as they did at NSP. This has resulted in a loss of pay for Plaintiffs Hunter and Ellis. (See Exhibits 122 [(filing 122-1)] and 123 [(filing 122-2)], Affidavits of Michael Hunter and Jaryl Ellis).

(Filing 123 at 3-93)

---

[52] The defendants object that "[t]he cited materials for Paragraph No. 461 do not establish the factual allegation that 'neither the D&E Center nor LCC have the same type of understaffing problem as NSP.'" (Filing 126 at 3) This objection is sustained.

## II. DISCUSSION

### A. Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence.  *See Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial.  *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).  The moving party bears the burden of showing there are no genuine issues of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[53]

### B. Section 1981 Liability

Section 1981 provides that all persons within the jurisdiction of the United States shall have "the same right ... to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "First enacted in 1866, the statute was amended in 1991 to define 'make and enforce contracts' to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468 (8th Cir.) (en banc)

---

[53] "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir.) (en banc), *cert. denied*, 123 S.Ct. 513 (2011).

(quoting 42 U.S.C. § 1981(b)), *cert. denied*, ___ U.S. ___, 130 S.Ct. 628, 175 L.Ed.2d 480 (2009). Because the focus of section 1981 is on contractual obligations, "'[a]ny claim brought under § 1981 . . . must initially identify an impaired "contractual relationship" under which the plaintiff has rights.'" *Id.* at 468-69 (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006)).

*Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 962-63 (8th Cir. 2011). Though not specifically referenced in the statute, § 1981 applies to employment contracts. *Artis v. Francis Howell North Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998).

A claim against a state actor under § 1981 must be asserted through § 1983. *Chism v. Curtner*, 619 F.3d 979, 983 (8th Cir. 2010) (citing *Artis*, 161 F.3d at 1181), *abrogated on other grounds by Torgerson*, 643 F.3d at 1052. However, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Consequently, the plaintiffs cannot sue to recover damages from any of the defendants in their official capacities; they can only seek declaratory and injunctive relief.[54]  *See id.* at 71, n. 10; *Rose v. Nebraska*, 748 F.2d 1258, 1262 (8th Cir. 1984).

---

[54] Although the amended complaint states that all of the defendants "are sued in their official capacities insofar as Plaintiff[s] seek[ ] prospective and permanent injunctive relief," the plaintiffs have not obtained service upon Defendants Sheair, Staley, Loock, Stoner, Miles, Haney, Runge, and Furby in their official capacities. Thus, the only official-capacity claims at issue are claims alleged against Defendants Houston and Bakewell.  To establish liability in an official-capacity suit under § 1983, a plaintiff must show either that the official named in the suit took an action pursuant to an unconstitutional governmental policy or custom, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner. *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989). The plaintiffs have failed to make the required showing for injunctive relief on their official-capacity claims.

This court has not found any Eighth Circuit Court of Appeals decision settling the question of individual liability on claims under § 1981 for courts in this Circuit. However, other courts have held that supervisory employees can be held individually liable on at least some kinds of race discrimination claims pursuant to § 1981. *See, e.g., Patterson v. County of Oneida, New York*, 375 F.3d 206, 226 (2d Cir. 2004) ("[A]lthough . . . Title VII claims are not cognizable against individuals, individuals may be held liable under §§ 1981 and 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment.") (citing cases); *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir. 1991) (an individual defendant can be held liable under § 1981 if the individual defendant was personally involved in the discriminatory conduct), *overruled on other grounds, Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1228 (10th Cir. 2000); *Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir. 1988) ("A supervisor can be held personally liable for violations of § 1981 and § 1983 only upon proof that he intentionally discriminated against the plaintiff"); *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986), aff'd on other grounds, 481 U.S. 604 (1987) ("Individuals may be held liable under § 1981 for their personal involvement in discrimination if they authorized, directed, or participated in the alleged discriminatory conduct").

*Payne v. Peter Kiewit Sons', Inc*., 2007 WL 1319535, *3 (D.Neb. 2007) (Thalken, M.J.). *See also Mutua v. Texas Roadhouse Management Corp.*, 753 F.Supp.2d 954, 967 (D.S.D. 2010) (supervisors may be liable under § 1981 if they were personally involved in the discrimination); *Jones v. Forrest City Grocery Inc.*, 2008 WL 2717738, *5 (E.D.Ark. 2008) ("If individuals are personally involved in the discrimination against a plaintiff, and if they intentionally caused an employer to infringe on a plaintiff's section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable."); *Habben v. City of Fort Dodge*, 472 F.Supp.2d 1142, 1156 (N.D.Iowa 2007) (supervisory employees may be liable under § 1981 for creation of hostile work environment and other kinds of discrimination personally carried out by them).

-116-

A supervisor incurs § 1983 liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011). The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he or she might see. *Id.* But a supervisor is only liable for his or her own misconduct and is not accountable for the misdeeds of his or her agents under a theory such as respondeat superior or supervisor liability. *Id.*

### C. Harassment

Harassment or hostile work environment claims under Title VII and § 1981 are analyzed under the same standards. *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 941 (8th Cir. 2010). "[A] plaintiff must show that he or she is a member of a protected group, that there was 'unwelcome harassment,' that there was a causal nexus between the harassment and membership in the protected group, and that the harassment affected a term, condition, or privilege of employment." *Id.* at 942 (quoting *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004)). Harassment which is severe or pervasive is "deemed to affect a term, condition, or privilege of employment." *Id.* (quoting *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir.2005)).

The standard is a demanding one, and "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice. *Id.* (quoting *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006)). Additionally, "[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment." *Id.* To sustain a claim, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Singletary*, 423 F.3d at 892). Further, the hostile work environment must

-117-

be both objectively and subjectively abusive. *Id.* (citing *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 843 (8th Cir.2002)).

The inquiry requires a consideration of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 942-43 (quoting *Arraleh*, 461 F.3d at 979). The court may also consider the "physical proximity to the harasser, and the presence or absence of other people." *Id.* at 943 (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999)). Whether conduct rises to the level of harassment is usually a factual determination for the jury. *Fuller v. Fiber Glass Systems, LP*, 618 F.3d 858, 864 (8th Cir. 2010).

In the present case, however, there is not sufficient evidence to support any plaintiff's claim of unlawful harassment as alleged against any defendant. In making this determination, I am guided by the decision of the United States Court of Appeals for the Eighth Circuit in *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076 (8th Cir. 2010), *abrogated on other grounds by Torgerson*, 643 F.3d at 1052, in which one of two African-American women employed as transportation aides for a hospital emergency room claimed to have been subjected to a hostile work environment based on a dozen instances of alleged racial discrimination:

> 1. Soon after she began working at Fairview, a nurse asked Smith if she was Puerto Rican because she spoke Spanish. Smith responded, "No, I'm black, look at me I'm black."

> 2. In April or May 2005, Smith brought fried chicken to a Fairview potluck. Smith overheard a nurse inquire as to who had brought the chicken and then receive the response, "Who else?" Smith then responded, "What? Only black people eat chicken?" Smith reported the incident to Pousard (her immediate supervisor); however, no corrective action was taken.

3. In May 2005, a picture of "Buckwheat," a character from the Little Rascals motion picture series who is an African-American child with braided hair, was posted on a door in the ER, along with other employees' childhood photographs. The caption above the picture read, "Guess who this is?" Smith inferred that the Buckwheat picture was placed on the door to represent her because she had recently braided her hair and was the only African-American employee whose childhood picture was not already on the bulletin board. Smith reported the incident to Pousard; however, no corrective action was taken.

4. In the summer of 2005, a nurse, who was not Smith's supervisor, grabbed a patient chart from Smith's hands and said, "[T]hese black aides don't know what they are doing." Smith reported the incident to Pousard; however, no corrective action was taken.

5. In September or October 2005, Smith brought a meal for lunch and upon entering the break room with the food, a coworker complained about a fish odor. The coworker was informed that Smith's meal contained fish, to which the coworker responded, "I smelled food that smelled better than that crap in my garbage." Smith then informed the coworker that it was an African dish.

6. In October 2005, Smith observed two coworkers using a work computer to view an article on the website, *The Onion*. The article discussed Hurricane Katrina and contained an image of a helicopter hovering over houses that were flooded by the hurricane. On the front porch of one of the houses, three people, appearing to be African-American, were pictured. The caption under the picture stated, "FEMA representatives call out to survivors, 'Show us your tits for emergency rations!'" Smith reported the incident to Pousard; however, no corrective action was taken.

7. In December 2005, Smith observed two coworkers using a work computer to view the website, www. getoffended. com. Smith claimed that one of her coworker's body language and facial expressions had invited her to look at what they were viewing. When she went to the screen, Smith observed two phrases written on t-shirts which stated: (1) "Guns don't kill people, only angry minorities kill people," and (2) "How

do you stop five niggers from raping a white girl? You throw them a basketball." That evening, Smith went home and viewed the website again, printing out several pages of its contents. Smith reported the incident to Sally Haack, Fairview's Human Resources Representative, who reminded the coworkers that personal internet use at work was inappropriate.

8. Once she returned to work in April 2006, Smith overheard a nurse say, "If she's unhappy here, why does she come back?" Another nurse responded, "Just like a dog, you beat them and abuse them, they still come back. Just like any good runaway slave would." Smith reported the incident to Pousard; however, no corrective action was taken.

9. When Smith and an ER technician were discussing skin care, Smith suggested to the technician that she could use a certain facial cleanser to help with acne, and the technician replied, "People can't see yours because you're black."

10. At one point, a coworker referred to Smith as "gal." The coworker told Smith that she called everyone "gal." Smith informed the coworker that the word reflected racial animosity.

11. After overhearing Smith and a hospital volunteer from Somalia discussing ethnic foods and employment positions at Fairview, Smith's coworker told the volunteer that what she and Smith were discussing was inappropriate. Smith reported the incident to Pousard; however, no corrective action was taken.

12. Teyona Brown, an African-American coworker, testified that she overheard two white employees referring to Smith and stating, "She needs to go back to the ghetto where she came from."

*Id.* at 1080-82 (footnotes and citations to record omitted). The district court granted the hospital's motion for summary judgment after finding that the alleged harassment was not sufficiently severe or perversive as to affect a term, condition, or privilege of Smith's employment. The Court of Appeals affirmed, explaining:

Several of the allegations made by Smith—the comments regarding Smith's lunch, acne, and ability to speak Spanish; the coworker's comment about Smith's conversation with the Somali volunteer; and the image on *The Onion*—at most only tenuously relate to race. In fact, Smith "offers little more than speculation and conjecture" that these incidents "had anything to do with race." *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 519 (8th Cir. 2010) (quotation omitted). Because no "reasonable person would find [these events] hostile or abusive," *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275, we hold that those allegations do not corroborate Smith's claim that she suffered from a hostile work environment even as they are considered in the totality of the circumstances of Smith's work environment.

. . .

The picture of Buckwheat, the comment about fried chicken, and the reference to the ghetto, although not all shown or recited directly to Smith, carry some inferences that they were racially motivated, especially considering the context of the events. *See, e.g., Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (stating that references to "ghetto children" were "perhaps racially inappropriate"); *Simmons v. Océ-USA, Inc.*, 174 F.3d 913, 915 (8th Cir. 1999) ("The term 'Buckwheat' is a racial slur when it is directed towards a black employee in the context of an employment relationship."). Furthermore, the evidence clearly indicates that Smith experienced unwelcome racial harassment when exposed to several comments that were explicitly racial in nature. Specifically, the material on the website getoffended.com, the comment regarding "black aides," and the references about runaway slaves unambiguously permit an inference of racial animus. *See, e.g., Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1035 (8th Cir. 2006) (noting that "in certain contexts, the term 'slave driver' could be considered evidence of racial animus"); *Galdamez v. Potter*, 415 F.3d 1015, 1024 n. 6 (9th Cir. 2005) (noting that "there are no 'talismanic expressions' of racial animus necessary to sustain a harassment claim," and noting that "racially charged 'code words' may provide evidence of discriminatory intent by 'send[ing] a clear message and carry[ing] the distinct tone of racial motivations and implications.'" (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir.

-121-

2004)*)); *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 579 (8th Cir.1999) (inference of racial animus permissible after a "racially-tinged comment" that referred to someone in terms of "your kind"). Notwithstanding the inappropriate nature of these events, when viewing the totality of circumstances, including (1) "the frequency and severity of the discriminatory conduct," (2) "whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance," and (3) "whether the conduct unreasonably interfered with the employee's work performance," *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 551 (8th Cir. 2007), we agree with Fairview's assertion that the evidence does not "satisfy the high threshold of actionable harm" necessary to constitute a hostile work environment, *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (quotation omitted).

First, the incidents were relatively infrequent, occurring over the span of Smith's 12 months of active employment in the ER. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759-60 (8th Cir. 2004) (finding that racial remarks that were "sporadic, no more than one per month," over a period of two years, some of which were "merely overheard by [the employee]" were not "so severe or pervasive [to] alter[ ] the terms or conditions of his employment"); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir. 1981) ("More than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions."). *But see Delph v. Dr. Pepper Bottling Co. of Paragould, Inc.*, 130 F.3d 349, 352, 354 (8th Cir. 1997) (upholding hostile work environment claim where the plaintiff had been subjected to "a steady barrage of racial name-calling at the [defendant's] facility"); *Ways v. City of Lincoln*, 871 F.2d 750, 754-55 (8th Cir.1989) (upholding a finding of a hostile work environment where the plaintiff had identified approximately 50 examples of racial harassment).

Next, although we look to the frequency of harassment, it is but one factor of our analysis and even infrequent conduct can be actionable if severe enough. *See Bowen*, 311 F.3d at 884-85. The severity of the conduct here does not rise to the requisite level needed to establish a

hostile work environment. Most of the events involved conduct that was not particularly severe, involved coworkers as opposed to Smith's direct supervisors, and could only be considered non-actionable, "mere offensive utterance[s]." *Singletary*, 423 F.3d at 893; *see Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006) ("To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant."); *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir.1999) (noting that we also consider the "physical proximity to the harasser, and the presence or absence of other people"). In fact, the record is void of "any of the physically threatening or intimidating behavior that we have found important in some actionable cases." *Anderson*, 606 F.3d at 520 (citing *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 909-10 (8th Cir. 2003) (finding hostile work environment when a death threat was involved)); *Bowen*, 311 F.3d at 885 ("Lee's serious misconduct and Bowe's subjective fear of bodily harm adequately demonstrate, for summary judgment purposes, that Lee's conduct was both objectively and subjectively hostile or abusive.").

In sum, the totality of the evidence, taken in the light most favorable to Smith, does not support Smith's contention that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter" her conditions of employment, and thus, Smith has not successfully established a hostile environment claim. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367. We conclude that, although many of the coworkers' "racially tinged" comments and actions were "ill-chosen," and "however ill-advised [their] attempts at racial humor, [the] conduct did not give rise to an actionable claim of racial hostility." *Canady*, 440 F.3d at 1035.

*Id.* at 1083-87.

The present case is complicated by the fact there are five plaintiffs and ten defendants. However, analyzing the harassment claims individually—as if there were but a single plaintiff and a single defendant[55]—it is clear that all of the claims fail for

---

[55] "Section 1983 does not sanction tort by association." *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 806 (8th Cir. 2010).

lack of evidence.  While the plaintiffs may perceive the Nebraska State Penitentiary scores  "9" or "10" on the hostile work environment scale, most of the incidents they complain about are joking comments made prior to roll call, only a few of which are alleged to have been made by Defendants Miles and Runge (over an unspecified period of time).  The plaintiffs were not threatened by any of the defendants, and when they allegedly received a threat from an unidentified co-worker their concerns were immediately addressed by Defendants Sheair, Bakewell, and Houston.  Decisions cited by the plaintiffs in support of their claims are not comparable.[56]

### 1. Plaintiff Ellis

Ellis heard the "back of the bus" comment once.  He does not know who said it, but he remembers Defendants Stoner, Runge, and Miles being present at the time. (Defendants' statement of material facts ("D") ¶¶ 100, 100a) Ellis testified he believes the comment was directed at the African American officers because it occurred when they walked into roll call. (Plaintiffs' statement of material facts ("P") ¶ 362)  Ellis also heard the "fried chicken" comment once, but does not know who said it or if any

---

[56] *See Reedy* (sufficient evidence of hostile work environment based on five incidents occurring over 7-month period, including (1) a co-worker calling plaintiff a "fucking nigger" to his face; (2) plaintiff observing two co-workers approach a black man, call him a "punk ass nigger," and tell him they were going to "whip his punk ass"; (3) plaintiff witnessing a co-worker accusing a black co-worker of stealing his car radio, exclaiming "all you niggers steal," and then throwing a metal blade at the black employee; (4) plaintiff observing racial graffiti written in a men's restroom including the word "coon" written below plaintiff's name and a drawing of an ape accompanied by the phrase "all niggers must die"; and (5) plaintiff seeing his name written below the phrase "kill all niggers" on the restroom handrail); *Green v. Franklin Nat. Bank of Minneapolis*, 459 F. 3d 903 (8th Cir. 2006) (finding 8 racially offensive incidents over a 3-month period sufficiently severe and pervasive to preclude summary judgment where the incidents involved a co-worker calling plaintiff a "monkey," "black monkey," and "chimpanzee," and threatening plaintiff); and *Ways* (approximately fifty examples of frequent racial slurs, comments, jokes, and cartoons during plaintiff's 17 years of  employment).

of the defendants were present. (D ¶ 105)  Ellis heard the "gang has arrived" comment once while walking into roll call, and he recalls Defendants Stoner and Runge laughing; he also thinks Defendant Haney was present.[57]  Ellis heard the comment another time at turnkey.  He does not know who made the comment either time.  (D ¶ 110)  Ellis testified the comment once prompted him to say, "Damn the jokes," and that Miles, Runge, and Stoner just looked at him and grinned before starting roll call. (P ¶¶ 367, 369)  Ellis also heard the "hood has arrived" comment once at roll call, and two or three times outside of roll call. He thinks Defendants Runge, Stoner, and Haney may have been present.  (D ¶ 115)  Ellis never heard the "white teeth" comment.  (D ¶ 120)  Ellis was told not to fraternize with African American inmates on one occasion. (D ¶ 144) Ellis testified that at roll call people would point at the plaintiffs and whisper on a daily basis.  (P ¶ 369)

On August 7, 2010, Ellis was in the NSP lieutenant's office being issued a supervisor's counseling log when he complained to Defendants Furby and Runge about "racial tension" and "things being said at roll call." (D ¶¶ 29, 30) He gave them the names of NSP employees he believed had engaged in workplace harassment; none of the defendants were mentioned. (D ¶¶ 31, 32) Ellis declined to put his complaint in writing and he requested Furby and Runge not to report the alleged harassment.  (D ¶¶ 34-36)  Furby and Runge were both later disciplined for honoring Ellis's request.[58] (D ¶¶ 37-39)  Ellis testified that when he checked back with Furby two weeks after making the oral report, Furby said he had only spoken with a Corporal Stanek, and that Ellis should stay away from him because he was a racist. (P ¶ 373)

---

[57] The "gang has arrived" comment is not overtly racist, and appears to have been made because the plaintiffs (excluding Delaney) habitually arrived together for roll call at the last minute.

[58] Ellis complains that Furby and Runge failed to follow the administrative regulations for reporting workplace harassment, but this does not establish a § 1981 or constitutional violation.

On September 3, 2010, Ellis wrote an anonymous "incident report" with input from Plaintiffs Hunter, Johnson, and Zeiger, which discussed the perceived "racial tension" at NSP but did not specifically accuse any of the defendants of workplace harassment. (D ¶¶ 41, 42)  On September 7, 2010, Defendant Bakewell received a telephone call from Jerall Moreland of the State Ombudsman's Office and they arranged to meet on September 9. (D ¶¶ 44, 45) Moreland brought a copy of the incident report to the meeting. (D ¶ 46) Although Moreland had been told that the report was previously delivered to Defendant Loock, the Lieutenant had been on vacation from September 2 to 7 and did not receive his copy of the report until September 10, 2010, when Captain Brittenham retrieved it from a locked incident report box along with other paperwork.  (D ¶¶ 47-50)[59]

On September 23, 2010, Defendant Sheair was assigned to investigate the allegations contained in the incident report. (D ¶ 52) When she met with Ellis on October 4, 2010, he reported that Defendant Miles said "it smells like fried chicken in here" on one occasion at roll call and would also say things like "here comes the soul train" and "the bus was late."[60] (D ¶ 54)  On October 20, 2010, Defendant Runge told Sheair that he heard the comment "the bus must have showed" on one occasion when Ellis, Hunter, Johnson, and Zeiger arrived at roll call, but stated he did not know who made the comment. (D ¶ 58)

On October 20, 2010, at about 3:30 p.m., Ellis called Defendant Sheair and told her he had been threatened by another NSP employee and feared for his life while at

---

[59] The undisputed evidence establishes there was no "coverup."  Although the plaintiffs were not satisfied with the response, their incident report was thoroughly investigated.

[60] As indicated above, Ellis testified he did not know who made the comments at roll call.

work; he refused to tell Sheair who threatened him.[61] (D ¶ 60) Sheair reported this call, as well as similar calls from Plaintiffs Hunter and Zeiger, to Defendant Bakewell, who directed Sheair to instruct the three officers come to his office the next morning. (D ¶¶ 61-64) Defendant Houston instructed Bakewell to contact the Nebraska State Patrol to investigate the allege threats and to temporarily assign the three officers to other DCS institutions in Lincoln; Bakewell made the necessary arrangements. (D ¶¶ 69, 71, 72) However, when they met with Bakewell the next day, Ellis and the others stated they felt safe at NSP and did not want to be transferred; Houston approved their request to continue working at NSP. (D ¶¶ 75-79)

On November 10, 2010, Ellis and Plaintiffs Hunter, Johnson, and Zeiger met with Defendants Houston, Bakewell, and Sheair, and Ombudsman Moreland, in the emergency command and training conference room located at the DCS Central Office. (D ¶ 81) There were eight framed photographs hanging in this conference room, one of which was a photograph of two inmates working in the Work Ethic Camp garden, which Ellis and the other the plaintiffs allegedly found offensive.[62] (D ¶ 82)

### 2. Plaintiff Hunter

Hunter heard the "back of the bus" comment twice in roll call and at least once while walking into roll call, but he does not know who made these comments. He remembers Defendants Stoner and Runge being present once, but does not know if they heard the comment. (D ¶ 101) Later in his deposition, though, Hunter testified that the comment was made by Runge, Stoner, or Miles while they were walking down the hallway. (P ¶ 402) Hunter heard the "fried chicken" comment twice, but does not know if anyone else heard it. (D ¶ 106) Hunter claims to have heard the "gang has arrived" comment at roll call seven or eight times and over twenty times

---

[61] There is no evidence that any of the defendants were involved in making the alleged threat.

[62] The photograph is innocuous.

throughout the institution since he has been assigned to NSP.  He does not know who made these comments and does not recall any of the defendants doing so. (D ¶ 111) Hunter heard the "hood has arrived" comment three times, but does not know who said it on any occasion. (D ¶ 116)  He never heard the "white teeth" comment. (D ¶ 121) Hunter estimated that out of the 90 or so people at roll call, 70-75% of them would laugh at or join in the alleged racially charged comments.  (P ¶ 403)

Hunter remembers an incident when he received a racially insensitive phone call while serving inmates watermelon as part of lunch service in the Housing Unit in summer of 2010, but he does not know who made the phone call. (D ¶ 134) He is aware of at least one racially insensitive comment made by Defendant Furby which was not directed at any of the plaintiffs. (D ¶ 135) Hunter also remembers one incident when someone said "Looks like the back of the bus is here" or "the gang has arrived" as he was walking in the hallway and Defendants Stoner and Runge were coming the other way. (D ¶ 136) Hunter is aware of other nonspecific joking-type comments and remembers being told not to fraternize with African American inmates by at least two different NSP employees at least one time. (D ¶¶ 137, 145)

Hunter testified that Defendant Furby spoke to him following Plaintiff Ellis's oral complaint of harassment in August 2010, and Hunter confirmed racial comments were being made. (P ¶ 375) Defendant Runge testified that Hunter had told him in May or June 2010 that an NSP officer named Stanek had been affiliated with a white supremacist group and was "talking crazy." (P ¶ 221)  On October 7, 2010, when Hunter met with Defendant Sheair as part of her investigation into the allegations of the incident report, he said he had heard comments like "there's the hood" and "there's the homeboys" and a comment about the way Plaintiff Johnson wears her hair. Hunter did not report who made these comments, but did state that Defendant Miles had said "the bus was late." (D ¶ 56) According to Hunter, Sheair told him these comments sounded like "high school stuff." (P ¶ 410)  Hunter called Defendant Sheair on October 20, 2010, at approximately 3:50 p.m., to report that he had been threatened

-128-

and was in fear for his life. Hunter said he was unaware of who actually made the threat, but that he had heard about the threat through the grapevine. (D ¶ 61)

### 3. *Plaintiff Johnson*

Johnson heard the "back of the bus" comment once, but does not know who said it or whether any of the defendants were present. (D ¶ 102)  Johnson remembers hearing the "fried chicken" comment once, before any of the lieutenants had arrived for roll call.  She states that the comment was not directed at her or anyone else.  (D ¶¶ 107, 107a)  Johnson heard the "gang has arrived" comment once, but does not know who said it. (D ¶ 112)  Similarly, she heard the "hood has arrived" comment once, but does not know who said it. (D ¶ 117)  She never heard the "white teeth" comment. (D ¶ 122)

On October 7, 2010, Johnson met with Defendant Sheair as part of her investigation and reported that she heard staff say "here comes the hood," "smells like fried chicken," and "there goes the posse." Johnson reported that Defendant Miles made the comments "smells like fried chicken" and "here comes the hood." Johnson also reported that Miles had made comments about the way she wore her hair, like "this ain't no hair show" or "this isn't the hood." (D ¶ 57)

### 4. *Plaintiff Zeiger*

Zeiger heard Defendant Runge make the "back of the bus" comment twice.  On both occasions he was walking in the hallway toward staff dining, either in front of or behind Runge. (D ¶ 103)  Zeiger heard Defendant Miles make the "fried chicken" comment once.  He remembers Defendant Stoner being present, and assumes Stoner could hear the comment. (D ¶¶ 108, 108a)  Zeiger also heard Miles make the "gang has arrived" comment once at roll call and once in the hallway. (D ¶¶ 113, 113a)  Zeiger heard Defendant Runge say "hood has arrived" at least twice while walking into first shift roll call, and also heard Miles make this comment at some unknown

time. (D ¶¶ 118, 118a)  Zeiger heard the "white teeth" comment at least once at roll call, and at least twice overall throughout the institution.  He heard Miles make the comment once, at some unknown time. (D ¶¶ 123, 123a)  Zeiger testified he also heard Miles say "I am sure you guys are happy" because watermelon was being served that day. (P ¶ 303, 304) Zeiger generally testified there were other racially oriented comments were made on a regular basis in his presence, but he does not remember any other comments made at roll call. (P ¶ 310, D ¶ 139) Zeiger testified he remembers being told not to fraternize with African American inmates on one occasion. (D ¶ 146)

Zeiger met with Defendant Sheair as part of her investigation on October 6, 2010, and reported that Defendant Miles said "it smells like fried chicken" when he and Plaintiffs Ellis, Hunter, and Johnson walked into roll call.  He also reported that Defendant Runge said "the bus has arrived." (D ¶ 55) On October 20, 2010, at approximately 4:20 p.m., Zeiger called Defendant Sheair to report that he had been threatened and feared for his life, but he refused to say who had threatened him. (D ¶ 62)

### 5. *Plaintiff Delaney*

Delaney heard Defendant Miles make the "back of the bus" comment twice in two and a half months.  Defendants Stoner and Furby were present, but Delaney does not remember observing any reaction from them on either occasion. (D ¶¶ 104, 104a) Delaney also heard Miles make the "fried chicken" comment once and the "hood has arrived" comment once. (D ¶¶ 109, 109a, 119, 119a)  He heard the "gang has arrived" comment once and the "white teeth" comment at least four times. (D ¶¶ 114, 124) Between June and September of 2010, Delaney overheard comments that he perceived to be racially insensitive directed towards Plaintiffs Ellis, Hunter, Johnson, and Zeiger at least 15 times; none of these were directed at Delaney, nor were they made by any of the defendants. (D ¶ 129) Delaney was not in the habit of walking into roll call with the other plaintiffs, but would usually arrive five minutes earlier (D ¶ 128) Delaney observed Defendants Stoner, Runge and Furby being present for these comments and

chuckling at least a couple of times. (D ¶ 130) Delaney was told not to fraternize with African American inmates by three different NSP employees, including Defendant Furby. (D ¶ 148) Delaney testified he observed the drug sniffing dog brought in much closer to the African American employees than to the white officers. (P ¶ 338) Delaney also testified that in about his second month at NSP, he heard Furby use the "N-word" while telling a story. (P ¶ 346)  Delaney recalls hearing Defendant Stoner refer to Plaintiff Zeiger as Corporal Zigger on one occasion. (D ¶ 140)

### D. Disparate Treatment

The elements of claims alleging disparate treatment on the basis of race under Title VII and intentional employment discrimination on the basis of race under § 1981 are identical. *Bennett*, 656 F.3d at 818. To create an inference of racial discrimination based on disparate treatment of fellow employees, the plaintiffs must show that they were treated differently than similarly situated persons who are not members of the protected class. *Id.* at 819.  "The test to determine whether individuals are similarly situated is rigorous and requires that the other employees be similarly situated in all relevant respects before the plaintiff can introduce evidence comparing herself to the other employees." *Id.* (quoting *Chism v. Curtner*, 619 F.3d 979, 984 (8th Cir. 2010)). In a case involving allegations of discriminatory disciplinary practices, for example, the Eighth Circuit explained that "[t]o be similarly situated, the comparable employees must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Id.* (quoting *Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004)).

### 1. Plaintiff Ellis

Ellis testified that "[w]hen he would be the only African American on the yard, there were would 14-15 Caucasians employees working the yard and the sergeant running the yard would come running to him and advise him he needed to a particular task rather than the one of the 14 or 15 Caucasians on the yard" (P ¶ 379), that "[t]here

would be times when he would be on a travel order where he would take an inmate to an outside hospital and when he would come back, . . .[t]he yard sergeant would ask where Ellis was so that he could do an additional detail rather than the Caucasian employee who accompanied Ellis on the escort" (P ¶ 380), and that he "would often be stuck doing less desirable tasks all day." (P ¶ 382) Even accepting this evidence as true, it does not show that any defendant was involved in or had knowledge of the alleged discriminatory treatment. Ellis believes he was assigned to a housing unit because Defendant Haney "does not like him" (P ¶ 396), but has not shown that the assignment was racially motivated.

### 2. Plaintiff Hunter

Hunter recalled one incident when Defendant Stoner told Ms. Blankenship to report that during a lock-down Hunter was in a housing unit that he was not assigned to work in, but other unidentified non-African American employees who were also in the unit were not mentioned in the report. (P ¶ 417) He also expressed a belief that African American officer would "have to fend for themselves" if they were in trouble because no one responded when Defendant Johnson once hit the emergency switch on her radio. (P ¶ 418) He also noted that, to his knowledge, no African American had been named employee of the month at NSP. (P ¶ 416) There is not sufficient evidence that Plaintiff Hunter has been discriminated against because of his race.

### 3. Plaintiff Johnson

Johnson related two instances of disparate treatment that did not involve any of the defendants. Once an unidentified corporal told her and Plaintiff Ellis to "get to work" while they were talking to an African American inmate, but ignored white employees who were talking to a white inmate. (P ¶¶ 430, 431) Another time a Sergeant Force told her she letting "too many black inmates" into the barber shop. (P ¶ 432) This evidence is immaterial to the claims made in this case.

Johnson also expressed an opinion that Defendants Furby and Miles were "unfair," and claimed that Furby would assign her duties when other persons were available. (P ¶¶ 428, 436). She identified one instance when she was called for yard duties instead of 10 other staff members who were available. (P ¶ 429) This evidence does not satisfy the rigorous standard for establishing that Furby treated Johnson differently from other employees by because of her race.

### 4. Plaintiff Zeiger

Zeiger claims, without providing any specific information, that he and some of the other plaintiffs have been assigned to undesirable jobs in the yard more often than non-African Americans. (P ¶ 313) He also claims to have been discriminated against by being assigned to off shift posts. (P ¶ 315) He has only implicated one defendant, Lt. Haney, who allegedly "singled him out for racially motivated reasons by assigning him to the farthest tower." (P ¶ 315) Zeiger's subjective belief that this assignment was racially motivated is not sufficient to create a genuine issue of material fact.

### 5. Plaintiff Delaney

Delaney testified that white officers hang out together in the yard, but he and Defendant Ellis have been told to "break up." He did not indicate who said this. (P ¶ 341) A yard sergeant reportedly told him he was "just lazy" when he complained about work assignments. Delaney did not identify the speaker, but there is evidence that Defendants Miles and Furby were the yard sergeants during this time. (P ¶ 342) He claimed "Miles gave him crap details more often than white officers," but did not provide evidence that the white officers were similarly situated to him in all relevant respects. (P ¶ 342) Delaney only provided one example when Miles "gave him a tug" while "chatting with three Caucasian officers who were available to do the tug." He theorized that Miles did this "because reports had been written about him regarding the racial comments." (P ¶ 343) Delaney also generally charged that he was treated

-133-

differently by Defendant Furby because of his race.  (P ¶ 344) Delaney's opinion that Miles and Furby treated him unfairly is inadequate proof of racial discrimination.

### E. Retaliation

The Eighth Circuit applies same analysis to retaliation claims under Title VII and § 1981.  *Takele v. Mayo Clinic*, 576 F.3d 834, 838 (8th Cir. 2009).  "When no direct evidence of discriminatory retaliation is asserted, as is the case at hand, the *McDonnell Douglas* analysis applies." *Gibson v. American Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012) (quoting *Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 936 (8th Cir. 2006)).  "First, the plaintiff must put forth a prima facie case of retaliation." *Id.*  To establish a prima facie case of retaliation, "an employee must show that he engaged in protected activity; he suffered a materially adverse action that would deter a reasonable employee from making a charge of employment discrimination; and there is a causal connection between the protected activity and the adverse action." *Id.* (quoting *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801-02 (8th Cir. 2011)).  "[I]f the plaintiff puts forth a prima facie case, the employer may rebut the resulting presumption of discrimination by articulating a legitimate, non-retaliatory reason for the adverse employment action. Finally, if the employer proffers a race-neutral rationale, the plaintiff may attempt to refute the asserted reason as mere pretext." *Id.* at 857(quoting *Twymon*, 462 F.3d at 936).

The "materially adverse action" standard, as established by the Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), "is objective, requiring [the court] to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions." *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007) (quoting *Carrington v. City of Des Moines*, 481 F.3d, 1046, 1050 (8th Cir. 2007)). The court must "separate significant from trivial harms" in order to determine whether the plaintiffs have satisfied this prong. *Id.* (quoting *Burlington Northern*, 548 U. S. at 68).

The Eighth Circuit's "post- *Burlington Northern* decisions have consistently held that, to be materially adverse, retaliation cannot be trivial; it must produce some 'injury or harm.'" *Littleton v. Pilot Travel Centers, LLC*, 568 F.3d 641, 644 (8th Cir. 2009) (quoting *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 917 (8th Cir. 2007)). "Thus, [the Court of Appeals] ha[s] concluded that commencing performance evaluations, or sending a critical letter that threatened 'appropriate disciplinary action,' or falsely reporting poor performance, or 'lack of mentoring and supervision' were actions that did not establish a prima facie case of retaliation, absent showings of materially adverse consequences to the employee." *Id.* (citing *Weger*, 500 F.3d at 727; *Gilbert*, 495 F.3d at 917; *Devin v. Schwa's Home Serv., Inc.*, 491 F.3d 778, 786 (8th Cir. 2007); *Higgins v. Gonzales*, 481 F.3d 578, 590 (8th Cir. 2007)).

### 1. Plaintiff Ellis

Ellis testified that "the work environment became more hostile for him" after the September 2010 incident report was turned in.  (P ¶ 385, 392) Defendant Stoner had Ellis written up, but not disciplined, for abandoning his post when Ellis went to the bathroom on one occasion. (P ¶¶ 385, 386) On September 16, 2010, Ellis was accused of laughing after an inmate insulted a coworker, and Stoner immediately called him into the office to question him about the incident. (P ¶ 393) Ellis also claims that Stoner called him once at home to check up on him when he called in sick. (P ¶ 394) As a matter of law, none of these actions allegedly taken by Defendant Ellis were "materially adverse."

On August 16, 2011, personnel investigator, Levi Bennett, recommended that Plaintiffs Hunter and Ellis be transferred to other NDCS facilities.  (P ¶ 453)  Bennet recommended the transfer of Ellis primarily because on the perceived conflict Ellis was having with Stoner. (P ¶ 459) Bennet stated in his report that transferring other persons involved "did not seem feasible given the extent of the conflicts reported by Mr. Ellis and Mr. Hunter and an inability to identify all employees who might be perceived by Mr. Ellis and Mr. Hunter to be involved."  (Filing 121-2 at 3) Bennet

also stated: "However, the safety and security concerns  raised by their comments must be addressed.  The Nebraska State Penitentiary is a maximum security facility in which staff must be able to work with and trust each other. Mr. Ellis and Mr. Hunter have reported that trust no longer exists. This adversely affects their safety and security as well as that of other staff, inmates and the public visiting the institution. It also can adversely affect the institution's security." (Filing 121-2 at 4)  Defendant Houston approved the recommended transfers. (P ¶ 460)  The transfer order stated that Ellis and Hunter were to retain their current shift and days off, but both claim they are working less overtime.  (P ¶¶ 460, 461)  Even if Ellis's transfer to the Diagnostic Center could be considered a materially adverse action which was causally connected to his complaints of racial discrimination, the evidence indicates that the transfer was made for safety and security reasons.  This is a legitimate, non-discriminatory reason for the transfer, and Ellis has not demonstrated pretext.

### 2. Plaintiff Hunter

Hunter indicated that he was not allowed to work as much overtime after submitting the September 2010 incident report.  (P ¶¶ 411, 412)  He has not identified any defendant as being responsible for this alleged adverse action.

Hunter was transferred to the Correctional Center on the recommendation of Levi Bennett.  The primary incident relied upon to conclude that Hunter was in a conflict-filled environment was a verbal exchange Hunter had with a Corporal White wherein Hunter received a statement of charges for cursing. (P ¶ 453) Hunter does not deny that the cursing incident occurred, but he seeks to defend his action by showing that he swore at Corporal White for talking about him shadow boxing" with an inmate, which Hunter denies doing.  (P ¶¶ 454-458) This does not constitute a showing that the reason given for his transfer was pretextual.

### 3. *Plaintiff Johnson*

Johnson testified that her vehicle and Plaintiff Ellis's vehicle were vandalized after they turned in the September 2010 incident report.  (P ¶¶ 439, 440) She also indicated that during a meeting with Defendant Bakewell in October 2010 regarding the alleged death threats, he related an incident when his son's vehicle had been vandalized after writing up a staff member. (P ¶ 444) Johnson further stated that "the harassment and being called out on the yard and being made to do different details was constant" after the September 2010 incident report, and that a lot of co-workers would no longer talk to her.  (P ¶¶ 442, 4443, 446, 447, 449) Johnson felt like she was being watched constantly. (P ¶ 448) Johnson's evidence is not sufficient to establish that any defendant took a materially adverse action against her in retaliation for her complaints of racial discrimination.

### 4. *Plaintiff Zeiger*

Zeiger provided no evidence of retaliatory treatment.

### 5. *Plaintiff Delaney*

Delaney testified that he was given a warning, but not disciplined, for showing up late for roll call sometime after the joined the lawsuit.  Delaney thinks Defendant Stoner "wrote him up" and that the warning was not justified because he had worked late the previous day on an extended travel order.  (P ¶¶ 339, 340, 347) Delaney also thinks that Defendant Furby has given him more "crappy details" because he joined the lawsuit and he stated that the other defendants do not even look at him. (P ¶ 348) He indicated that other employees do not speak to him and do not want to be seen with him; he thinks Defendants Stoner and Runge "start coming down on them" if they have any interaction with him.  (P ¶¶ 352, 353) Delaney's evidence, like Johnson's, is insufficient to establish a prima facie case of retaliation.

### III.  CONCLUSION

No plaintiff has presented sufficient evidence to establish a claim against any defendant for racial harassment or creating a race-based hostile work environment, for disparate treatment based on race, or for unlawful retaliation following the plaintiffs' claims of racial discrimination.

Accordingly,

IT IS ORDERED:

1. Defendants' motion to strike exhibits (filing 128) is denied.

2.  Defendants' motions for summary judgment (filings 98 and 109) are granted and the plaintiffs' action is dismissed with prejudice.

3. Final judgment shall be entered by separate document.

April 26, 2012.                    BY THE COURT:

                                   *Richard G. Kopf*
                                   Senior United States District Judge

_____

        * This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.